**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>BMI OLDCO INC., *et al*.,<br><br><br><br>Debtors. | Civil Action No. 4:25-cv-02193<br><br>Bankruptcy Case No. 23-90794 (MI) |

**FUTURE CLAIMANTS' REPRESENTATIVE'S RESPONSE TO BANKRUPTCY**
**COURT'S MAY 14, 2025 REPORT AND RECOMMENDATION**

Sander L. Esserman as the legal representative for persons that will assert talc-related personal injury demands (as defined in section 524(g)(5) of title 11 of the United States Code (the "**Bankruptcy Code**")) against the Debtors (as defined below) after the effective date of a confirmed plan under sections 105(a) and 524(g) of the Bankruptcy Code but who have not presently done so (the "**Future Claimants' Representative**" or "**FCR**") hereby submits this response to the Report and Recommendation (as defined below) [Docket No. 1] of the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**").

**INTRODUCTION[1]**

The FCR proposes an alternative path to the course of action recommended by the Bankruptcy Court to advance the Chapter 11 Cases below. The presence of asbestos in Debtor BMI's talc and the liability of BMI, and its non-Debtor affiliates MTI and SMI, for injuries or

---

[1]    Capitalized terms used in this Introduction that are not already defined have the meaning ascribed to them below.

wrongful death resulting from the presence of that asbestos are critical questions in the Chapter 11 Cases. But ultimately, they are questions to be decided in a jury trial addressing causation and damages. The FCR submits that future claimants and the parties in the Chapter 11 Cases would benefit from allowing a small number of those trials to proceed to resolution. The results of those trials, some of which appear to be at or near readiness, would inform the issues of whether plaintiffs can prove the underlying asbestos presence and injury causation question posed by the Bankruptcy Court, —what the claims are worth and who else besides BMI is liable.

The omnibus evidentiary proceeding proposed by the Bankruptcy Court could address the causation question for present claimants. But it would do so at great cost. It would require hundreds, if not thousands, of claimants to come forward and litigate what would likely be the most substantial and costly portion of a massive number of cases. It could result in the "hundreds of separate trials [that] will drain available resources from the estate such that actual victims would receive less recovery," that the Bankruptcy Court says (and the FCR agrees) should be avoided, if possible.[2] Yet with all that cost, it would not provide answers on the other issues that the parties are likely to spend substantial time litigating—the amount of damages that flow from proven exposures to asbestos in BMI's talc and the culpability of MTI and SMI for those damages. The litigation posed by the Bankruptcy Court is also the type of proceeding that the Fifth Circuit has long cautioned against—collective litigation of causation questions where asbestos is alleged to have caused injuries and wrongful death.[3]

---

[2]    *See* Ch. 11 Docket No. 1478 at 3.

[3]    *See* section IIA infra.

If litigation is required to substantiate the presence of asbestos in BMI's talc, the more limited approach advocated by the FCR would better advance the Chapter 11 Cases than the proceeding recommended by the Bankruptcy Court.

**BACKGROUND**

**I.      Participants in the Chapter 11 Cases**

1.      On October 2, 2023, Barretts Minerals Inc. ("**BMI**") and its affiliate Barretts Ventures Texas LLC (together with BMI, the "**Debtors**") each filed chapter 11 petitions in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**"), thereby commencing cases (the "**Chapter 11 Cases**") under chapter 11 of the Bankruptcy Code.[4]

2.      On October 13, 2023, the Debtors filed a motion to appoint Mr. Esserman as FCR. On November 20, 2023, the Bankruptcy Court entered an order approving the appointment of Mr. Esserman as the FCR.[5]

3.      On October 20, 2024, the United States Trustee for Region 7 (Southern and Western Districts of Texas) appointed an Official Committee of Unsecured Creditors (the "**Committee**") in the Chapter 11 Cases.[6]  The Committee comprises entirely individuals alleging claims related to personal injury or wrongful death as a result of BMI's talc.

4.      The Debtors are indirect subsidiaries of Mineral Technologies, Inc. ("**MTI**") and an affiliate of MTI, Minerals Technologies Investments LLC (the "**DIP Lender**"), is currently the debtor in possession lenders in the Chapter 11 Cases.[7]

---

[4]   *See* Ch. 11 Docket No. 1.   "Ch. 11 Docket No." refers to the docket in Case No. 23-90794-MI before the Bankruptcy Court.

[5]   *See* Ch. 11 Docket Nos. 126 (Motion to Appoint FCR); 307 (Order Appointing FCR).

[6]   *See* Ch. 11 Docket Nos. 138 (Notice of Appointment of Committee).

[7]   *See* Docket No. 917 (Order authorizing Financing from DIP Lender).

33260819.1

## II.    Events in the Chapter 11 Cases

5.    The Debtors entered chapter 11 with a plan to sell their operating assets and, eventually obtained an order authorizing the sale of their assets, over the objection of the Committee and certain tort claimants, which sale closed on April 29, 2024.[8]

6.    At the outset of the Chapter 11 Cases, the Debtors obtained an order (the "**PI Order**"), over the objection of the Committee, enjoining the prosecution of certain prepetition claims against MTI and its other affiliated non-debtors related to BMI's talc, but such order exempted so-called "Testing Claims," defined as "claims against MTI and SMI seeking recovery from MTI and/or SMI solely on account of such entity's purported actions in connection with any alleged inadequacy of testing of talc mined, beneficiated, and/or sold by BMI."[9]  The Creditors Committee has appealed the PI Order, which appeal is pending in this Court as Civil Action No. 4:24-CV-914.  The injunction in the PI Order has been continued from time to time and currently will not expire until after the Report and Recommendation is resolved and the Abatement Order (defined below) is lifted.[10]

7.    The Debtors, MTI, the Committee and the FCR entered into an agreement to undertake a mediation with Kenneth R. Feinberg "to attempt to reach a comprehensive resolution of any and all issues in conjunction with a potential Plan and 524(g) Trust, including, but not limited to, (a) claims related to personal injury in any way related to asbestos, talc, or other compounds or substances in connection with the Debtors' historical business operations or

---

[8]    *See* Ch. 11 Docket No. 128 (Bidding Procedures and Sale Motion); 714 (Committee's Objection to Sale); 718 (Joinder in Committee's Objection to Sale); 753 (Sale Order); and 862 (Notice of Sale Closing).

