**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

-------------------------------------------------------- x
In re:                                                   :
                                                         :   Civil Action No. 4:25-cv-02193
BMI OLDCO INC., *et al.*,[1]                              :
                                                         :   Bankruptcy Case No. 23-90794 (MI)
              Debtors.                                    :
                                                         :
-------------------------------------------------------- x

**DEBTORS' RESPONSE TO THE SUBMISSIONS OF**
**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS AND**
**FUTURE CLAIMANTS' REPRESENTATIVE IN CONNECTION WITH**
**THE BANKRUPTCY COURT'S MAY 14, 2025**
**<u>REPORT AND RECOMMENDATION</u>**

---

[1]   The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: BMI Oldco Inc. (f/k/a Barretts Minerals Inc.) ("**BMI**") (8715) and Barretts Ventures Texas LLC ("**BVT**," and collectively with BMI, the "**Debtors**") (0787). The Debtors' address is 5605 North MacArthur Boulevard, Suite 1000, PMB 139, Irving, Texas 75038.

i

**TABLE OF CONTENTS**

**Page**

I.     STATEMENT OF ISSUES TO BE RULED UPON BY THE COURT ................. 1

II.    SHORT SUMMARY OF THE DEBTORS' ARGUMENT .................................... 1

III.   NATURE & STAGE OF THE PROCEEDING........................................................ 3

      A.    The Debtors Filed for Bankruptcy Protection to Address Their Historic Talc-Related Liabilities ................................................................. 3

      B.    The Debtors Progress the Chapter 11 Cases .................................................. 5

      C.    The Debtors Engage in Mediation with Their Stakeholders; Mediation Efforts Break Down.................................................................... 6

      D.    The Debtors File a Proposed Plan of Reorganization ................................. 6

      E.    The Bankruptcy Court Declines to Dismiss the Chapter 11 Cases and Issues the Report and Recommendation ....................................................... 7

IV.   ARGUMENT ........................................................................................................... 8

      A.    Withdrawal of the Reference as Contemplated by the Bankruptcy Court's Report and Recommendation is Appropriate ................................. 8

      B.    A Determination of Whether BMI's Talc Contained Asbestos in Sufficient Quantity and Form to Cause Asbestos-Related Disease Is a Worthwhile Exercise and Consistent with Controlling Authority ............. 12

      C.    This Court Is Able to Structure an Efficient Proceeding to Adjudicate the Issue of General Causation.................................................................... 16

V.    CONCLUSION ..................................................................................................... 22

On May 14, 2025, the Bankruptcy Court entered the *Abatement Order and Report and Recommendation to District Court* (the "**Report and Recommendation**") [Docket No. 1; Bankr. Docket Nos. 1478 and 1479[2]], which, among other things, "[r]ecommends that the reference . . . be withdrawn, in part, [and] that the District Court determine, by trial or otherwise, whether any of the talc sold by Barretts Minerals, Inc. ('BMI') contained sufficient quantity and form of asbestos to cause mesothelioma or other asbestos-related diseases" (the "**Referred Matter**").

In its Report and Recommendation, the Bankruptcy Court recommends that this Court withdraw the reference under 28 U.S.C. § 157(a) to make an appropriate determination with respect to the Referred Matter based on the input of any parties-in-interest that elect to participate (the "**Proceeding**").

## I.   STATEMENT OF ISSUES TO BE RULED UPON BY THE COURT

*Whether to withdraw the reference as suggested by the Bankruptcy Court in its Report and Recommendation to adjudicate the limited issue of whether talc sold by BMI contained asbestos in sufficient quantity and form to have caused asbestos-related disease and, if withdrawal of the reference is accepted, how the Proceeding should be structured?*

## II.   SHORT SUMMARY OF THE DEBTORS' ARGUMENT

The Debtors supported withdrawal of the reference with respect to the Referred Matter when the Bankruptcy Court initially raised the idea in April 2025. And, upon review of the Report and Recommendation issued by the Bankruptcy Court following input

---

[2]   Docket references herein to the case before the District Court, Case No. 4:25-cv-02193, are cited as "Docket No. __". Docket references to filings in the Chapter 11 Cases (as defined below), Case No. 23-90794 (MI), are cited as "Bankr. Docket No. __".

from interested stakeholders, as well as the submissions by the Official Committee of Unsecured Creditors (the "**UCC**") and the Future Claimants' Representative ("**FCR**"), the Debtors continue to support withdrawal of the reference to have this Court address the Referred Matter—an issue that is critical to progressing the Debtors' chapter 11 cases (the "**Chapter 11 Cases**").

The Debtors filed for chapter 11 protection in October 2023 to address and equitably resolve mounting talc-related personal injury claims in which plaintiffs allege that they were exposed to BMI talc contaminated with asbestos, which they contend caused them to develop mesothelioma.  BMI and the BMI Affiliates[3] have consistently disputed, and continue to dispute, the allegation that the talc that BMI sold into the market contained asbestos.  And throughout the Chapter 11 Cases, representatives of current and future personal injury claimants, including the UCC and FCR, have taken the position that it was BMI's allegedly contaminated talc that caused talc claimants to develop mesothelioma.[4] Adjudication of whether talc sold by BMI did or did not contain asbestos in sufficient quantity and form to cause mesothelioma may affect, among other things, the validity and value of claims against the Debtors, claims that the Debtors' estates may have against third parties, whether the Debtors may propose a plan that contemplates injunctive relief under section 524(g) of the Bankruptcy Code, and whether the Debtors have viable talc-related claims against the BMI Affiliates.