[9]    *See* Adv. Proc. No. 23-03225, Docket No. 92 (Bankr. S.D. Tex. Feb. 5, 2024).

[10]    *See* Adv. Proc. No. 23-03225, Docket No. 159 (Bankr. S.D. Tex. May 30, 2025).

33260819.1

products, including any contribution, indemnification, guarantee, subrogation claims, or other related claims; (b) claims and causes of action of the Debtors against third-parties, including but not limited to the Non-Debtor Affiliates; (c) claims and causes of action of the Non-Debtor Affiliates against the Debtors; and (d) any other matters agreed to among the Mediation Parties or as otherwise directed by further order of the Court," which was approved by the Bankruptcy Court on January 5, 2024.[11]  The Mediation continued for fourteen months but terminated in March 2025 with no resolution reached.[12]

8.    On March 22, 2024, the Court entered an order, over the objection of the Committee, extending the Debtors' exclusive periods to file and solicit acceptances of a chapter 11 plan until dates that were 30 and 90 days, respectively, after the withdrawal by the Committee from the mediation overseen by Mr. Feinberg or Mr. Feinberg's filing of a notice with the Bankruptcy Court terminating such mediation.[13]

9.    In June 2024, the Committee filed a motion to dismiss the Chapter 11 Cases, which was joined by certain claimants.  The Motion was held in abeyance until April 2025 to allow for mediation.  The Debtors objected and, after a trial held on April 14 and 15, 2025, the Court denied the Committee's motion.[14]

---

[11]    *See* Ch. 11 Docket No. 538 (Joint Stipulation and Agreed Order re: Mediation) ¶ D.

[12]    *See* Ch. 11 Docket No. 1478 (Report and Recommendation) at 2.

[13]    *See* Ch. 11 Docket No. 762.

[14]    *See* Ch. 11 Docket Nos. 994 (Committee's Motion to Dismiss); 1310 (Claimants' Joinder to Committee's Motion); 1311 (Debtors' Objection); 1506 (Findings of Fact and Conclusions of Law with respect to Committee's Motion to Dismiss).  The Court previously denied a motion by the Committee to transfer venue of the Chapter 11 Cases to Montana, *see* Ch. 11 Docket No. 413, which was subject to appeal before this Court in Civil Action No. 4:23-CV-4788 before being dismissed without prejudice.  *See* Civil Action No. 4:23-CV-4788, Docket No. 26.

10.     On March 24, 2025, the Debtors commenced an adversary proceeding seeking, *inter alia*, a determination that so called "Testing Claims" were property of the estate under section 541 of the Bankruptcy Code and protected from prosecution by non-Debtors under section 362 of the Bankruptcy Code, as well as entry of an injunction under sections 105(a) and 362 of the Bankruptcy Code enjoining the prosecution of Testing Claims by non-debtors.  The Debtors also sought a motion for summary judgment on its declaratory relief counts and a preliminary injunction for its injunctive count.  No relief has been granted in this adversary proceeding.[15]

11.     On April 2, 2025, the Debtors filed a chapter 11 plan and a motion to establish a bar date for "Direct Talc Personal Injury Claims."  The Committee and FCR objected to the motion to establish a bar date.  No relief has been granted with respect to the Plan or proposed bar date for Direct Talc Personal Injury Claims.[16]

12.     On April 16, 2025, the Bankruptcy Court issued a Case Management Order stating that the Court was "considering (i) ordering that a determination be made in this case of whether any of the talc sold by the Debtor or any of its affiliates contained asbestos; and (ii) if the Court does so order, recommending that the reference be withdrawn by the District Court for a determination of that single issue," and invited submissions and arguments from parties in interest in the Chapter 11 Cases.  The Debtors, MTI, the FCR, and the Creditors Committee (who was joined by certain claimants) filed written submissions and presented arguments to the

---

[15]  *See* Adv. Proc. No. 25-3102 Docket No. 1 (Complaint); 2 (Motion for Summary Judgment); 5 (Motion for Preliminary Injunction).

[16]  *See* Ch. 11 Docket Nos. 1352 (Bar Date Motion); 1353 (Plan); 1405 (FCR's Objection to Bar Date Motion); 1407 (Committee's Objection to Bar Date Motion).

Bankruptcy Court in respect of the Case Management Order.[17]  The Court then issued the Report and Recommendation described below.

### III.    Asbestos Litigation Concerning BMI, MTI and SMI

13.    "BMI mined, beneficiated, and sold talc from its Barretts, Montana location. Before 2018, BMI was named as a defendant in 14 asbestos-related personal injury lawsuits. . . . By the Petition Date in 2023, BMI was named in over 500 asbestos-related personal injury lawsuits.  Since the Petition Date, the number of personal injury claims has increased to 800 across 22 different states.  MTI and [Specialty Minerals Inc. ("SMI")] are also named as defendants based on allegations that they negligently tested the BMI-mined talc for the presence of asbestos."[18]

14.    As the Bankruptcy Court found, "BMI commenced this chapter 11 bankruptcy case to resolve about 800 talc-related personal injury lawsuits across 22 states."[19]  The Bankruptcy Court held below that "filing for bankruptcy to resolve a debtor's current and future asbestos liabilities under § 524(g) is a valid bankruptcy purpose" and found that BMI had filed its chapter 11 case "to settle claims against BMI through a 524(g) trust."[20]

15.    The Court also found that "on April 17, 2025, MTI publicly announced that it established a reserve of $215 million to fund the [proposed 524(g) trust] and related asbestos

---

[17]    *See* Ch. 11 Docket Nos. 1411 (Case Management Order); 1426 (Debtors' Submission); 1427 (Committee's Submission); 1428 (MTI's Submission); 1429 (FCR's submission); 1431 (Certain Claimants' Joinder to Committee's Submission).