---

[3]   The "**BMI Affiliates**" includes Minerals Technologies Inc ("**MTI**"), Specialty Minerals Inc. ("**SMI**"), and any other non-debtor subsidiaries of MTI.

[4]   If such position were unfounded, neither the UCC nor the FCR would have standing as a party in interest in the Chapter 11 Cases.

Accordingly, not only is there a well-developed "case or controversy," but a determination of the threshold issue contemplated by the Referred Matter will directly impact the administration of the Chapter 11 Cases. Adjudication of this issue may be done in an efficient, coordinated, and binding manner that does not delve into whether exposure to BMI's talc specifically caused any individual claimant's disease or compromise any claimant's Seventh Amendment right to a jury trial, but *will* greatly facilitate, as a marker for collective negotiations, progress in and the resolution of the Chapter 11 Cases.

As they did before the Bankruptcy Court, the UCC and the FCR each oppose withdrawal of the reference to allow this Court to take up the Referred Matter, each, in their own proposed formulation, recommending alternative forms of "marker" adjudications. The Debtors address below (1) the reasons why withdrawal of the reference for the purpose of addressing the Referred Matter is both permissible and desirable in that it would help progress the Chapter 11 Cases and (2) a proposed structure for the Proceeding.

## III.    NATURE & STAGE OF THE PROCEEDING

### A.    The Debtors Filed for Bankruptcy Protection to Address Their Historic Talc-Related Liabilities

On October 2, 2023, the Debtors filed for protection under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas in response to an overwhelming number of pending and anticipated future personal injury claims contending that claimants' asbestos-related disease was caused by exposure to talc mined, beneficiated, processed, or sold by BMI. BMI is a wholly-owned subsidiary of

SMI, which itself is a wholly-owned subsidiary of MTI. BVT is a wholly owned subsidiary of BMI.

Historically, BMI mined, beneficiated, and processed industrial talc, but did not sell talc-containing products directly to consumers. BMI's talc operations were originally held by an unincorporated division of Pfizer Inc. In 1992, Pfizer divested its minerals businesses, transferring certain related assets and equity interests to MTI, after which BMI began operating as the wholly-owned subsidiary of MTI's own wholly-owned subsidiary, SMI.

Before 2018, BMI had been sued in 14 lawsuits alleging personal injuries from exposure to asbestos allegedly contained in products that used BMI's talc. Starting in 2018, talc-based personal injury lawsuits against BMI increased exponentially—and by 2023, there were over 800 actions[5] relating to BMI's talc pending against BMI and certain BMI Affiliates. And although BMI believed it had indemnification rights against Pfizer for talc-related claims alleging exposure before October 1992, Pfizer had by then refused to honor those obligations. The Debtors accordingly concluded that filing for chapter 11 protection was the best—indeed, the only—option to preserve value for the Debtors' stakeholders and ensure fair and equal treatment for both current and future claimants.

Following commencement of the Chapter 11 Cases, the United States Trustee appointed the UCC to represent the interests of unsecured creditors, and the Bankruptcy

---

[5]    "The 800 claimants are represented by a small number of highly competent counsel." Report and Recommendation at 4.

4

Court appointed the FCR to represent the interests of future talc claimants.  *See* 11 U.S.C. §§ 524(g), 1102(a)(1).

### B.    The Debtors Progress the Chapter 11 Cases

Over the course of the Chapter 11 Cases, the Debtors have taken steps to achieve their goal of addressing their historical talc-related liabilities, including by marketing and selling their primary talc-related assets through a court-approved sale process and investigating estate causes of action, including against the BMI Affiliates for their role in BMI's business and operations and in connection with allegations of inadequate testing of BMI's talc, that the Debtors could pursue to bring additional value into the estates.

Claims against the Debtors have been stayed since the commencement of the Chapter 11 Cases in accordance with the automatic stay under section 362 of the Bankruptcy Code.  The Debtors also initiated an adversary proceeding in the Bankruptcy Court to confirm that talc-related personal injury claims against the BMI Affiliates remain stayed. *See* Adv. Proc. Case No. 23-03225.  The Bankruptcy Court issued an order staying the prosecution and filing of talc-related personal injury claims (except Testing Claims (as defined below)) against the BMI Affiliates, the effect of which has been extended by stipulation and further orders. *See* Adv. Proc. Case No. 23-03225, Docket No. 160.

The Bankruptcy Court declined to enjoin claims against the BMI Affiliates solely premised on any alleged inadequacies in testing talc mined, beneficiated, and/or sold by BMI ("**Testing Claims**").  In March 2025, the Debtors initiated an adversary proceeding (the "**Testing Adversary Proceeding**") seeking a declaration that Testing Claims are property of BMI's estate and should be enjoined and/or subject to the stay. *See* Adversary

Proceeding No. 25-03102.[6]  To date, the Bankruptcy Court has not ruled on any issues in the Testing Adversary Proceeding.