[18]    *See* Ch. 11 Docket No. 1506 (Findings of Fact and Conclusions of Law) at 1-2.

[19]    *See* Ch. 11 Docket No. 1478 (Report and Recommendation) at 1.

[20]    *See* Ch. 11 Docket No. 1506 (Findings of Fact and Conclusions of Law) at 7-8.

33260819.1

charges." It further observed that "[a]t $215 million, the reserve is quite large. The Court does not imply that it is large enough."[21]

16.    At a May 19, 2025 status conference before the Bankruptcy Court, it was acknowledged that two trials, one in California in August 2025 and one in Florida in October 2025, had been set to pursue so called "testing claims" against MTI and/or SMI. The Bankruptcy Court declined to consider any relief that would impede those trials, provided that such claims were within the exceptions for testing claims established by the PI Order.[22]

## THE REPORT AND RECOMMENDATION

17.    On May 14, 2025, the Bankruptcy Court issued its Abatement Order and Report and Recommendation to the District Court (the "**Report and Recommendation**"). The Report and Recommendation: "Recommends that the District Court withdraw the reference and determine, by trial or otherwise, whether any of the talc sold by BMI contained sufficient quantity and form of asbestos to cause mesothelioma or other asbestos-related diseases." *See* Report and Recommendation at 1. The Bankruptcy Court further ordered that the Chapter 11 Cases and all related adversary proceedings be abated pending the District Court's determination (the "**Abatement Order**"). The Scope of the Abatement Order was clarified at a hearing held on May 19, 2025.[23]

---

[21]    *See* Ch. 11 Docket No. 1506 (Findings of Fact and Conclusions of Law) at 5, 9 n. 4.

[22]    *See* Ch. 11 Docket No. 1509 (May 19, 2025 Hr'g Tr.) at 5:23-6:1; 8:8-13; 10:18-22; 11:8-11; 23:13-15; *see also* Ch. 11 Docket Nos. 1492 and 1493 (Mr. Maricich's Response to Status Conference) at 1 (identifying Mr. Maricich's August 2025 trial in California Superior Court).

[23]    *See* Ch. 11 Docket Nos. 1478 and 1479 (Report and Recommendation); 1509 (May 19, 2025 Hr'g Tr.).

## ARGUMENT

18.     As the FCR argued below, the Chapter 11 Cases could be advanced if a limited number of trials were conducted to establish BMI, MTI and SMI's liability for damages to particular plaintiffs caused by exposure to asbestos in talc supplied by BMI.  Subjecting BMI, MTI and SMI to actual litigation in the tort system would accomplish several goals:  (i) it would provide an opportunity for individual plaintiffs to demonstrate that the putative defendants can be held liable for those plaintiffs' injuries alleged to have been caused by asbestos in BMI's talc; (ii) it would provide insight into whether MTI and SMI, in particular, can be held liable for such injuries; and (iii) it will result in tort system values, which could range from plaintiff verdicts in the millions (or more) to defense verdicts awarding $0.00 in damages, that the parties can use to assess the potential liabilities to be compromised in a chapter 11 plan.  It is clearly within the authority of this Court to permit such trials to proceed in the forums in which they were originally filed.

19.     On the other hand, the trial that would be conducted pursuant to the Report and Recommendation would first and foremost be unwieldy and costly and could devolve into a causation trial on the merits of each current claimant's individual claim.

20.     Second, the Bankruptcy Court's rationale conflates the common question of whether asbestos was ever present in BMI's talc in amounts that may have caused injury with the question of whether a particular plaintiff's exposure to asbestos-laden talc sold by BMI caused that particular plaintiff's mesothelioma.  The latter question is a question of causation that each plaintiff—and each defendant—has a Seventh Amendment right to be presented to a jury for individual determination.  Thus, the question is not amenable to the sort of omnibus proceeding proposed by the Bankruptcy Court, a point the Fifth Circuit has made clear.

21.     Third, the Bankruptcy Court's approach seems to suggest that the outcome of the omnibus proceeding would result in decisions binding on all creditors. However, the Fifth Circuit has repeatedly rejected that approach in asbestos litigation.

22.     Lastly, the FCR's statutory mandate is to protect the rights of future claimants, most significantly to ensure that future claimants are treated in a substantially similar manner as present claimants in a 524(g) plan and that any such plan is fair and equitable to future claimants. Thus, the FCR's participation and support is essential to establishing a chapter 11 plan that, by statute, can be binding on all future claimants. The FCR is not, however, the agent of any particular claimant and, thus, the FCR's participation in any omnibus proceeding would not extend to establishing that any particular future claimant (whose identity and injuries are, by definition unknown to the FCR and others) was exposed to talc sold by BMI that contained asbestos, as the Report and Recommendation sets out to do.