### C. The Debtors Engage in Mediation with Their Stakeholders; Mediation Efforts Break Down

Beginning in January 2024, the Debtors engaged in mediator-assisted negotiations with various stakeholders—including the UCC, the FCR, and the BMI Affiliates—in hopes of reaching a consensual resolution of disputed issues and proposing a plan of reorganization that would enjoy the support of the Debtors, the BMI Affiliates, the UCC, and the FCR.

In March 2025, after fourteen months of negotiations and multiple extensions of the mediation, the negotiations reached an impasse.  *See* Bankr. Docket Nos. 952, 982, 1037, 1075, 1149, 1206, 1335.

### D. The Debtors File a Proposed Plan of Reorganization

On April 2, 2025, the Debtors filed a proposed plan of reorganization, providing talc claimants with two alternatives.  Bankr. Docket No. 1353.  The first alternative would establish a section 524(g) trust to provide recoveries to holders of present and future asbestos-related claims according to court-approved procedures.[7]  Under this alternative,

---

[6]   In connection with initiation of the Testing Adversary Proceeding, the Debtors filed an accompanying *Motion for an Order Extending the Automatic Stay to and/or Preliminarily Enjoining Certain Actions Against Non-Debtors* [Adv. Pro. 25-03102, Adv. Proc. Docket No. 5] seeking an order extending the automatic stay and/or preliminarily enjoining the continuation, amendment, and settlement of any Testing Claims against the BMI Affiliates pending the Court's adjudication of the Testing Adversary Proceeding.

To the extent the litigation of any pending Testing Claims may harm the estates and/or interfere with the Proceeding before this Court, the Debtors reserve the right to seek further relief with respect to Testing Claims.

[7]   Section 524(g) "authorizes a bankruptcy court to issue an injunction 'to enjoin and channel present and future asbestos related claims against a debtor to [a] trust [established] in connection with the confirmation of a chapter 11 plan.'"  Bankr. Docket No. 1506.  The channeling injunction can provide protection to third parties as well. *See* 11 U.S.C. § 524(g)(4)(A)(ii).

6

the BMI Affiliates would make a significant contribution to the trust, in exchange for the protection of a channeling injunction. The second alternative would establish a trust to process tort claims, as well as provide for a discharge of the Debtors' liabilities and the settlement of estate causes of action. Under this alternative (unlike the first alternative), the BMI Affiliates would not benefit from a channeling injunction but would propose a fund available to talc claimants willing to settle with them. Because the latter alternative provides less comprehensive relief, the expected contribution by the BMI Affiliates to the trust would be smaller than the contribution under the first alternative.

### E. The Bankruptcy Court Declines to Dismiss the Chapter 11 Cases and Issues the Report and Recommendation

Following a hearing in April 2025 in connection with the UCC's request to dismiss the Chapter 11 Cases, the Bankruptcy Court issued findings of fact and conclusions of law denying dismissal of the Chapter 11 Cases.

On April 16, 2025, the Bankruptcy Court issued a *Case Management Order* [Bankr. Docket No. 1411] (the "**CMO**"), informing the parties that it was "considering (i) ordering that a determination be made in this case of whether any of the talc sold by the Debtor or any of its affiliates contained asbestos; and (ii) if the Court does so order, recommending that the reference be withdrawn by the District Court for a determination of that single issue." CMO at 1.

The Bankruptcy Court then considered submissions from interested parties in response to the CMO, including the Debtors, the BMI Affiliates, the UCC, the FCR, and certain individual claimants, and held a status conference on April 29, 2025.

7

On May 14, 2025, the Bankruptcy Court entered the Report and Recommendation. Bankr. Docket Nos. 1478 and 1479.  The Debtors coordinated with the UCC and FCR to agree upon a briefing schedule to file submissions to this Court to address the Report and Recommendation and the scope and procedure concerning the Proceeding.  The UCC filed an objection and response to the Report and Recommendation, Docket No. 4 ("**UCC Brief**"), and the FCR also submitted a response, Docket No. 3 ("**FCR Brief**").

IV.   **ARGUMENT**

A.   **Withdrawal of the Reference as Contemplated by the Bankruptcy Court's Report and Recommendation is Appropriate**

For all of the reasons addressed in the Report and Recommendation, determination of whether talc sold by BMI contained asbestos in sufficient quantity and form that would support a general causation finding as to the injuries alleged by claimants would significantly streamline and assist in progressing the Chapter 11 Cases.  Because the threshold determination of liability is based on a single product—BMI's talc—resolving that general causation question, even as a "marker" determination, will directly inform the merit and value of talc personal injury claims asserted against the Debtors' estates, as well as the Debtors' estate causes of action against non-debtor parties, including the BMI Affiliates and Pfizer, and thus, will assist in progressing negotiations toward a consensual plan of reorganization.

Granting the Bankruptcy Court's request is both permissible and expressly envisioned by the Bankruptcy Code.