## I.     Allowing a Limited Number of Individual Trials to Move Forward Would Advance the Chapter 11 Cases

23.     Whether BMI's talc contains asbestos is a disputed question which occasioned and now drives the Chapter 11 Cases. But the record undermines the need for the sweeping trial recommended by the Bankruptcy Court to answer that question, because the defendants concede that they have real liability to resolve. The Bankruptcy Court has found that BMI commenced these cases to resolve its asbestos liability through a 524(g) trust. *See* ¶ 14, n. 15, *supra*. And it has found that MTI has already reserved a nine-figure amount to contribute for itself to the resolution of BMI's talc liability. *See* ¶ 15, n. 17, *supra*.[24] With the need for resolution of

---

[24]    Like the Bankruptcy Court, the FCR does not concede that the amount reserved is sufficient to resolve any parties' liability for asbestos contained in BMI's talc.

asbestos liability conceded, the focus of these cases should be on proceedings that will provide guidance on the scope and scale of these claims.

24.    Section 524(g) plans are frequently negotiated by applying a defendant's history in the tort system (percentage of claims resolved for payment and average award per resolved claim) to assumptions about the number and strength of current and anticipated future claims against the defendants.  Here, BMI has limited history in the tort system compared to other businesses with traditional asbestos exposure or even talc exposure.  BMI has never taken a case to trial.[25]  Thus, no jury (or judge) has ever had to answer the question of whether asbestos in BMI's talc has injured any of the myriad claimants that have sued on those grounds.  In fact, BMI faced little litigation related to talc and asbestos injuries before 2018.  Talc and asbestos claims against BMI only began to proliferate, and at an accelerating rate, in the five years before BMI filed for bankruptcy.[26]  Further, for more than 18 months, BMI (and MTI and SMI) have been able to avoid any reckoning on these claims due to the imposition of the automatic stay protecting BMI[27] and the PI Order entered by this court protecting MTI and SMI.

25.    BMI, MTI, and SMI have not been vindicated in the tort system.  Talc claimants have been able to secure material settlement amounts for injuries allegedly caused by talc from BMI's mine.  Here too, however, BMI's history is limited.  First, BMI, MTI, and SMI were able to avoid their own liabilities altogether for some time because they did not enter any settlements

---

[25]    *See* Ch. 11 Docket No. 13 (First Day Declaration of David J. Gordon) ¶ 55 ("No cases alleging Talc Claims against BMI have gone to trial.")

[26]    *See Id*. ("Prior to 2018, BMI had only been named in 14 lawsuits alleging Talc Claims. In 2018 and 2019, plaintiffs began filing Talc Claims at an increasing pace, rising to 18 in 2018 and 48 in 2019. In the wake of recent high-profile verdicts, including one multi-billion dollar verdict, and the ensuing media focus on talc litigation, the number of claims increased to 93 in 2020, 169 in 2021, and 205 in 2022.")

[27]    *See* 11 U.S.C. § 362(a)(1).

of their own prior to 2022. Instead, Pfizer obtained releases for BMI and the Non-Debtor

Affiliates from various claimants.[28] But then Pfizer began to refuse to resolve claims for, or

obtain releases in favor of, BMI, MTI, and SMI.[29] As a result, in 2022 and 2023, BMI settled

claims in 24 actions.[30] Those settlements, BMI contends, came at "inflated values" due to

Pfizer's decision to settle claims without including BMI, MTI, and SMI as part of Pfizer's

settlement.[31]

> **A.    The FCR's Proposed Course of Action**

26.    Given this thin record in the tort system, granting stay relief to permit a limited

number of talc claimants to proceed to trials against BMI, MTI, and SMI would have several

benefits to the advancement of these Chapter 11 Cases.

27.    *First*, it would provide real values from the tort system (whether by settlement or

litigation) for use by the parties in these Chapter 11 Cases in their negotiations over a 524(g) plan

and allow the Court to assess what the Talc Claimants' claims against BMI, MTI, and SMI may

---

[28]    As part of Pfizer's spin-off of various divisions (including BMI's talc operations) to BMI's
ultimate corporate parent, MTI, in 1992, Pfizer agreed to indemnify MTI and its subsidiaries
for various liabilities. *See* Ch. 11 Docket No. 13 (First Day Declaration of David J. Gordon)
¶ 56 ("As discussed below, Pfizer has historically settled Talc Claims and obtained releases
for BMI and the Non-Debtor Affiliates, given Pfizer's indemnification obligations under the
Reorganization Agreement. When BMI and/or a Non-Debtor Affiliate was named in a talc-
related lawsuit that alleged pre-Reorganization Date exposure to talc, the claim would be
tendered to and typically independently resolved by Pfizer.").

[29]    *See Id*. ("However, a dispute has arisen with Pfizer with respect to the scope of its indemnity
obligations under the Reorganization Agreement, and Pfizer has excluded BMI from certain
recent settlements. Prior to 2022, BMI had not settled any Talc Claims with plaintiffs
directly.").

[30]    *Id*. ("Prior to 2022, BMI had not settled any Talc Claims with plaintiffs directly. Since then,
BMI has settled 24 Talc Claims with plaintiffs directly.")

[31]    *Id*. ¶ 62.

33260819.1

- 12 -

be worth.  It will reveal whether BMI, MTI, and SMI are undervaluing claims against them and the creditors overvaluing such claims, or *vice versa*.[32]

28.    <u>*Second*</u>, talc claimants have trial-ready cases.[33]  Similarly, BMI has alleged that it is ready to defend against any liability it has to talc claimants.[34]  Allowing trial-ready cases to move forward in the tort system will provide results in substantially shorter time than an action to determine whether "any talc," of the millions upon millions of tons of talc sold by BMI,[35] "contained asbestos," as contemplated by the trial recommended by the Bankruptcy Court.