8

It is fully within the Bankruptcy Court's power to issue a report and recommendation suggesting withdrawal of the reference for the limited purpose of having this Court take up an issue, such as here, that is appropriately decided by an Article III court. *See* 28 U.S.C. 157(b)(5) ("The district court *shall* order that personal injury tort and wrongful death claims shall be tried in the district court in which the bankruptcy case is pending, or in the district court in the district in which the claim arose, as determined by the district court in which the bankruptcy case is pending.") (emphasis added); *see, e.g., In re Autoseis, Inc.*, 2015 Bankr. LEXIS 2243, *4-5 (S.D. Tex. June 1, 2015) (withdrawal of the reference was appropriate because the issue involved a personal injury tort claim). Because a determination of the Referred Matter concerns personal injury tort claims, adjudication of that issue is left solely to the District Court. Accordingly, the UCC's analysis concerning whether cause exists to withdraw the reference is irrelevant.[8]

---

[8]    In any event, cause does exist to withdraw the reference to address the Referred Matter, as suggested by the Bankruptcy Court. In connection with a request for a permissive withdrawal, courts in the Fifth Circuit consider: (1) whether the nature of the proceedings are core or non-core; (2) whether withdrawal promotes the economical use of the parties' resources; (3) whether withdrawal will promote uniformity in bankruptcy administration; (4) whether withdrawal motivates forum-shopping; (5) whether withdrawal will expedite the bankruptcy process; and (6) whether a party has demanded a jury trial. *See Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 999 (5th Cir. 1985). As discussed elsewhere herein, the issue to be determined through the Proceeding is non-core, and withdrawal would be an efficient use of resources to decide a common issue, would promote uniformity, would not motivate forum-shopping, and would expedite the bankruptcy process. Although the UCC argues that the Proceeding would not advance the Chapter 11 Cases because "[n]one of these claims are currently before the Bankruptcy Court, nor are any proceedings requiring adjudication of the Talc-Asbestos Issue," they ignore that a decision on the issue of whether BMI's talc contained asbestos in a quantity and form sufficient to cause disease is central to the dispute in the Chapter 11 Cases and would inform the validity and value of the very talc-related personal injury claims that drove the Debtors to file for bankruptcy in the first place and which confer standing to the UCC as a party in interest in the Chapter 11 Cases.

As to whether the claims are before the Bankruptcy Court, that argument by the UCC also misses the point. This Court has the statutory power to remove pending claims and consolidate them before the district court in which the bankruptcy case is pending. *See* Fed. R. Bankr. P. 9027; 28 U.S.C. §§ 157(b)(5), 1334 and 1452; *see also A.H. Robins Co. v. Piccin*, 788 F.2d 994, 1011 (4th Cir. 1986) (finding "[s]ection 157(b)(5) . . . expressly confers on the district court sitting in bankruptcy and having jurisdiction of the bankruptcy proceedings the power to fix the venue of any tort case against the debtor pending in both districts."); *Whittingham v. CLC of Laurel, LLC*, No. 2:06cv11-KS-MTP, 2006 WL 2423104, at *1 (S.D. Miss. Aug. 22, 2006) ("[T]he ultimate venue of the trial in

9

The UCC similarly is incorrect that a specific and independent proceeding is required in order to withdraw the reference.  No such requirement exists under applicable Fifth Circuit precedent.  Although the Proceeding contemplated under the Bankruptcy Court's Report and Recommendation may be unique, there is no requirement, as the UCC suggests, that the withdrawal relate to a discrete proceeding separate and apart from the bankruptcy case itself.[9]  But this logic presents a Catch-22: there cannot be a discreet proceeding in the Bankruptcy Court to try a personal injury case, because only the District Court has the power to do so; yet clearly Congress contemplated in section 157(d) the District Court's withdrawal of the reference to try such proceedings.  So long as there is a contested issue in need of adjudication, as is present here, the reference may be withdrawn such that the adjudication of that issue takes place in the District Court and not in the Bankruptcy Court.

Contrary to the UCC's suggestion, the Proceeding would not be an advisory opinion, but a determination of an issue central to the Chapter 11 Cases as to which there

---

the personal injury case should be determined by the District Court where the bankruptcy case is pending."); *see also* 1 *Collier on Bankruptcy* ¶ 3.06 (16th ed. 2025) ("Section 157(b)(5) provides that the venue of the [personal injury tort and wrongful death] trial is to be determined by the district court in which the title 11 case is pending. This unusual, perhaps unique, provision empowers a court other than that in which the litigation is pending to decide where the trial is to take place.  The court in which the title 11 case is pending has the options of trying the case itself or directing that the trial occur in the district court for the district in which the claim arose.").

[9]   The reference cited by the UCC to consideration of "whether the underlying lawsuit is core or non-core" from the *Holland America* factors relates to whether there is cause under the permissive withdrawal of the reference standard articulated by the Fifth Circuit.  UCC Brief at 7.  As explained above, that standard is not applied in the context of a withdrawal of the reference in connection with a personal injury tort claim where jurisdiction rests with the District Court as a matter of statute.  Indeed, the case cited by the UCC on this point, *Guffy v. Brown (In re Brown Med. Ctr., Inc.)*, No. 15-3229, 2016 WL 406959 (S.D. Tex. Feb. 3, 2016), concerned a request to withdraw the refence in connection with a request to avoid certain attorney fee payments as fraudulent transfers, not a personal injury tort claim.

10

is plainly a "case or controversy."[10]  Even the authority cited by the UCC recognizes that withdrawal of the reference may be appropriate to address "an operative part of the proceeding."  UCC Brief at n.25 (quoting 1 Norton Bankr. L. & Prac. 3d § 8:1).  Here, the proceeding from which the Bankruptcy Court proposes that the reference be withdrawn is the bankruptcy case itself, to address the issue of general causation.