29.    <u>*Third*</u>, BMI commenced these Chapter 11 Cases with the purpose of confirming a 524(g) plan.  *See* ¶ 14.  The bargain for injured creditors in a 524(g) plan is a trust with distribution procedures that fairly compensates holders of qualified claims.  The FCR believes that additional tort system outcomes would benefit all parties in negotiating the provisions of a 524(g) plan and its implementing documents—providing insight into two critical aspects: (i) what type of claims can (or cannot) be successfully prosecuted against any of BMI, MTI, and SMI, and (ii) what type of recoveries can be had against BMI, MTI, and SMI.  Litigation in the

---

[32]   Even if these claims are settled, rather than taken to trial, it can inform whether historical settlements were at "inflated values," as BMI contends, *see supra*, note 31, or reflective of the outcomes BMI, MTI, and SMI's face in the tort system.

[33]   *See supra,* ¶ 16, note 22.

[34]   *See* Ch. 11 Docket No. 1384 (Apr. 10, 2025 Hr'g Tr.) 6:22-7:3 ("DEBTORS COUNSEL: The estimation goes to colorability.  We don't think there is evidence that can be proven in a Federal Court as to that there was asbestos in talc that was mined or sold, ultimately sold, as well as to the extent there is asbestos in the talc, as proven by the evidentiary record, whether the claimants in particular had exposure that would give rise to their injury.").

[35]   BMI operated for approximately 31 years prior to its chapter 11 filing.  In 2022, 2021 and 2020 (just the three full years before these Chapter 11 Cases were commenced), BMI sold 102,000, 117,000 and 122,000 tons of talc.  *See* Mineral Technologies, Inc. Form 10-K for the period ended December 31, 2022 available at https://www.sec.gov/ix?doc=/Archives/edgar/data/891014/000089101423000014/form10k.htm (last accessed April 19, 2025).

tort system will help to test the merits and value of these actual claims rather than try to answer only the factual question of whether BMI's talc contained asbestos. While the question asked by the Bankruptcy Court will be addressed by plaintiffs in the trials the FCR posits should proceed and will likely be a substantial aspect of those trials, those trials will go beyond that question and not only fully answer the causation question but also the damages questions.

**B.      The FCR's Proposal is the More Productive Alternative**

30.      The FCR is mindful that this proposal may give certain current claimants a head start on realizing their claims. On balance, though, the FCR believes that the benefits that may be gained if these trials provide an impetus to restart (and hopefully bring to a successful conclusion) negotiations over a 524(g) plan would outweigh any prejudice arising from allowing a head start to a few claimants, particularly when considered in light of the solvency and market capitalization of MTI.

31.      The plaintiffs and their counsel pursuing claims against BMI, MTI and SMI are both highly adverse to those defendants and motivated to ensure that strong cases are brought to trial. Thus, if the plaintiffs fail to win verdicts in the few test trials that would move forward under the FCR's proposal, those results would also be an important data point for the parties in the Chapter 11 Cases to assess the likelihood that future plaintiffs can prove up their claims against BMI, MTI and SMI.

32.      Finally, the FCR's proposed process would appear to have less of a financial impact on the estate and creditors than the trial recommended by the Bankruptcy Court. The FCR agrees with the Bankruptcy Court's observations that "because the presence of asbestos in BMI's talc is a key disputed issue, a process involving hundreds of separate trials will drain available resources from the estate such that actual victims would receive less recovery." Report and Recommendation at 3. But the trial proposed by the Bankruptcy Court hastens, for all

33260819.1

practical purposes, the very result it says that it wants to avoid.  It appears to be designed to require, at a minimum, *each present claimant* to effectively conduct their causation trial as to BMI to show (i) presence of asbestos, (ii) in sufficient quantity and form that (iii) caused their injury or wrongful death.  Such an endeavor, multiplied across the 800 (or more) current claimants would be far more expensive than conducting a small number of complete trials on all counts against BMI, MTI and SMI.

C.     **Implementing the FCR's Proposal is Clearly Within the Discretion of the District Court**

33.     The Bankruptcy Court, in reliance on 28 U.S.C. § 157(b)(5), appears to suggest that the District Court (or a sister federal court) is the exclusive forum in which personal injury and wrongful death claims against BMI must be liquidated.  *See* Report and Recommendation at 3-4.  However, as explained below, section 157(b)(5) reflects a division of labor between the District Court and Bankruptcy Court when it comes to matters that are to be tried in federal courts at all.  That section does not mandate that personal injury or wrongful death claims be tried in federal court, and personal injury actions already in state court are permitted to be resolved there.

34.     As explained in *In re White Motor Credit Corp.*, 761 F.2d 270, 273-74 (6th Cir.1985), section 157(b)(5) of title 28 of the United States Code must be read in conjunction with section 1334(c)(1) of that title, which preserves the district court's authority to abstain in favor of state court adjudication.  Indeed, the Sixth Circuit reasoned that Congress intended that "the district court would first decide whether it should leave the cases with respect to which claims have been filed in the bankruptcy court in the courts in which they are pending and then, *if it decides against this course*, the district court must try the cases itself or send them to the federal court for the district in which they arose."  *Id.* at 273 (emphasis supplied).  Thus, section

157(b)(5) does not require personal injury claims related to a debtor to be exclusively resolved in the federal courts.

35.     The Fifth Circuit reached the same conclusion in *Baumgart v. Fairchild Aircraft Corp.*, 981 F.2d 824 (5th Cir. 1993).  In that case, the debtor had been sued in multiple wrongful death and product liability cases brought by 19 German citizens in Texas state court prepetition. After its chapter 11 filing, the debtor removed the cases to federal court and successfully moved the district court to dismiss the cases on *forum non conveniens* grounds in favor of resolution of the action in Germany.  On appeal, the Fifth Circuit rejected the tort plaintiffs' argument that under section 157(b)(5) "the district court is ***required*** to try" the plaintiffs' tort claims, finding that the "language provides that consolidation of actions in the forum where the bankruptcy is pending is permissible, but not mandatory" and citing favorably the analysis in *White Motor Credit*.[36]

36.     Thus, this Court can simply authorize that the automatic stay be lifted to allow certain pending actions against BMI, MTI and SMI to proceed as proposed by the FCR.[37]  For the reasons discussed herein, cause plainly exists to do so.