In the event this Court concludes that withdrawal of the reference is best suited to address independent proceedings, one or more of the underlying tort claims may be removed and consolidated before this Court.  *See* Fed. R. Bankr. P. 9027; 28 U.S.C. §§ 157(b)(5), 1334 and 1452; *In re KSRP, Ltd.*, 809 F.3d 263, 266 (5th Cir. 2015) (the grant of related-to jurisdiction is broad and "includes any litigation where the outcome could alter, positively or negatively, the debtor's rights, liabilities, options, or freedom of action or could influence the administration of the bankrupt estate.") (internal quotations and citations omitted).  Indeed, courts have recognized that sections 157(b)(5) and 1334(b) provide a statutory mechanism to enable the "prompt, fair, and complete resolution" of all personal injury claims "related to" a bankruptcy in a single forum.[11]

---

[10]  The UCC claims there is no "case or controversy," but concedes there is a fundamental disagreement between the parties on the very issue raised in the Report and Recommendation.  *See* UCC Brief at 8; Report and Recommendation at 4-5 ("Throughout this bankruptcy case, BMI and the claimants have been engaged in a real and substantial controversy regarding the presence of disease producing asbestos in BMI-mined talc.  It is a matter that directly impacts the administration of the bankruptcy case, the feasibility of the § 524(g) plan, the value of claims, and resolution of any future asbestos claims.  The District Court's determination regarding the presence or absence of talc is necessary and appropriate to resolve multiple matters already argued before this Court.").

[11]  Given the nature of the Proceeding and the effect of determination on general causation, all pending talc personal injury claims against BMI and the BMI Affiliates could be centralized before this Court to ensure that claimants are afforded notice, due process, and a full and fair opportunity to participate in the determination.  *See A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 1014 (4th Cir. 1986) ("No progress along estimating these contingent claims, however, can be made until all Dalkon Shield claims and suits are centralized before a single forum where all interests can be heard and in which the interests of all claimants with one another may be harmonized."); *see, e.g.*, *In re Dow Corning Corp.*, 86 F.3d 482, 497 (6th Cir. 1996) ("We agree with the Fourth Circuit that section

11

**B.    A Determination of Whether BMI's Talc Contained Asbestos in Sufficient Quantity and Form to Cause Asbestos-Related Disease Is a Worthwhile Exercise and Consistent with Controlling Authority**

As the Bankruptcy Court correctly observed "[r]esolving whether BMI's talc contained asbestos—an issue common to all claimants—will substantiate or negate the basis for hundreds of pending and future claims against BMI." Report and Recommendation at 2. This issue will inform how a plan of reorganization in the Debtors' Chapter 11 Cases may and should be structured. A determination of this key and disputed issue in a consolidated and efficient manner will best position the Debtors to progress the Chapter 11 Cases. And, as noted above, this Court is uniquely positioned to resolve this central question. *See* 28 U.S.C. § 157(b)(5).

The Court can structure the Proceeding[12] such that parties "will not be . . . deprived of their day in court." Report and Recommendation at 4. Appropriate notice can be provided to individuals with manifested talc personal injury claims, both those who have already commenced a pending lawsuit and those who have not yet done so, all of whom would be invited to participate in the Proceeding in a coordinated and efficient manner. Such a noticing program will ensure that talc personal injury claimants are made aware of the Proceeding in this Court and its impact on their claims, and would ensure that such

---

157(b)(5) should be read to allow a district court to fix venue for cases pending against non-debtor defendants which are 'related to' a debtor's bankruptcy proceedings pursuant to Section 1334(b).").

[12]    Although the Debtors support full withdrawal of the reference to this Court on the single issue of general causation as proposed in the Report and Recommendation, the Bankruptcy Court could also oversee pre-trial and other related matters to support the Proceeding. *See*, *e.g.*, *In re Nortel Networks, Inc.*, 539 B.R. 704, 712 (D. Del. 2015) ("Permitting the Bankruptcy Court to oversee pretrial matters in this proceeding, and withdrawing it only when it is ripe for a jury trial, promotes judicial economy and a timely resolution of this case."); *In re Enron Corp.*, 295 B.R. 21, 28 (S.D.N.Y. 2003) ("Courts have also recognized that it serves the interests of judicial economy and efficiency to keep an action in Bankruptcy Court for the resolution of pre-trial, managerial matters, even if the action will ultimately be transferred to a district court for trial.").

12

individuals receive due process and a full opportunity to participate.  Contrary to the FCR's suggestion, such a proceeding would not result in "hundreds of separate trials," but could be structured as a consolidated proceeding where interested parties are given an opportunity to participate in a coordinated manner.

Moreover, the Proceeding would not constitute the type of impermissible claim aggregation against which some courts have cautioned.  A decision concerning a threshold common issue that may apply to multiple claims is not the same as claim aggregation.  Collective proceedings are permitted to establish general causation.  *See*, *e.g.*, *Adkisson v. Jacobs Eng'g Grp., Inc.*, 342 F. Supp. 3d 791, 799 (E.D. Tenn. 2018) (noting that individualized proof is not required to establish general causation, which is "why general causation is often litigated on a class-wide, or at least collective or consolidated basis.").  Here, a threshold determination of whether BMI's talc contained asbestos in quantity and form sufficient to cause asbestos-related disease is precisely the type of common question that may be appropriately answered through a collective proceeding.