---

[36]   *Id.* at  829-31 (emphasis in original); *see also In re Pan American Corp.*, 950 F.2d 839 (2d Cir. 1991) (The Second Circuit upheld the District Court refusal to transfer a Florida state court action to the southern District of New York where the debtor-defendants case was pending, holding "despite the apparently mandatory 'shall order', section 157(b)(5) has consistently been construed to recognize discretion in district courts to leave personal injury cases where they are pending.").

[37]   11 U.S.C. § 362(d)(1) ("On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay— (1)for cause, including the lack of adequate protection of an interest in property of such party in interest;")

## II.     The Omnibus Proceeding Proposed by the Bankruptcy Court Has Too Many Shortcomings

37.     In considering the Report and Recommendation, this Court should be guided by the Fifth Circuit's admonition that "[a]t almost every turn the circuit has rejected attempts at aggregation and issue preclusion in asbestos cases.  Our adversity toward group resolution sounds in our concern that no one be deprived the right to a full and fair opportunity to litigate their claims."[38]  For the reasons set forth below, the Report and Recommendation is yet another turn at litigating asbestos liability *en masse* and should be avoided under the principles espoused by the Fifth Circuit.

### A.     The Fifth Circuit Has Rejected Collective Proceedings in Asbestos Matters Seeking to Establish Causation

38.     The question posed by the Bankruptcy Court is effectively one of causation: prove that BMI's talc had sufficient asbestos in it to cause injury.  Report and Recommendations at 1 ("determine, by trial or otherwise, whether any of the talc sold by Barretts Minerals, Inc. ("BMI") contained sufficient quantity and form of asbestos to cause mesothelioma or other asbestos-related diseases").  And it is a question directed at the injured parties.  *See* Report and Recommendation 5-7 (describing role that current claimants will play in the proposed omnibus proceeding).  Fundamentally, each individual claimant is entitled to a separate jury trial on the question of whether the talc supplied by BMI contained asbestos that caused their injuries.[39] And the Fifth Circuit has held that claimants should not be subjected to a process for group

---

[38]  *Arnold v. Garlock, Inc.*, 278 F.3d 426, 443 (5th Cir. 2001).

[39]  *See, e.g., Cimino v. Raymark Industries, Inc.*, 151 F.3d 297, 319 (1998) ("In sum, as *Fibreboard* held, under Texas law causation must be determined as to 'individuals, not groups.'  And, the Seventh Amendment gives the right to a jury trial to make that determination.").

resolution that "deprive[s] the right to a full and fair opportunity to litigate their claims."[40]  By forcing claimants into an omnibus proceeding to establish a central aspect of their claim—that the talc they were exposed to contained asbestos—the claimants would be deprived of their rights to an individual jury trial on causation.

39.    The Bankruptcy Court posits that:  "Resolving whether BMI's talc contained asbestos—an issue common to all claimants—will substantiate or negate the basis for hundreds of pending ***and future*** claims against BMI."  Report and Recommendation at 2 (emphasis supplied).  But the Fifth Circuit has rejected such a contention.  "Commonality among class members on issues of causation and damages can be achieved only by lifting the description of the claims to a level of generality that tears them from their substantively required moorings to actual causation and discrete injury.  Procedures can be devised to implement such generalizations, but not without alteration of substantive principle."[41]  As the Fifth Circuit held in *Arnold*, "adherence to state substantive law and to the Seventh Amendment right to trial by jury would not tolerate making the resolution of a handful of claims binding as to defendant asbestos manufacturers' liability with respect to all plaintiffs."[42]  But the Bankruptcy Court appears to contemplate just such a sweeping outcome from the omnibus proceeding, and most troubling, for future claimants as well as present ones.

40.    The Bankruptcy Court recognized the Fifth Circuit's aversion to the omnibus proceeding that it is recommending but finds support in the Fifth Circuit's decision in *Jenkins v. Raymark*.[43]  *See* Report and Recommendation at 2.  However, the Fifth Circuit has characterized

---

[40]    *Arnold*, 278 F.3d at 443.

[41]    *In re Fibreboard Corp.*, 893 F.2d 706, 712 (5th Cir. 1990) (applying Texas law).

[42]    *Arnold*, 278 F.3d at 443.

[43]    831 F.2d 550 (5th Cir.1987).

*Jenkins* as the outer bounds for the use of collective proceedings to bind claimants and, in doing so, recognized that *Jenkins* "still required individual jury determinations of causation and damages."[44]

41.    In a predecessor decision to the *Jenkins* decision cited in *Arnold* and the Report and Recommendation, the Fifth Circuit upheld a trial court's certification of a class of asbestos plaintiffs for purposes of a trial on the "state of the art" defense and other "defense and defense-related questions," that were common to all the plaintiffs' claims.[45]  Thus, *Jenkins* is distinguishable in two important ways.  Here, the Bankruptcy Court is recommending an omnibus proceeding that would put the claimants to their proof on their *prima facie* claims, requiring them to show that asbestos was in BMI's talc and caused their injuries, whereas the court in *Jenkins* only certified a class to conduct a trial on common defenses.  Further, the nature of the underlying claims and defenses are different here than in the more traditional asbestos defendant in *Jenkins* .  The primary question here is whether BMI, MTI and SMI failed in their efforts to keep asbestos out of the talc altogether, not whether their intentional use of asbestos in a product was appropriate, as was presented in *Jenkins*.