The UCC contends that the Fifth Circuit's decision in *Arnold v. Garlock*, 278 F.3d 426 (5th Cir. 2001), stands for the proposition that centralizing asbestos cases to rule on "purportedly common issues" is not permitted.  *See* UCC Brief at 10.  The UCC is incorrect in applying *Arnold* in the present bankruptcy context.  The Fifth Circuit in *Arnold* noted that they "did not disagree that certain mass tort claims in some circumstances might be consolidated with bankruptcy proceedings in a single district in accordance with § 157(b)(5)."  *Arnold*, 278 F.3d at 440.  The Fifth Circuit went on to observe that consolidation of pending tort litigation pursuant to section 157(b)(5) is appropriate where,

13

as here, there are common issues related to a "singular product, sold to the same market and incurring substantially similar injuries." *Id.*

In any event, adjudication of the narrow issue contemplated by the Report and Recommendation would not involve the ultimate adjudication of the claims of individual claimants and whether BMI's talc specifically caused their disease. Rather, it would remain focused on the threshold issue of general causation. As the Fifth Circuit ruled in *Jenkins v. Raymark*, 782 F.2d 468 (5th Cir. 1986), where individual jury determinations of causation and damages are preserved, a procedure may be established to try common threshold issues, the result of which may be applicable to all claimants.[13] *Id.* at 473 (affirming district court's decision in finding that mass tort claims could be certified for adjudication of common issues); *see also Arnold*, 278 F.3d at 443 (citing *Jenkins* as precedent for permitting the adjudication of "common issues in a single trial" so long as the procedure "still required individual jury determinations of causation and damages.").

The FCR's suggestion of permitting something akin to "bellwether" trials to adjudicate liability and damages as to particular plaintiffs is not a realistic or helpful alternative to the Proceeding envisioned by the Bankruptcy Court. Such an exercise would not best accomplish any of the goals that underlie the Bankruptcy Court's Report and

---

[13]   Contrary to the suggestion in the UCC's brief (UCC Brief at 12-13), *Jenkins* was not "abrogated" by the Supreme Court's decision in *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997), which does not even cite to or reference *Jenkins* and stands only for the proposition that aggregation of mass tort claims is not appropriate where, unlike here, there are significant disparities among claims. *See id.* at 625 ("[M]ass tort cases arising from a common cause or disaster may, depending upon the circumstances, satisfy the predominance requirement . . . The text of the Rule does not categorically exclude mass tort cases from class certification, and District Courts, since the late 1970's, have been certifying such cases in increasing number."). Likewise, the Supreme Court's decision in *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) does not foreclose the adjudication of common issues in appropriate circumstances.

14

Recommendation. Indeed, having individual trials proceed as to individual claimants' claims would be more costly and time-consuming and would not result in findings that are more broadly binding and informative, such that the exercise would help progress the Chapter 11 Cases. *See*, *e.g.*, *Cimino v. Raymark Indus., Inc.*, 151 F.3d 297, 320-21 (5th Cir. 1998) (overturning decision from proceeding where rulings as to damages associated with individual claimants' claims were extrapolated to others); *see also In re Hanford Nuclear Reservation Litig.*, 497 F.3d 1005, 1025 (9th Cir. 2007) ("We recognize that the results of the Hanford bellwether trial are not binding on the remaining plaintiffs.").

Moreover, it is entirely possible that individual trials could yield inconsistent and conflicting results such that it would merely serve to further confuse the issues, not clarify them. In its submission, the FCR focuses on the *value* of claimants' claims, but ignores that the value of claims should be directly tied to the issue of general causation and whether BMI's talc contained asbestos—as claimants contend—and in a quantity and form sufficient to have caused their disease. It is that inquiry that the Bankruptcy Court suggested this Court take up, and it is that inquiry that will help inform further negotiations and decisions made in the Chapter 11 Cases.

Finally, both the FCR and UCC are simply incorrect that the Proceeding envisioned by the Bankruptcy Court in its Report and Recommendation would deny claimants their Seventh Amendment right to a jury trial. Rather, claimants would preserve all jury trial rights to establish that asbestos in talc sold by BMI, if found, specifically caused their

15

disease and to prove associated damages.    Here, the UCC and FCR[14], as fiduciaries appointed specifically to represent the interests of current and future talc claims, respectively, have been expressly invited to participate in the Proceeding.    *See* Report and Recommendation at 9-10.    And claimants—the representation of which is largely consolidated across a handful of law firms—would be afforded notice of such a Proceeding and an opportunity to participate therein, adequately addressing any due process concern.[15]

Overall, the Proceeding envisioned by the Bankruptcy Court's Report and Recommendation would be expected to yield answers to a question central to the disputed issues in the Chapter 11 Cases and can do so in a way that respects claimants' due process and Seventh Amendment rights.