## B.    The Fifth Circuit Disfavors Efforts to use Collective Proceedings in Asbestos Matters for Preclusion Purposes

42.    The Bankruptcy Court appears to envision that the outcome of the omnibus proceeding would be binding on all creditors—even future claimants whose injuries have not manifested and, thus, are not present.  Yet, *Arnold* forecloses that goal as a legitimate purpose to

---

[44]    *Id.*

[45]    *See Jenkins v. Raymark Industries, Inc.,* 782 F.2d 468 (1986).  The *Jenkins* decision cited in *Arnold* and the Report and Recommendation, which is reported at 831 F.3d 550, concerns construction of a settlement reached in the *Jenkins* matter and does not directly address the certification question.

support the conduct of the omnibus proceeding the Bankruptcy Court has recommended.  In

*Arnold*, the Fifth Circuit found that "the availability of coordinated federal court judgments for

their preclusive effect in future actions" was not proper grounds to transfer cases *en masse* to the

District of Delaware to be resolved as a part of the chapter 11 case of Garlock's co-defendant.[46]

So too should the Bankruptcy Court's recommendation be rejected.

43.    *Garlock* details a long line of cases in which the Fifth Circuit repeatedly rejected

similar "creative procedural avenues" to short circuit the rights of asbestos litigants to have their

day in court.  One such case, from 20 years earlier, was *Hardy v. Johns-Manville Sales Corp.*,

681 F.2d 334 (5th Cir. 1982).  In *Hardy*, the trial court entered an omnibus order under which,

"both parties are precluded from presenting evidence on the 'state of the art'-evidence that, under

Texas law of strict liability, is considered by a jury along with other evidence in order to

determine whether as of a given time warning should have been given of the dangers associated

with a product placed in the stream of commerce," based on facts and legal conclusions

adjudicated in *Borel v. Fibreboard Paper Products Corp.*[47]  Various parties that were not

defendants in *Borel* appealed that usage of collateral estoppel.  The court refused to apply

collateral estoppel based on a lack of privity, reasoning that "the fact that all the non-*Borel*

defendants, like the *Borel* defendants, are engaged in the manufacture of asbestos-containing

products does not evince privity among the parties."[48]  The Court also cited that fact that the

non-*Borel* defendants did not "participat[e] in any capacity" in the *Borel* litigation and some

were "not even aware of the *Borel* litigation until those proceedings were over."[49]  Future

---

[46]    *Arnold*, 278 F.3d at 442-43.

[47]    681 F.2d at 337.

[48]    *Id*. at 339

[49]    *Id.* 339-40.

33260819.1

claimants, at a minimum, and potentially current claimants will be similarly situated to the non-*Borel* defendants that the Fifth Circuit found could not be estopped from pursuing their claims in *Hardy*. The Bankruptcy Court's recommendation should not be acted upon if, in fact, the goal is to preclude non-participating claimants from adjudicating asbestos liability against BMI, MTI and SMI.

### C. The Omnibus Proceeding Asks a Question that is Simply Too Broad

44.     Here, BMI's representatives have acknowledged that asbestos appears in close proximity to talc in BMI's mines, and they have gone on to testify to their efforts to ensure that the talc they mined did not inadvertently include asbestos. [50] Obvious from that testimony is the possibility that BMI's efforts failed and talc that they mined and subsequently shipped to customers did, in fact, contain asbestos. [51] As an initial matter, it is far from clear how a court could determine with any precision whether "***any of the talc*** sold by the Debtors or any of its

---

[50]  *See* Ch. 11 Docket No. 786 (March 21, 2024 Hr'g Tr) 10:4-13 ("MR. JONAS:  Okay, are you aware of certain prior testing of talc from Barretts' mine that found asbestos in the talc?  MR. GORDON:  I'm aware and I think I testified to this earlier in the case, but I'm aware of the testing that has occurred over the years and the procedures for testing.  I do know that as a matter of course, I recall testifying to this and I recall hearing this from Barretts' employees that as part of the testing, if any asbestos was detected in the early stage, I guess at the blasting stage, that product was not removed or mined or processed.").

*See* Ch. 11 Docket No. 1414 (April 14, 2025 Hr'g Tr.) 180:4-16 ("MR. THOMPSON:  You are aware, however, that  there were test results from the Montana  mines showing asbestos in the talc, right? MR. MONAGLE:  In the mine samples, yes, of course. That's why we put the whole procedure into place.  MR. THOMPSON:  You're familiar that asbestos was found in those holes, right? MR. MONAGLE:  Yes.  By the way, only in areas where we wouldn't dig.  So when you say those holes, it's not every hole.  If you found asbestos in a hole, you don't dig there.").

Upon information and belief, the Debtors did not test every shipment of talc over the 32 plus years in which they operated.  Even if the Debtors' testing program covered every possible shipment of talc, the sufficiency of the Debtors' testing program, as applied, may be subject to challenge.

[51]  *See* note 49, *supra*.

affiliates"—constituting millions of tons of talc[52] sold over a period of starting in 1992—
"contained asbestos."  Indeed, the FCR accepts BMI's testimony that it took efforts to avoid
asbestos in its talc, but the Report and Recommendation effectively asks if it had a 100% success
rate in doing so.  *See* Report and Recommendation at 1.  That question seems impossible to
answer.  Pursuing that answer will be extremely expensive as well.