### C.    This Court Is Able to Structure an Efficient Proceeding to Adjudicate the Issue of General Causation

The Bankruptcy Court's recommended Proceeding—limited to whether talc sold by BMI was contaminated with asbestos in forms and amounts capable of causing asbestos-related disease—is both procedurally appropriate and will assist in progressing the Debtors' Chapter 11 Cases.    Focusing the Proceeding on whether talc claimants can establish general causation will facilitate the fair, efficient, and evidence-based resolution

---

[14]    The FCR's suggestion that he does not represent future claimants for purposes of proving causation ignores that the FCR is appointed to represent the interests of future claimants in connection with the Chapter 11 Cases. FCRs participate with some regularity in proceedings that would ultimately affect their constituents' future claims, whether those involve negotiations that result in a consensual plan or adjudication of issues germane to a bankruptcy case.    To suggest otherwise would render any participation by an FCR illusory and entirely unnecessary.

[15]    In any event, courts have recognized that there are exceptions to the traditional notion of permitting all individuals to "have [their] own day in court," such as where "a person, although not a party, has his interests adequately represented by someone with the same interests who is a party or where a special remedial scheme exists expressly foreclosing successive litigation by nonlitigants, as for example in bankruptcy . . . ."    *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 846 (1999).

of claims against the Debtors' estates. Indeed, absent resolution of this issue, which the Bankruptcy Court cannot do in a binding manner for the reasons discussed above, the parties are left to negotiate and litigate in the abstract, without clarity on whether claimants can establish the most basic scientific predicate for liability.

Structuring the Proceeding to address the issue proposed by the Bankruptcy Court aligns with established federal case management practices in complex tort litigation and is well-suited to the structure and objectives of the Chapter 11 Cases. Courts often isolate and resolve foundational scientific questions through focused expert discovery and evidentiary proceedings before addressing individualized factual disputes.

The threshold issue to be adjudicated is whether talc products sold by BMI were contaminated with asbestos in forms and quantities capable of causing asbestos-related disease in humans. This question is common to all pending talc claims and does not depend on any particular claimant's exposure, diagnosis, or use of a specific product. It is the type of global, scientific issue that courts frequently address through centralized, front-end proceedings, particularly in the context of multidistrict litigation.

In toxic tort litigation, plaintiffs bear the burden of establishing general causation by a preponderance of the evidence. *See Ruffin v. BP Expl. & Prod., Inc.*, 137 F.4th 276, 280 (5th Cir. 2025) ("To establish a defendant's liability for a toxic tort, as with any tort, a plaintiff must prove causation. . . . [Plaintiff] must establish both general causation and specific causation."). To satisfy this burden, plaintiffs must present admissible expert testimony that meets the standards of Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

17

Federal courts have long recognized the utility of addressing general causation before proceeding to case-specific discovery or trials. For example, in *In re Zantac (Ranitidine) Products Liability Litigation*, the district court excluded plaintiffs' experts under *Daubert* and entered judgment for defendants. *See In re Zantac*, 644 F. Supp. 3d 1075, 1286-87 (S.D. Fla. 2022). There, plaintiffs sought to prove that ranitidine caused cancer, identifying eleven general causation experts to do so. The court ultimately deemed those experts' reports unreliable. *Id.* at 1278-88; *see also id.* at 1287-90 (outlining summary judgment briefing schedule). Consequently, the court granted summary judgment for the defendants. *Id.* at 1286 & n.170.

Similarly, in *In re Lipitor (Atorvastatin Calcium) Marketing, Sales, and Products Liability Litigation*, the court conducted centralized expert proceedings before allowing any claims to proceed to trial. *See* Case Mgmt. Order No. 29 (Dkt. No. 746), *In re Lipitor*, No. 14-mn-02502 (D.S.C. 2015). Plaintiffs alleged that Lipitor caused Type 2 diabetes. In support of their claims, plaintiffs served common expert disclosures of general causation experts. Plaintiffs then served specific expert disclosures in two bellwether cases. *Id.* After expert discovery and *Daubert* briefing, the court excluded plaintiffs' experts, leading certain defendants to seek summary judgment. *In re Lipitor*, 227 F. Supp. 3d 452, 466 (D.S.C. 2017). The court granted summary judgment as to the bellwether cases. *Id.* at 457. The court then issued an order to show cause to see if any plaintiff could differentiate her case in a manner that would survive *Daubert*. *Id.* at 458-59. Eleven months later, no new plaintiff had come forward. *Id.* at 459. Instead, plaintiffs filed an omnibus response arguing that the non-bellwether plaintiffs had not had an opportunity to "hire experts" or

18

"prepare expert reports." *Id*. at 460. The court rejected this argument—given the multiple previous opportunities the plaintiffs had not seized—and granted summary judgment against all remaining plaintiffs. *Id.* at 491 ("This Court is familiar with the science and issues present and can dispose of the issues far more quickly and efficiently than dozens of courts spread across the country."); *see also In re Lipitor*, 892 F.3d 624, 649 (4th Cir. 2018) (affirming grant of summary judgment to defendant Pfizer). Decisions like those in *Zantac* and *Lipitor* reflect court recognition that general causation is a threshold issue that should be addressed early, with rigor and efficiency.