45.    Assuming a claimant does come forward with that proof, it will have established,
at most, only that specific claimant's claim.  Indeed, most courts require specific evidence of
exposure to specific product.  In Texas, for instance, plaintiffs must show that the talc ***they were***
exposed to contained asbestos and caused ***their injuries***.[53]  And further, the Fifth Circuit has held
that plaintiffs and defendants are each entitled to have that determination made in a jury trial as
to each individual plaintiff.[54]  Thus, there will not be expansive probative value from such an
affirmative finding.

46.    Yet, if no claimant comes forward with proof, the Report and Recommendation
seems to imply a course of action that will be premised on the fact that no party could ever had
been exposed to BMI talc with asbestos in it.  However, for the reasons discussed above, the

---

[52]    *See* note 34, *supra*.

[53]    *Borg-Warner Corp. v. Flores*, 232 S.W.3d 765, 773 (Tex. 2007) ("***Defendant-specific
evidence*** relating to the approximate ***dose to which the plaintiff was exposed***, coupled with
evidence that the dose ***was a substantial factor*** in causing the asbestos-related disease, will
suffice" (emphasis supplied)); *see also Rutherford v. Owens-Illinois, Inc.*, 16 Cal. 4th 953,
968, 941 P.2d 1203, 1214 (1997), as modified on denial of reh'g (Oct. 22, 1997)("Most
asbestos personal injury actions are tried on a products liability theory. In the context of
products liability actions, the plaintiff must prove that the defective products supplied by the
defendant were a substantial factor in bringing about his or her injury.").

[54]    *Cimino*, 151 F.3d at 313 ("under Texas substantive law causation of plaintiff's injury by
defendant's product and plaintiff's resultant damages must be determined as to 'individuals,
not groups.'").

answers derived in the omnibus proceeding can only be binding in disputes between BMI, MTI, SMI and claimants that participate in the omnibus proceeding itself.

47.    Thus, the outcome of the omnibus proceeding would have limited utility in ultimately resolving the Chapter 11 Case.

### D.    The FCR is Not a Representative of Individual Future Claimants for Purposes of Proving Causation

48.    The Report and Recommendation suggests that the omnibus proceeding could "substantiate or negate *the basis for* hundreds of pending and *future claims* against BMI." Report and Recommendation at 2 (emphasis supplied).  However, future claimants will not be able to participate in the omnibus proceedings.  While the Bankruptcy Court points to the FCR as a party in interest in the Chapter 11 Cases that can participate in the omnibus proceeding, *see* Report and Recommendation at 10, the FCR is not the representative of future claimants for purposes of establishing their own specific claims.

49.    Courts have rejected similar efforts on due process and statutory grounds.  In *In re G-I Holdings, Inc.*,[55] the future claimants representative was named as a defendant in a declaratory judgment action to establish whether a party had successor liability to future claimants of a debtor.  While recognizing that the representative had broad party in interest standing under section 1109 of the Bankruptcy Code, the Court found that "the forced participation of the Legal Representative in the successor liability action is not statutorily authorized and would be an abuse of his role."[56]  In doing so, the Court rejected the argument that the representative was a guardian *ad litem* with authority to bind future claimants.[57]  Indeed,

---

[55]    328 B.R. 691 (D.N.J. 2005).

[56]    *G-I Holdings, Inc.*, 328 B.R. at 698.

[57]    *Id.* at 697-98.

in *In re Imerys Talc America, Inc.*,[58] the Third Circuit recently echoed that and explained that an FCR cannot bind specific creditors: "True *guardians ad litem* have the legal authority to bind those they represent, which an FCR does not; it merely participates in the negotiation of a plan and channeling injunction that will govern its constituents' future claims."[59]

50.    To be sure, the FCR plays a role in future claimants being ***bound by a plan.*** He is tasked with ensuring that the treatment of future claimants under a plan that proposes a 524(g) trust and injunction is fair and equitable and substantially similar to the treatment afforded current claimants.[60] But even then, it is the plan, and a bankruptcy court's approval of it, that binds the creditors not any particular act of the FCR.[61] The FCR, cannot act for individual creditors to establish their own claims.

## CONCLUSION

51.    The Chapter 11 Cases need to be moved forward. The Bankruptcy Court's recommended course of action, however, runs directly into various, longstanding limitations the Fifth Circuit has placed on asbestos litigation. The FCR has offered a catalyst to do so that can answer the key questions that have stalled progress to date. This proposal could come at far less costs and delay than the process recommended by the Bankruptcy Court.

---

[58]  38 F.4th 361 (3d Cir. 2022),

[59]  *Id.* at 374 n.9.

[60]  11 U.S.C. § 524(g)(2)(B)(ii)(V) and (4)(B)(ii)

[61]  11 U.S.C. § 524(g)(3), (4); *see also Imerys Talc America*, 38 F.4th at 374 n.9 ("[The FCR] merely participates in the negotiation of a plan and channeling injunction that will govern its constituents' future claims.")/

Dated:  June 11, 2025,
        Dallas, Texas

          **STUTZMAN, BROMBERG,
ESSERMAN & PLIFKA
A Professional Corporation**

          */s/ Peter C. D'Apice*
Peter C. D'Apice
Heather J. Panko
2323 Bryan Street, Suite 2200
Dallas, TX 75201-2689
Telephone: (214) 969-4900
Email: dapice@sbep-law.com
       panko@sbep-law.com

-and-

Robert S. Brady (DE Bar No. 2847)
Edwin J. Harron (DE Bar No. 3396)
Sharon M. Zieg (DE Bar No. 4196)
Ryan M. Bartley (DE Bar No. 4985)
YOUNG CONAWAY STARGATT
& TAYLOR, LLP
1000 North King Street
Wilmington, DE 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email: rbrady@ycst.com
       eharron@ycst.com
       szieg@ycst.com
       rbartley@ycst.com

*Counsel to the Future Claimants' Representative*

33260819.1