Establishing a similar proceeding is particularly appropriate here, where resolving the threshold causation issue in this Court will provide a scientifically grounded foundation to assist in progressing the Chapter 11 Cases. Indeed, the ability to confirm a plan and structure a trust depends, at least in part, on understanding whether the underlying claims asserted against the Debtors have a viable scientific basis. Addressing the issue of general causation at this stage of the proceedings is particularly important in talc litigation because multiple courts have found that plaintiffs' theories of asbestos contamination and causation lack scientific reliability and fail to satisfy the requirements of *Daubert*. For example, in *Weiss v. Albertsons*, 2023 Ariz. Super. LEXIS 204 (Ariz. Super. Ct. June 20, 2023), the court excluded expert testimony after concluding that the "theory that asbestos from talcum powder causes mesothelioma does not have general acceptance in the scientific community," and noting that "there is simply no definitive, scientific, control group, peer-reviewed study that has concluded that there is any causal connection between asbestos in talc and mesothelioma." *Id.* at *70. Similarly, in *Lanzo v. Cyprus Amax Minerals Co.*, 254

19

A.3d 691 (N.J. App. Div. 2021), the appellate court reversed a substantial verdict and held

that the trial court had failed to perform its gatekeeping role by admitting expert testimony

grounded in a scientifically unsupported theory about non-asbestiform mineral fragments.

*Id.* at 722.  These rulings underscore the critical need to resolve, through centralized

proceedings, whether plaintiffs can meet their burden to show that talc sold by BMI is

capable of causing asbestos-related disease.

The proposed approach is also an efficient use of estate and judicial resources.  The

parties have already developed a substantial evidentiary record in prepetition litigation.

What remains is limited additional fact discovery,[16] followed by expert disclosures and

*Daubert* proceedings.  The matter can be resolved on an expedited schedule within six to

nine months, consistent with or faster than general causation phases in comparable mass

tort dockets.

Below is an illustrative schedule for such a Proceeding, which structures the

Proceeding in a manner that is narrowly tailored, time-limited, and avoids adjudication of

individualized injury:

---

[16]  Extensive discovery, including concerning the Debtors' operations and corporate history, prior litigation claims, talc testing, and sales and market data, has already been conducted in connection with the prepetition litigation and in the Chapter 11 Cases.  As such, only modest additional discovery will be necessary to complete the record and prepare for trial.

***Estimated Timeline***

| Phase | Timeline |
|---|---|
| Day 0–30 | Scheduling Conference; Issuance of Case Management Order |
| Day 30–90 | Focused Fact Discovery (2 months) |
| Day 90–180 | Expert Disclosures and Discovery (3 months) |
| Day 180–210 | Daubert Briefing (opening, opposition, reply) |
| Day 210–240 | Daubert Hearing (scheduled within 30 days of briefing close) |
| Day 240–255 | Court ruling on admissibility |
| Day 255–270 | Trial on general causation (2 weeks) |

This proposed schedule gives both sides a fair opportunity to present scientific evidence and creates a record that will assist—not hinder—resolution of the Chapter 11 Cases. Any necessary procedural specifics—such as expert sequencing or hearing protocols—can be efficiently resolved through a case management order, issued after consultation with the parties.

The proposed Proceeding is fair, limited, grounded in precedent, consistent with how federal courts routinely manage complex scientific questions in mass tort proceedings, and strategically aligned with the objectives of the Bankruptcy Code. It will clarify key issues that underpin the primary claims against the Debtors' estates, promote efficient negotiations, and preserve all parties' rights and defenses.[17]

---

[17] Moreover, the Debtors expect that the very fact of the existence of the Proceeding will serve to focus all parties on the alternative of a negotiated settlement or settlements, which also will serve to progress the Chapter 11 Cases.

21

## V.    CONCLUSION

For the reasons discussed herein, the Debtors request that the Court withdraw the reference as proposed by the Bankruptcy Court and hold a status conference with the parties to address how best to structure the Proceeding to yield a decision as to whether talc sold by BMI contained asbestos in sufficient quantity and form to have caused asbestos-related disease and to discuss an appropriate case management order to govern the focused adjudication of general causation consistent with the timeline and framework outlined above.

Dated: June 25, 2025

Respectfully submitted,

**PORTER HEDGES LLP**

By: */s/ John F. Higgins*

John F. Higgins (SDTX No. 563)
Eric D. Wade (SDTX No. 21401)
Heather K. Hatfield (SDTX No. 641873)
Megan Young-John (SDTX No. 3120284)
1000 Main St., 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Email: jhiggins@porterhedges.com
        ewade@porterhedges.com
        hhatfield@porterhedges.com
        myoung-john@porterhedges.com

-and-

**LATHAM & WATKINS LLP**

Jeffrey E. Bjork (admitted *pro hac vice*)
Kimberly A. Posin (admitted *pro hac vice*)
Amy C. Quartarolo (admitted *pro hac vice*)
Christina Craige (admitted *pro hac vice*)
Shawn P. Hansen (admitted *pro hac vice*)
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071
Telephone: (213) 485-1234
Email: jeff.bjork@lw.com
        kim.posin@lw.com
        amy.quartarolo@lw.com
        chris.craige@lw.com
        shawn.hansen@lw.com

*Counsel for Debtors and Debtors in Possession*

23

## CERTIFICATE OF SERVICE

I certify that on June 25, 2025, I caused a true and correct copy of the foregoing document to be served by the Court's CM/ECF notification system, which will send notice of electronic filing to all counsel of record.

/s/ *John F. Higgins*
John F. Higgins

24