# EXHIBIT 1

**Fill in this information to identify the case:**

Name of Debtor & Case Number:

☒  Barretts Minerals Inc.(Case No. 23-90794)
☐  Barretts Ventures Texas LLC (Case No. 23-90793)

**United States Bankruptcy Court for the Southern District of Texas**

# Proof of Claim  Official Form 410

04/22

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. With the exception of administrative expenses arising under 11 U.S.C. §503(b)(9), do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

| Part 1: | Identify the Claim |
| --- | --- |

| | | |
| --- | --- | --- |
| 1. **Who is the current creditor?** | American International Industries | |
| | Name of the current creditor (the person or entity to be paid for this claim) | |
| | Other names the creditor used with the debtor _____ | |
| 2. **Has this claim been acquired from someone else?** | ☒ No ☐ Yes.  From whom? _____ | |
| 3. **Where should notices and payments to the creditor be sent?** Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | **Where should notices to the creditor be sent?** | **Where should payments to the creditor be sent?** (if different) |
| | Nelson Mullins LLP; attn: Julia Gowin | |
| | Name | Name |
| | 19191 S. Vermont Ave., Suite 900 | |
| | Number      Street | Number      Street |
| | Torrance, CA 90502 | |
| | City          State          ZIP Code | City          State          ZIP Code |
| | Contact phone  424-221-7458 | Contact phone _____ |
| | Contact email  julia.gowin@nelsonmullins.com | Contact email _____ |
| | Uniform claim identifier for electronic payments in chapter 13 (if you use one): | |
| | __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ | |
| 4. **Does this claim amend one already filed?** | ☒ No ☐ Yes.  Claim number on court claims registry (if known) _____ | Filed on _____ MM / DD / YYYY |
| 5. **Do you know if anyone else has filed a proof of claim for this claim?** | ☒ No ☐ Yes.  Who made the earlier filing? _____ | |

**Part 2:**    Give Information About the Claim as of the Date the Case Was Filed

| | |
|---|---|
| 6. **Do you have any number you use to identify the debtor?** | ☒ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____  ____  ____  ____ |

7. **How much is the claim?**    $ _unliquidated_____ .    **Does this amount include interest or other charges?**
   ☒ No
   ☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

8. **What is the basis of the claim?**

   Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

   Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

   Limit disclosing information that is entitled to privacy, such as health care information.

   See attached exhibit.

9. **Is all or part of the claim secured?**

   ☒ No
   ☐ Yes.    The claim is secured by a lien on property.

   **Nature of property:**
   ☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*
   ☐ Motor vehicle
   ☐ Other. Describe: _____

   **Basis for perfection:** _____
   Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

   **Value of property:**    $_____
   **Amount of the claim that is secured:**    $_____
   **Amount of the claim that is unsecured:**  $ _unliquidated_____  (The sum of the secured and unsecured amounts should match the amount in line 7.)

   **Amount necessary to cure any default as of the date of the petition:**    $_____

   **Annual Interest Rate** (when case was filed)_____%
   ☐ Fixed
   ☐ Variable

10. **Is this claim based on a lease?**

    ☒ No
    ☐ Yes. **Amount necessary to cure any default as of the date of the petition.**    $_____

11. **Is this claim subject to a right of setoff?**

    ☒ No
    ☐ Yes. Identify the property: _____

| | |
|---|---|
| **12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**<br><br>A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☒ No<br>☐ Yes. *Check one:* |

|  | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| ☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| ☐ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |

\* Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment.

| | | |
|---|---|---|
| **13. Is all or part of the claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9)?** | ☒ No<br>☐ Yes. **Indicate the amount of your claim arising from the value of any goods received by the Debtor within twenty (20) days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.** | $_____ |

---

**Part 3:    Sign Below**

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

Check the appropriate box:

☒ I am the creditor.
☐ I am the creditor's attorney or authorized agent.
☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date    05/06/2024
　　　　　　　　　　　MM / DD / YYYY

/s/ Charles Loveless, Executive Vice President, American International industries
Signature

**Print the name of the person who is completing and signing this claim:**

| | |
|---|---|
| Name | Charles Loveless |
| | First name          Middle name          Last name |
| Title | Executive Vice President |
| Company | American International industries |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |
| Address | 2220 Gaspar Ave. |
| | Number          Street |
| | Commerce, CA 90040 |
| | City          State          ZIP Code |
| Contact phone | 323-728-2999          Email  c-loveless@aiibeauty.com |

**EXHIBIT TO PROOF OF CLAIM OF AMERICAN INTERNATIONAL INDUSTRIES ("A-I-I")**

A-I-I manufactures and distributes personal care products including hair care, skin care, and beauty products. As of the filing of this Proof of Claim, A-I-I has been named in civil actions in various jurisdictions where plaintiffs have alleged use of and/or exposure to talcum powder products including "Clubman Talc."

With respect to Barretts Minerals Inc. and its related entities (collectively, "Debtors"), certain plaintiffs allege that Debtors mined and/or manufactured talc contaminated with trace levels of asbestos, which was incorporated into talcum powder products such as Clubman Talc. A-I-I denies such contamination claims. As of the date of this Proof of Claim, plaintiffs have named Debtors as co-defendants in certain causes of action involving A-I-I (collectively, the "Litigation").

This Proof of Claim is therefore filed as an unliquidated Proof of Claim for any and all amounts adjudicated, or otherwise determined, to be owed to A-I-I by Debtors in connection with the Litigation. A-I-I shall supplement this Proof of Claim at such time.

A-I-I expressly reserves the right to amend and supplement this Proof of Claim at any time for whatever reason including, without limitation, for the purpose of filing additional claims or to specify the amount of A-I-I's unliquidated claims as they become liquidated, or to update the estimates of the amounts owed to A-I-I.

By virtue of the filing of the Proof of Claim, A-I-I does not waive, and hereby expressly reserves, its rights to pursue claims including, but not limited to, the claims described herein, against Debtors based upon all available legal theories, including, but not limited to, rights of set off and recoupment.

Due to the voluminous nature of filings in the Litigation, the relevant pleadings and other documents supporting the amount of A-I-I's claims are not attached to this Proof of Claim. A-I-I will provide reasonable documents in support of this claim upon request to counsel for A-I-I.

# EXHIBIT 2

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF KING

**DIANNE LaSALLE**, individually, as Personal Representative of the Estate of the Decedent JACK LaSALLE, and on behalf of all wrongful death beneficiaries of Decedent JACK LaSALLE,

Plaintiff,

v.

**AMERICAN INTERNATIONAL INDUSTRIES**, sued individually, as alter-ego of, and as successor-in-interest to PINAUD, INC., ED PINAUD, INC., d/b/a ED. PINAUD, THE NESLEMUR COMPANY, formerly known as THE NESTLE-LE MUR COMPANY;
**ARYZ CORP.**;
**BARRETTS MINERALS INC.**;
**BAYER CONSUMER CARE HOLDINGS LLC**, sued individually, as alter-ego of, and as successor-in-interest to SCHOLL, INC.;
**BRENNTAG NORTH AMERICA, INC.**, sued individually, as alter-ego of, and as successor-in-interest to MINERAL AND PIGMENT SOLUTIONS, INC. and as successor-in-interest to WHITTAKER, CLARK & DANIELS, INC.;
**BRENNTAG SPECIALTIES, LLC**, individually and as successor-in-interest, parent, alter ego, and equitable trustee to BRENNTAG SPECIALTIES, INC. (formerly known as MINERAL AND PIGMENT SOLUTIONS, INC.), sued individually, as alter-ego of, and as successor-in-interest to WHITTAKER, CLARK & DANIELS, INC.;
**CHATTEM, INC.**, a subsidiary of SANOFI-AVENTIS U.S. LLC, sued individually, as alter-ego of, and as successor-in-interest to THE GOLD BOND STERILIZING POWDER COMPANY a/k/a THE GOLD BOND COMPANY;
**COSTCO WHOLESALE CORPORATION**:
**ERX CORP.**;

No. 23-2-08165-0 SEA

SECOND AMENDED COMPLAINT FOR PERSONAL INJURIES (SURVIVORSHIP), LOSS OF CONSORTIUM, AND WRONGFUL DEATH

SECOND AMENDED COMPLAINT - 1

SCHROETER, GOLDMARK & BENDER
401 Union Street • Suite 3400 • Seattle, WA 98101
Phone (206) 622-8000 • Fax (206) 682-2305

3348820.1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

**GLAMOUR INDUSTRIES CO.**, formerly known as BETTY K. DEVELOPMENT CO.;
**MERCK & CO., INC.**, sued individually, as alter-ego of, and as successor-in-interest to SCHOLL, INC.;
**PTI UNION, LLC**, a/k/a PHARMA TECH INDUSTRIES;
**RAZY PROPERTIES, INC.**;
**REBGRO CORPORATION**;
**SAFEWAY INC.**;
**SPECIALTY MINERALS INC.**; and
**SRYZ CORP.**,

Defendants.

COMES NOW the Plaintiff and presents the following claims for relief:

## I.  PARTIES

1.      Dianne LaSalle resides in Spokane Valley, Washington. Dianne LaSalle is the surviving spouse of Decedent Jack LaSalle, a former plaintiff, who died from malignant mesothelioma on March 29, 2024. Mr. LaSalle's surviving children are Julie LaSalle, Misty Mason, and Heather Tucker. Dianne LaSalle is the Plaintiff in multiple capacities: (1) as Personal Representative of the Estate of the Decedent Jack LaSalle, asserting Mr. LaSalle's surviving claims for personal injuries; (2) individually, asserting her claims for loss of consortium; and (3) individually, and on behalf of all other wrongful death beneficiaries of Decedent Jack LaSalle, asserting all of their claims for wrongful death.

2.      Defendants and/or their predecessors-in-interest (hereinafter collectively referred to as "Defendants") are corporations who, at all times relevant herein manufactured, sold, distributed or supplied asbestos-containing products, and/or asbestos-containing talc, and/or other finished and unfinished asbestos-containing talcum powder products, and/or raw asbestos fiber of various kinds and grades used conjunction with asbestos (hereinafter collectively referred to as "Defendants' Products").

SECOND AMENDED COMPLAINT - 2

SCHROETER, GOLDMARK & BENDER
401 Union Street ● Suite 3400 ● Seattle, WA  98101
Phone (206) 622-8000 ● Fax (206) 682-2305

3348820.1

## II.  JURISDICTION

3.      This Court has jurisdiction over this cause pursuant to RCW 4.12.025 because, at all times relevant herein, defendants transacted business and/or may be served with process in King County, Washington. This Court has specific jurisdiction over all out-of-state defendants because they each purposefully performed acts or consummated transactions in Washington State; Plaintiffs' cause of action arises out of and/or relates to defendants' activities and/or transactions in Washington State; and assumption of jurisdiction over such out-of-state defendants by this Court does not offend traditional notions of fair play and substantial justice. Furthermore, Defendants American International Industries, Aryz Corp., Erx Corp., Glamour Industries Co., Razy Properties, Inc., Sryz Corp., Specialty Minerals, Inc., Barretts Minerals, Inc., Chattem, Inc., Safeway, Inc., Merck & Co., Inc., Bayer Healthcare LLC, Brenntag North America, Inc., Brenntag Specialties, LLC, and Whittaker, Clark & Daniels, Inc. have openly stipulated to personal jurisdiction in Washington as indicated in Defendants' Amended Stipulated Consent to Jurisdiction in Washington filed on December 5, 2022 in *LaSalle v. American International Industries*, Case No. 22CV018567, Superior Court of the State of California County of Alameda attached as **Exhibit A**.

## III.  FACTUAL ALLEGATIONS

4.      Decedent Jack LaSalle was exposed to asbestos and/or asbestos-containing products and/or asbestos-containing talc, which had been mined, manufactured, produced, specified, and/or placed into the stream of commerce by the defendants and was exposed to asbestos used by defendants and/or in conjunction with defendants' products.  As a direct and proximate result of this exposure, Mr. LaSalle developed mesothelioma, and then died from mesothelioma.

SCHROETER, GOLDMARK & BENDER
401 Union Street ● Suite 3400 ● Seattle, WA  98101
Phone (206) 622-8000 ● Fax (206) 682-2305

3348820.1

5.      Plaintiff provides the following information:

A.   Specific Disease:              Pleural Mesothelioma

B.   Dates of Diagnosis; and Death:  July 2022; March 29, 2024

C.   Military:                      U.S. Army

D.   Means of Exposure:             Personal use of asbestos-containing talcum powder products; occupational use of asbestos-containing talcum powder products; secondary exposure to family members' use of asbestos-containing talcum powder products; and secondary exposure to co-workers' use of asbestos-containing talcum powder products.

E.   Places of Exposure:            Spokane, WA
                                    Burke, ID
                                    Fort Ord, CA
                                    Fort Leonard Wood, MO
                                    Wildflecken, Germany
                                    Yakima, WA
                                    Lewiston, ID
                                    Newman Lake, WA
                                    Spokane Valley, WA

F.   Dates of Exposure:             1955 to 2021

G.   Current Address:               ███████████
                                    Spokane Valley, WA 99037

## IV.  LIABILITY

5.      Plaintiffs claim liability based upon the theories of product liability, including strict product liability under WPLA, Section 402A of the Restatement (Second) of Torts, negligence, and intentional conduct. The liability-creating conduct of Defendants consisted, inter-alia, of negligent, defective, and unsafe design; failure to contain adequate warnings; failure to properly inspect, test, warn, instruct, monitor and/or recall; failure to substitute safe products; producing, marketing, and/or selling unreasonably dangerous or extra-hazardous and/or defective products; producing, marketing, and/or selling products not reasonably safe as

SECOND AMENDED COMPLAINT - 4

SCHROETER, GOLDMARK & BENDER
401 Union Street ● Suite 3400 ● Seattle, WA  98101
Phone (206) 622-8000 ● Fax (206) 682-2305

3348820.1

designed; producing, marketing and/or selling products were more dangerous than would be contemplated by an ordinary user; producing, marketing, and/or selling products with risks which outweighed their benefits; producing, marketing, and/or selling products with misrepresentation of product safety; producing, marketing, and/or selling defectively manufactured products which failed to comply with their own specifications; and suppressing the publication of information regarding the dangers of asbestos.

## V. DAMAGES

6.     As a proximate result of defendants' tortious conduct, Decedent Jack LaSalle sustained pain, suffering, and disability in an amount not now known, but which will be proven at trial. Mr. LaSalle also sustained medical expenses and economic losses in an amount to be proven at trial. Plaintiff Diane LaSalle has sustained loss of spousal consortium as a result of Mr. LaSalle's illness. Likewise, because of Mr. LaSalle's wrongful death, Plaintiff Diane LaSalle has sustained, and will sustain, further loss of spousal consortium. Additionally, because of Mr. LaSalle's wrongful death, Julie LaSalle, Misty Mason, and Heather Tucker each have sustained, and will sustain, loss of parental consortium. Additionally, because of Mr. LaSalle's wrongful death, Plaintiff Diane LaSalle, Julie LaSalle, Misty Mason, and Heather Tucker each have incurred, and will incur, end-of-life expenses.

WHEREFORE, Plaintiff prays for judgment against defendants as follows:

a.     All economic damages, including medical expenses, end-of-life expenses, expenses for other services, loss of earnings and loss of earning capacity;

b.     All noneconomic damages recoverable under Washington law and RCW 4.56.250, including, but not limited to, the injury itself, past

SECOND AMENDED COMPLAINT - 5

SCHROETER, GOLDMARK & BENDER
401 Union Street ● Suite 3400 ● Seattle, WA  98101
Phone (206) 622-8000 ● Fax (206) 682-2305

and future pain and suffering, mental and physical disability, disfigurement, emotional distress, and loss of enjoyment of life;

c.    Punitive or exemplary damages as permitted by relevant state law;

d.    For pre- and post-judgment interest in the maximum amounts allowed;

e.    All other damages recoverable under Washington law; and

e.    For such other relief as the Court deems just.

DATED this 8th day of May, 2024.

SCHROETER, GOLDMARK & BENDER

_s/ Colin B. Mieling_
KAITLIN T. CHERF, WSBA #45241
LUCAS GARRETT, WSBA #38452
COLIN B. MIELING, WSBA #46328
CRAIG A. SIMS, WSBA #28267
Counsel for Plaintiff
401 Union Street, Suite 3400
Seattle, WA 98101
Phone:  (206) 622-8000
Fax:      (206) 682-2305
Email: SGBasbestos@sgb-law.com;
           cherf@sgb-law.com;
           garrett@sgb-law.com;
           mieling@sgb-law.com;
           csims@sgb-law.com

SECOND AMENDED COMPLAINT - 6

SCHROETER, GOLDMARK & BENDER
401 Union Street ● Suite 3400 ● Seattle, WA 98101
Phone (206) 622-8000 ● Fax (206) 682-2305

3348820.1

EXHIBIT A

E-SERVICE
68510760
Dec 05 2022
04:13PM
File & ServeXpress

Robert E. Thackston (SBN 255658)
Julia A. Gowin (SBN 234995)
Nilofar Karbassi (SBN 306887)
David E. Ashdown (SBN 333946)
**LATHROP GPM LLP**
2049 Century Park East, Suite 3500F
Los Angeles, CA  90067
T 310-789-4654 | F 310-789-4601
Email: *nilofar.karbassi@lathropgpm.com*

Attorneys for Specially Appearing Defendants,
**AMERICAN INTERNATIONAL INDUSTRIES, ARYZ CORP.,
ERX CORP., GLAMOUR INDUSTRIES CO., RAZY
PROPERTIES, INC., AND SRYZ CORP.**

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF ALAMEDA

| | |
|---|---|
| **JACK LASALLE and DIANNE LASALLE,**<br><br>      **Plaintiffs,**<br><br>v.<br><br>**AMERICAN INTERNATIONAL INDUSTRIES, et al.**<br><br>      **Defendants.** | Case No. 22CV018567<br>*Assigned for all purposes to the Hon. Jo-Lynne Lee, Department 18*<br><br>**DEFENDANTS' AMENDED STIPULATED CONSENT TO JURISDICTION IN WASHINGTON**<br><br>FNC Hearing:     December 9, 2022<br>Complaint Filed:  September 27, 2022<br>Trial Date:       March 27, 2023 |

      WHEREAS Plaintiffs Jack and Dianne LaSalle ("Plaintiffs") filed the above captioned action in the Superior Court of the State of California, County of Alameda on September 27, 2022.

      WHEREAS all Plaintiffs reside in the state of Washington.

      WHEREAS Plaintiffs allege that Mr. LaSalle was injured as a result of his purported use of talcum powder in Washington.

      WHEREAS Defendant American International Industries has filed a Motion to Stay or Dismiss based on forum *non conveniens*.

1

WHEREAS a more appropriate forum for this litigation would be Washington where all Plaintiffs reside, where Mr. LaSalle purportedly purchased and used the product(s) at issue in this case, and where potential witnesses reside.

WHEREAS the undesigned Defendants have conferred and agree that Washington is an appropriate forum for this litigation.

DEFENDANTS AGREE AND STIPULATE AS FOLLOWS:

1. Defendants submit to personal jurisdiction in Washington for the purposes of this case only;

2. Defendants agree to toll the statute of limitations for the time Plaintiffs' action was pending in California; and

3. Defendants agree to make discoverable documents, evidence, and witnesses available in Washington to the extent consistent with Washington law.

Dated: November 22, 2022

**LATHROP GPM LLP**

By: _____
Robert E. Thackston
Julia A. Gowin
Nilofar Karbassi
David E. Ashdown
Attorneys for Specially Appearing Defendants,
**AMERICAN INTERNATIONAL INDUSTRIES, ARYZ CORP., ERX CORP., GLAMOUR INDUSTRIES CO., RAZY PROPERTIES, INC., AND SRYZ CORP.**

Dated: November 16, 2022

**TUCKER ELLIS LLP**

By: /s/ Ferlin P. Ruiz _____
James P. Cunningham
Ferlin P. Ruiz
Attorneys for Defendants,
**PFIZER, INC., SPECIALTY MINERALS, INC., BARRETTS MINERALS, INC.**

2

1    Dated:  November 11, 2022                    **GORDON  REES  SCULLY  MANSUKHANI**
                                                              **LLP**

2

3                                        By:    /s/ William L. Coggshall
                                                William L. Coggshall
4                                               Attorney for Defendant,
                                                **CHATTEM, INC.**
5

6    Dated:  November 15, 2022                    **BARNES & THORNBURG, LLP**

7

8                                        By:    /s/ Mihran Yezbekyan
                                                Kelley S. Olah
9                                               Mihran Yezbekyan
                                                Attorneys for Defendant,
10                                               **SAFEWAY, INC.**

11
     Dated:  November 15, 2022                    **RIDLEY MASTER**
12

13                                       By:    /s/ Vanthara Meak
                                                Vanthara Meak
14                                               Attorneys for Specially Appearing Defendant,
                                                **MERCK & CO., INC**
15

16   Dated:  November 17, 2022                    **HUSCH BLACKWELL LLP**

17

18                                       By:    /s/ Frederic W. Norris
                                                Bradford J. DeJardin
19                                               Frederic W. Norris
                                                Shayan Heidarzadeh
20                                               Attorneys for Defendant,
                                                **BAYER HEALTHCARE LLC**

21   Dated:  November 21, 2022                    **MURRIN & ASSOCIATES, LLC**

22

23                                       By:    /s/ Reynold M. Martinez
                                                Charles P. Murrin
24                                               Michael C. Scanlon, Jr.
                                                Reynold M. Martinez
25                                               Attorneys for Specially Appearing Defendants,
                                                **BRENNTAG NORTH AMERICA, INC. &**
26                                               **BRENNTAG SPECIALTIES, LLC**

27

28

                                        3
     **DEFENDANTS' AMENDED STIPULATED CONSENT TO JURISDICTION IN WASHINGTON**

1

Dated:  December 5, 2022

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEMLER,  ARMSTRONG  &  ROWLAND, LLP


By:     /s/ Jennifer C. Rasmussen
        Jennifer C. Rasmussen, Esq.
        Salin Ebrahamian, Esq.
        Attorneys for Defendants,
        **WHITTAKER, CLARK & DANIELS, INC.**

4

## PROOF OF SERVICE

### *Jack LaSalle vs. AII, et al.*
### *Alameda Case No.: 22CV018567*

## STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I declare that I am employed by Lathrop GPM LLP.  I am over the age of eighteen years and not a party to the within cause; my business address is 2049 Century Park East, Suite 3500S Los Angeles, CA  90067.

On the date set forth below, I served the foregoing document(s) described as:

### DEFENDANTS' AMENDED STIPULATED CONSENT TO JURISDICTION IN WASHINGTON

On the parties in said cause:

<u>**Via File & Serve Xpress**</u>
Joseph D. Satterley, Esq.
Ian A. Rivamonte, Esq.
KAZAN, MCCLAIN, SATTERLEY
    & GREENWOOD
55 Harrison Street, Suite 400
Oakland, CA 94607
T: (510) 302-1000
F: (510) 835-4913
jsatterley@kazanlaw.com
irivamonte@kazanlaw.com
Attorneys for PLAINTIFFS

<u>**Via File & Serve Xpress**</u>
All Defense Counsel of Record

☒       **BY FILE & SERVE XPRESS**: by electronically serving the document(s) via File & Serve Xpress on the recipients designated on the Transaction Receipt located on the File & Serve Xpress website.

I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed on December 5, 2022, at Los Angeles, CA.

_____
Signature

**Winsome M. Taylor**
Print Name

**DEFENDANTS' STIPULATED CONSENT TO JURISDICTION IN WASHINGTON**

SUPERIOR COURT OF THE STATE OF WASHINGTON IN AND FOR
THE COUNTY OF KING

LASALLE ET ANO

vs.

AMERICAN INTL INDUSTRIES ET
AL

Case No.: 23-2-08165-0 SEA

CERTIFICATE OF E-SERVICE

(AFSRES)

I, Colin Mieling, certify that I initiated electronic service of the following document(s) on
the parties listed below who have consented to accept electronic service via the King
County eFiling Application.  Service was initiated on May 08, 2024 at 02:05:59 PM.

Document(s):

1. AMENDED COMPLAINT

Parties:

1. Marissa Alkhazov, Attorney for Respondent/Defendant
   email: malkhazov@buchalter.com
2. Claude Bosworth, Attorney for Respondent/Defendant
   email: asbestos@rizzopc.com
3. Christopher Marks, Attorney for Respondent/Defendant
   email: cmarks@tktrial.com
4. Colin Mieling, Petitioner/Plaintiff
   email: mieling@sgb-law.com
5. Jeanne Loftis, Attorney for Respondent/Defendant
   email: asbestos@bullivant.com
6. Kaitlin Cherf, Petitioner/Plaintiff
   email: cherf@sgb-law.com
7. Kathryn Johnson, Attorney for Respondent/Defendant
   email: asbestos@rizzopc.com
8. Lucas Garrett, Petitioner/Plaintiff
   email: garrett@sgb-law.com
9. Samuel Anderson, Respondent/Defendant
   email: sanderson@davisrothwell.com
10. Shaun Morgan, Attorney for Respondent/Defendant
    email: asbestos@rizzopc.com

CERTIFICATE OF E-SERVICE - 1

11. William Lockwood, Attorney for Respondent/Defendant
email: wglockwood@grsm.com

Executed this 8th day of May, 2024.

s/ Colin Mieling
WSBA #:     46328
810 Third Avenue, Suite 500
Seattle, WA 98104
206-622-8000
mieling@sgb-law.com

CERTIFICATE OF E-SERVICE - 2

# EXHIBIT 3

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

-------------------------------------------------------- x
:
In re: : Chapter 11
:
BMI OLDCO INC., *et al.*,[1] : Case No. 23-90794 (MI)
:
Debtors. : (Jointly Administered)
:
-------------------------------------------------------- x

## JOINT PLAN OF REORGANIZATION FOR BMI OLDCO INC. AND BARRETTS VENTURES TEXAS LLC UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

**LATHAM & WATKINS LLP**

Jeffrey E. Bjork (admitted *pro hac vice*)
Kimberly A. Posin (admitted *pro hac vice*)
Christina M. Craige (admitted *pro hac vice*)
Shawn P. Hansen (admitted *pro hac vice*)
Jonathan J. Weichselbaum (admitted *pro hac vice*)
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071
Telephone:  (213) 485-1234

**PORTER HEDGES LLP**

John F. Higgins (TX Bar No. 09597500)
Megan Young-John (TX Bar No. 24088700)
Jack M. Eiband (TX Bar No. 24135185)
1000 Main Street, 36th Floor
Houston, TX 77002
Telephone:  (713) 226-6000

*Counsel to the Debtors and Debtors-in-Possession*

Dated: April 2, 2025
Houston, Texas

*This Plan contemplates the issuance of a "Channeling Injunction" pursuant to section 524(g) of the Bankruptcy Code.  For a description of the causes of action to be enjoined and the identities of the entities that would be subject to, and protected by, the injunction, see __ARTICLE XI__ of this Plan.*

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: BMI Oldco Inc. (f/k/a Barretts Minerals Inc.) (8715) and Barretts Ventures Texas LLC (0787).  The Debtors' address is 5605 North MacArthur Boulevard, Suite 1000, Irving, Texas 75038.

# TABLE OF CONTENTS

Page

ARTICLE I. DEFINITIONS AND INTERPRETATIONS ..........................................................1

    1.1    Capitalized Terms.........................................................................................1
    1.2    Ancillary Documents...................................................................................17

ARTICLE II. ADMINISTRATIVE EXPENSE CLAIMS, DIP CLAIMS, AND
    PRIORITY TAX CLAIMS .........................................................................17

    2.1    Summary ......................................................................................................17
    2.2    Administrative Expense Claims ...................................................................17
    2.3    DIP Claims ..................................................................................................19
    2.4    Priority Tax Claims .....................................................................................20

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY
    INTERESTS.................................................................................................20

    3.1    Summary ......................................................................................................20
    3.2    Treatment and Classification of Claims and Equity Interests .................21
    3.3    Elimination of Vacant Classes ....................................................................24
    3.4    Special Provision Governing Claims ...........................................................24
    3.5    Controversy Concerning Impairment ...........................................................24

ARTICLE IV. ACCEPTANCE OR REJECTION OF PLAN....................................................25

    4.1    Deemed Acceptance of the Plan...................................................................25
    4.2    Deemed Rejection of Plan ............................................................................25
    4.3    Voting Class .................................................................................................25
    4.4    Class Acceptance Requirement ....................................................................25
    4.5    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the
            Bankruptcy Code; Cram Down ....................................................................25
    4.6    Issuance of Channeling Injunction ..............................................................25
    4.7    Votes Solicited in Good Faith .....................................................................25

ARTICLE V. DISTRIBUTIONS UNDER THE PLAN ON ACCOUNT OF NON-TALC
    CLAIMS.......................................................................................................26

    5.1    Distributions ................................................................................................26
    5.2    Record Date for Holders of Non-Talc Claims..............................................26
    5.3    Date of Distributions ...................................................................................26
    5.4    Postpetition Interest on Claims....................................................................26
    5.5    Means of Cash Payment ...............................................................................27
    5.6    Delivery of Distributions..............................................................................27
    5.7    Full Benefit of Distributions........................................................................27
    5.8    Undeliverable Distributions and Unclaimed Property. ................................27

i

# TABLE OF CONTENTS
## (Continued)

Page

5.9     Prepayment of Non-Talc Claims ................................................................27
5.10    Fractional Cents ........................................................................................28
5.11    Setoff and Recoupment ............................................................................28
5.12    Surrender of Cancelled Instruments or Securities ....................................28
5.13    De Minimis Distributions ........................................................................28
5.14    Compliance with Tax Requirements and Allocations ..............................28

ARTICLE VI. PROCEDURES FOR RESOLVING AND TREATING CONTINGENT,
UNLIQUIDATED, AND DISPUTED CLAIMS ..............................................29

6.1     Disputed Non-Talc Claims .......................................................................29
6.2     Prosecution of Non-Talc Claims Generally ............................................29
6.3     Claims Objection Deadline ......................................................................29
6.4     Estimation of Non-Talc Claims ...............................................................29
6.5     Disallowance of Non-Talc Claims ...........................................................30
6.6     Payments and Distributions with Respect to Disputed Non-Talc Claims ..............30
6.7     Resolution of Talc Personal Injury Claims; Disallowance of Talc Personal
        Injury Claims ............................................................................................30

ARTICLE VII. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
LEASES ..........................................................................................................31

7.1     General Treatment ....................................................................................31
7.2     Preexisting Obligations to the Debtors under Executory Contracts ........32
7.3     Cure of Defaults .......................................................................................32
7.4     Rejection of Executory Contracts and Consequences Thereof ...............32
7.5     Nonoccurrence of Effective Date ............................................................33

ARTICLE VIII. MEANS FOR IMPLEMENTATION OF THE PLAN ......................................33

8.1     Generally ..................................................................................................33
8.2     [Reserved] ................................................................................................33
8.3     Affiliate Settlement ..................................................................................33
8.4     Transactions on the Effective Date ..........................................................34
8.5     The Talc Personal Injury Trust .................................................................35
8.6     Amended Organizational Documents .......................................................35
8.7     Net Reserve Funds ...................................................................................35
8.8     Corporate Governance of Reorganized Debtors .......................................35
8.9     Director and Officer Liability Insurance ..................................................35
8.10    Operations of the Debtors Between Confirmation and the Effective Date ...........36
8.11    Corporate Action ......................................................................................36
8.12    Effectuating Documents; Further Transactions ........................................36
8.13    Closing of the Chapter 11 Cases ..............................................................37
8.14    Notice of Effective Date ...........................................................................37

ii

# TABLE OF CONTENTS
(Continued)

Page

ARTICLE IX. Talc Personal Injury Trust ..................................................................37

    9.1    524(g) Talc Personal Injury Trust ..............................................................37
    9.2    Non-524(g) Talc Personal Injury Trust ....................................................39

ARTICLE X. EFFECT OF CONFIRMATION ...........................................................41

    10.1   Dissolution of Unsecured Creditors Committee; Discharge of the Future
          Claimants' Representative ........................................................................41
    10.2   Vesting of Assets ......................................................................................42
    10.3   Preservation of Certain Causes of Action, Rights to Settle Claims and
          Compromise Controversies, and Defenses ..............................................42
    10.4   Terms of Injunction and Automatic Stay ..................................................42
    10.5   No Successor Liability ..............................................................................43

ARTICLE XI. RELEASES, INJUNCTIONS, AND INDEMNIFICATION OF CLAIMS ..........43

    11.1   Settlement of Claims and Equity Interests ................................................43
    11.2   Discharge of Debtors ................................................................................44
    11.3   Discharge Injunction ................................................................................44
    11.4   Channeling Injunction ..............................................................................44
    11.5   Exculpation ..............................................................................................46
    11.6   Releases by Debtors and Their Estates and Related Injunction ..............47
    11.7   Releases by Holders of Claims ................................................................48
    11.8   Injunction Related to Releases; Injunction Against Interference with Plan ..........49
    11.9   Supplemental Settlement Injunction ........................................................49
    11.10  Certain Waivers ........................................................................................49
    11.11  Gatekeeper Provision ..............................................................................50
    11.12  Disallowed Claims ....................................................................................50
    11.13  Indemnification Obligations ......................................................................51

ARTICLE XII. CONDITIONS PRECEDENT TO CONFIRMATION AND
CONSUMMATION OF THE PLAN ...............................................................51

    12.1   Conditions Precedent to Confirmation of the Plan ..................................51
    12.2   Conditions Precedent to the Effective Date of the Plan ..........................56
    12.3   Waiver of Conditions Precedent ..............................................................56
    12.4   Failure to Achieve the Effective Date ......................................................56

ARTICLE XIII. JURISDICTION OF BANKRUPTCY COURT ................................57

    13.1   Retention of Jurisdiction ..........................................................................57
    13.2   Modification of Plan ..................................................................................59
    13.3   Consent to Jurisdiction ............................................................................60

US-DOCS\149447838.9

# TABLE OF CONTENTS
(Continued)

|  |  |  | Page |
|---|---|---|---|
| **ARTICLE XIV. MISCELLANEOUS PROVISIONS** |  |  | 60 |
| 14.1 | Governing Law |  | 60 |
| 14.2 | Notices |  | 60 |
| 14.3 | Exhibits and Schedules; Conflicts |  | 61 |
| 14.4 | Exemption from Transfer Taxes |  | 61 |
| 14.5 | Recordable Order |  | 61 |
| 14.6 | Binding Effect |  | 61 |
| 14.7 | Severability |  | 61 |
| 14.8 | Further Assurances |  | 62 |
| 14.9 | Further Authorizations |  | 62 |
| 14.10 | General Statements |  | 62 |
| 14.11 | Entire Agreement |  | 62 |
| 14.12 | 2002 Notice Parties |  | 62 |

US-DOCS\149447838.9

**TABLE OF CONTENTS**
(Continued)

## <u>EXHIBITS</u>

| | |
|---|---|
| Exhibit A-1 | 524(g) Talc Personal Injury Trust Agreement |
| Exhibit A-2 | Non-524(g) Talc Personal Injury Trust Agreement |
| Exhibit B-1 | 524(g) Trust Distribution Procedures |
| Exhibit B-2 | Non-524(g) Trust Distribution Procedures |
| Exhibit C-1 | 524(g) Talc Claims Indemnification Agreement |
| Exhibit C-2 | Non-524(g) Talc Claims Indemnification Agreement |
| Exhibit D | Talc Claimant Release |

US-DOCS\149447838.9

> **THE PLAN IS SUBJECT TO ONGOING NEGOTIATION BETWEEN THE DEBTORS AND NON-DEBTOR AFFILIATES.  DISCUSSIONS AMONG SUCH PARTIES REMAIN ONGOING.  FOR THE AVOIDANCE OF DOUBT, AS OF THE DATE HEREOF, EACH OF THE DEBTORS AND THE NON-DEBTOR AFFILIATES RESERVE ALL RIGHTS WITH RESPECT TO THE PLAN.**

## INTRODUCTION

The Debtors respectfully propose the following plan of reorganization pursuant to sections 524(g) and 1121(a) of the Bankruptcy Code.

## ARTICLE I.

### DEFINITIONS AND INTERPRETATIONS

In this Plan, the definitions provided in this <u>ARTICLE I</u> shall apply.  Unless otherwise specified, all Article or Exhibit references in this Plan are to the respective Article of or Exhibit to this Plan, as the same may be amended or modified from time to time.  Wherever from the context it appears appropriate, each term stated in either the singular or the plural will include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender will include the masculine, feminine, and neuter.  The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to this Plan as a whole and not to any particular Article, subsection or clause.  The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of this Plan.  The headings in this Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.  In computing any period of time prescribed or allowed by this Plan, unless otherwise expressly provided, the provisions of Rule 9006(a) of the Bankruptcy Rules will apply.  If the date on which a transaction may occur pursuant to this Plan will occur on a day that is not a Business Day, then such transaction will instead occur on the next succeeding Business Day.

**1.1    Capitalized Terms**.  The capitalized terms used herein have the respective meanings set forth below.  Any term that is not otherwise defined in this <u>Section 1.1</u>, but that is defined elsewhere in this Plan, the Bankruptcy Code, or the Bankruptcy Rules, shall have the meaning given to that term in this Plan, the Bankruptcy Code, or Bankruptcy Rules, as applicable.

**"524(g) Talc Claims Indemnification Agreement"** means, in the event the 524(g) Voting Threshold is met, that certain agreement, which shall be substantially in the form attached as <u>Exhibit C-1</u> hereto and which may be filed with the Plan Supplement, whereby the Reorganized Debtors and the Talc Personal Injury Trust shall indemnify and hold harmless each Non-Debtor Affiliate and all Representatives of the Debtors and Non-Debtor Affiliates in respect of any liability, obligation, fee, judgment, settlement, or expense, including, without limitation, legal fees and expenses, arising from or incurred in connection with any action based upon, attributable to, or arising out a Talc Personal Injury Claim, an Affiliate Released Claim, or any violation of the Channeling Injunction by any Entity or Person.

**"524(g) Talc Personal Injury Trust Agreement"** means the agreement, substantially in the form attached as <u>Exhibit A-1</u> hereto, which may be filed with the Plan Supplement, to be dated

as of the Effective Date, between the Reorganized Debtors and the Talc Personal Injury Trustees, governing the creation and the terms of the Talc Personal Injury Trust in the event the 524(g) Voting Threshold is met.

"**524(g) Trust Distribution Procedures**" means the trust distribution procedures for the Talc Personal Injury Trust, which shall be substantially in the form attached as <u>Exhibit B-1</u> hereto and which may be filed with the Plan Supplement, and such additional procedures as may subsequently be adopted by the Talc Personal Injury Trust in accordance with the 524(g) Talc Personal Injury Trust Agreement, which provide for the resolution, liquidation, and satisfaction of Allowed Talc Personal Injury Claims in the event the 524(g) Voting Threshold is met.

"**524(g) Voting Threshold**" shall have the meaning ascribed to it in <u>Section 4.4</u> of this Plan.

"**Administrative Expense Claim**" means any unpaid Claim for costs and expenses of administration during the Chapter 11 Cases pursuant to sections 363, 364(c)(1), 365, 503(b) 507(a)(2), or 507(b) of the Bankruptcy Code, including, without limitation: (a) any actual and necessary costs and expenses incurred on or after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) Claims pursuant to section 503(b)(9) of the Bankruptcy Code, if any; (c) Professional Fee Claims and any other compensation for legal, financial, advisory, accounting, and other services and reimbursement of expenses Allowed by the Bankruptcy Court under sections 328, 330, 331, or 503(b) of the Bankruptcy Code that have been incurred on or after the Petition Date and through the Effective Date; and (d) all fees and charges assessed against the Estates under section 1930, chapter 123, of title 28 of the United States Code.

"**Affiliate**" shall have the meaning ascribed to such term in section 101(2) of the Bankruptcy Code.

"**Affiliate Adversary Proceeding**" shall mean that action commenced by the Debtors seeking declaratory and other relief as to the scope and nature of the Debtors' claims against MTI and SMI, which action is captioned *BMI Oldco Inc. and Barretts Ventures Texas LLC v. Those Parties Listed in Appendix A to Complaint and John And Jane Does 1- 1,000*, Adv. Pro. No. 25-03102 (Bankr. S.D. Tex).

"**Affiliate Adversary Proceeding Order**" shall mean a Final Order in the Affiliate Adversary Proceeding.

"**Affiliate Cash**" means (a) in the event the 524(g) Voting Threshold is met, $[ ● ] in Cash or (b) in the event the 524(g) Voting Threshold is not met, $[ ● ] in Cash.

"**Affiliate Contribution**" means, in the aggregate, the following contributions made prior to, on, or after the Effective Date by MTI or one or more of its Affiliates on behalf of MTI and the other Non-Debtor Affiliates: (a) the Affiliate Trust Contribution; (b) the funding of the Net Reserve Funds; and (c) the forgiveness of the DIP Claims.

"**Affiliate Released Claims**" means, collectively, (a) all Causes of Action and (b) any and all claims, causes of action, suits, costs, debts, liabilities, theories of recovery, remedies,

US-DOCS\149447838.9

obligations, dues, sums of money, accounts, reckonings, bonds, bills, covenants, contracts, controversies, agreements (other than those agreements entered into pursuant to this Plan), promises, damages, judgments, executions and demands whatsoever, of whatever kind or nature (including, without limitation, those arising under the Bankruptcy Code), whether known or unknown, suspected or unsuspected, fixed or contingent, in law or in equity, which the Debtors, their Estates, or the Reorganized Debtors have, had, may have, or may claim to have against any of the Non-Debtor Affiliates including without limitation with respect to any Talc Personal Injury Claim.

"**Affiliate Settlement**" means that certain comprehensive settlement by and among the Debtors, MTI, and SMI, the terms of which are set forth and implemented in this Plan.

"**Affiliate Trust Contribution**" means the contribution of the Affiliate Cash on the Effective Date to the Talc Personal Injury Trust by MTI or one or more of its Non-Debtor Affiliates, on behalf of MTI and the other Non-Debtor Affiliates.

"**Allowed**" means (a) with respect to Claims, and including applicable and allowable premiums and penalties: (i) any Claim proof of which is timely filed by the applicable Claims Bar Date; (ii) any Claim that is listed in the Schedules as neither contingent, unliquidated, nor disputed, and for which no Proof of Claim has been timely filed; or (iii) any Claim that is allowed pursuant to this Plan; *provided*, *however*, that with respect to any Claim described in clauses (i) and (ii) above, such Claim shall be considered Allowed only if no objection to the allowance of such Claim has been filed within the applicable period of time fixed by this Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is filed and the Claim shall have been allowed by a Final Order; *provided*, *further* that, with respect to Talc Personal Injury Claims, such Talc Personal Injury Claims must have been allowed in accordance with the Trust Distribution Procedures and (b) with respect to Equity Interests: (i) any Equity Interest registered in the stock register (or its equivalent) maintained by or on behalf of the relevant Debtor as of the Confirmation Date; (ii) any Equity Interest that is allowed pursuant to this Plan; or (iii) any other Equity Interest that has been allowed by a Final Order of the Bankruptcy Court. Notwithstanding anything to the contrary herein, no Claim or Professional Fee Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes the Debtors or Reorganized Debtors, as applicable. "Allow" and "Allowance" shall have correlative meanings. Unless otherwise provided in this Plan or a Final Order, the Allowed amount of any Claim or Professional Fee Claim shall not include interest or penalties accruing on such Claim from and after the Petition Date.

"**Amended Organizational Documents**" means the amended and restated organizational documents of the Reorganized Debtors, which shall be substantially in the form contained in the Plan Supplement.

"**Avoidance Action**" means any and all avoidance, recovery, subordination, or similar actions, claims, or remedies that may be brought by or on behalf of the Debtors or their Estates under the Bankruptcy Code or applicable non-bankruptcy law, including, without limitation, actions or remedies arising under chapter 5 of the Bankruptcy Code or under similar or related local, state, federal, or foreign statutes and common law, including fraudulent transfer laws, or other similar related laws.

"**Balloting Agent**" means Stretto, Inc.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, as amended from time to time, as applicable to the Chapter 11 Cases.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of Texas or such other court (other than the District Court) as may have jurisdiction over the Chapter 11 Cases.

"**Bankruptcy Rules**" means, collectively: (a) the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code; (b) the Federal Rules of Civil Procedure, as applicable to the Chapter 11 Cases or any proceedings therein; and (c) the local rules of the Bankruptcy Court, all as amended from time to time and applicable to the Chapter 11 Cases. When used to reference specific rules, such term shall mean the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code.

"**BMI**" means BMI Oldco Inc. (f/k/a Barretts Minerals, Inc.), a Delaware corporation, as a debtor-in-possession in the Chapter 11 Cases.

"**BMI Equity Interests**" means the Equity Interests of BMI, 100% of which are held by SMI.

"**Business Day**" means any day other than a Saturday, a Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

"**Buyer**" means Elevation Newco, LLC as the purchaser of substantially all of BMI's talc related assets pursuant to the Sale Order.

"**BVT**" means Barretts Ventures Texas LLC, a Texas limited liability company, as a debtor-in-possession in the Chapter 11 Cases.

"**BVT Equity Interests**" means all of the Equity Interests in BVT, 100% of which are held by BMI.

"**Cash**" means legal tender of the United States of America or the equivalent thereof.

"**Cause of Action**" means any action, including any Avoidance Action, cause of action, liability, obligation, account, controversy, right to legal remedy, right to equitable remedy, right to payment, suit, debt, sum of money, damage, judgment, Claim or Demand whatsoever, whether known or unknown, now or in the future, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured, whether alleged, asserted or assertable directly, indirectly or derivatively, in law, equity, admiralty, or otherwise, arising under any applicable law, regulation, or similar governmental pronouncement.

"**Channeling Injunction**" means the injunction provided for in <u>Section 11.4</u> of this Plan.

"**Chapter 11 Cases**" means the cases under Chapter 11 of the Bankruptcy Code commenced by the Debtors on the Petition Date in the Bankruptcy Court jointly administered under Case No. 23-90794 (MI).

"**Claim**" shall have the meaning ascribed to such term in section 101(5) of the Bankruptcy Code as it pertains to "claims" against the Debtors.

"**Claims Bar Date**" means, collectively, the applicable date by which a Proof of Claim must be or must have been Filed for Claims against the Debtors, as established by the General Bar Date Order and the Direct Talc Personal Injury Claims Bar Date Order, as applicable.

"**Claims Bar Date Orders**" means, collectively, the General Bar Date Order and the Direct Talc Personal Injury Claims Bar Date Order.

"**Claims Objection Deadline**" means the deadline for objecting to Claims (other than Administrative Expense Claims) set forth in Section 6.3 of this Plan, which shall be on or before the later of (a) 180 days after the Effective Date and (b) such other period of limitation as may be specifically fixed by the Bankruptcy Court upon a motion by the Debtors or Reorganized Debtors.

"**Class**" means a category of Holders of Claims or Equity Interests described in ARTICLE III of this Plan.

"**Committee Members**" means the members of the Unsecured Creditors Committee.

"**Confirmation Date**" means (a) in the event the 524(g) Voting Threshold is met, the earlier of (i) the date on which the order of the Bankruptcy Court confirming this Plan under section 1129 of the Bankruptcy Code is affirmed by the District Court and (ii) the date on which the Confirmation Order is entered by the District Court; or (b) in the event the 524(g) Voting Threshold is not met, the date on which the Confirmation Order is entered by the Bankruptcy Court, in each case, subject to all conditions to confirmation of this Plan specified in ARTICLE XII of this Plan having been satisfied or waived pursuant to, and in accordance with ARTICLE XII of this Plan.

"**Confirmation Hearing**" means the hearing(s) held by the Bankruptcy Court and/or District Court pursuant to section 1128 of the Bankruptcy Code to consider confirmation of this Plan, as such hearing(s) may be adjourned or continued from time to time.

"**Confirmation Order**" means (a) in the event the 524(g) Voting Threshold is met, (i) the order of the District Court confirming the Plan under section 524(g) and section 1129 of the Bankruptcy Code or (ii) collectively, the order of the Bankruptcy Court confirming the Plan under section 524(g) and section 1129 of the Bankruptcy Code and the order of the District Court affirming such order, which in either case shall contain the Channeling Injunction; or (b) in the event the 524(g) Voting Threshold is not met, the order of the Bankruptcy Court confirming this Plan under section 1129 of the Bankruptcy Code.

"**Cure Claim**" means a Claim based upon the Debtors' monetary default(s) under an Executory Contract existing as of the time such Executory Contract is assumed by the Debtors pursuant to section 365 of the Bankruptcy Code.

"**Cure Notices**" means, collectively, (a) the *Notice of Executory Contracts and Unexpired Leases that May be Assumed and Assigned in Connection with the Sale of the Debtors' Assets and the Proposed Cure Cost with Respect Thereto* [Docket No. 283] filed on November 14, 2023, (b) the *Supplemental Notice of Executory Contracts and Unexpired Leases that May be Assumed and Assigned in Connection with the Sale of the Debtors' Assets and the Proposed Cure Cost with Respect Thereto* [Docket No. 656] filed on February 28, 2024, (c) the *Second Supplemental Notice of Executory Contracts and Unexpired Leases that May be Assumed and Assigned in Connection with the Sale of the Debtors' Assets and the Proposed Cure Cost with Respect Thereto* [Docket No. 721] filed on March 13, 2024, (d) the *Third Supplemental Notice of Executory Contracts and Unexpired Leases that May be Assumed and Assigned in Connection with the Sale of the Debtors' Assets and the Proposed Cure Costs with Respect Thereto* [Docket No. 849] filed on April 26, 2024, and (e) the *Fourth Supplemental Notice of Executory Contracts and Unexpired Leases that May be Assumed and Assigned in Connection with the Sale of the Debtors' Assets and the Proposed Cure Costs with Respect Thereto* [Docket No. 852] filed on April 29, 2024.

"**D&O Liability Insurance Policies**" means all insurance policies (including any "tail policy") covering the Debtors' current or former directors', managers', officers', and/or employees' liability and all agreements, documents, or instruments relating thereto.

"**Debtor Release**" means the releases of the Released Parties provided for in <u>Section 11.6</u> of this Plan.

"**Debtor Trust Contribution**" means, collectively, (a) the issuance and transfer of 100% of the Reorganized BMI Equity Interests, (b) the transfer of 100% of the BVT Equity Interests, and (c) [ ● ], in each case, to the Talc Personal Injury Trust.

"**Debtors**" means, collectively, BMI and BVT.

"**Demand**" means a demand for payment, present or future, against the Debtors or any other Protected Party that falls within the meaning of "demand" in section 524(g) of the Bankruptcy Code.

"**DIP Claim**" means a right to payment held by MTI LLC on account of any and all of the Debtors' obligations under the DIP Credit Agreement.

"**DIP Credit Agreement**" means that certain *Debtor-in-Possession Credit Agreement*, dated as of May 21, 2024, between the Debtors and MTI LLC, as amended and supplemented from time to time.

"**Direct Talc Personal Injury Claim**" means any Claim, commitment, obligation, suit, judgment, damage (whether compensatory, exemplary, punitive or otherwise), Demand, debt, cause of action, theory of recovery, or liability of any kind or nature, or any portion thereof, against any Protected Party, including but not limited to causes of action based on theories of conspiracy or concert of action, for, attributable to, arising out of, with respect to, in connection with, based upon, or resulting from, any alleged bodily injury, death, sickness, disease, emotional distress, fear of cancer, medical monitoring, or any other alleged personal injuries or harms to Persons (whether physical, emotional or otherwise and whether or not diagnosable, evident, or manifested), arising out of, based upon, or relating to, directly, or indirectly or where the theory of recovery may, but

6

for the Chapter 11 Cases or confirmation of this Plan, otherwise be pursued against one or both of the Debtors, in whole or in part, (a) the presence of or exposure to talc, asbestos, or talc-containing, asbestos-containing, or asbestos-contaminated products or things and (b) the alleged acts, omissions, business, premises, or operations of either Debtor, or any predecessor, or any other Entity directly or indirectly arising out of or in any way relating to: (i) any materials or products mined, milled, processed, manufactured, sold, designed, marketed, fabricated, beneficiated, constructed, supplied, produced, installed, maintained, serviced, specified, selected, repaired, removed, replaced, released, distributed, tested, and/or in any other way made available by the Debtors or any other Entity; (ii) any materials or products present at any premises owned, leased, occupied, or operated by any Entity; or (iii) any talc or asbestos in any way connected to either Debtor.

Direct Talc Personal Injury Claims include (but are not limited to) all direct or derivative claims, commitments, obligations, suits, judgments, damages, Demands, debts, causes of action and liabilities whatsoever, whether: (a) in tort, contract, warranty, restitution, conspiracy, guarantee, strict liability or any other theory of law, equity or admiralty; (b) brought, threatened, arising in, or pursued in any United States jurisdiction or other jurisdiction anywhere in the world; (c) liquidated or unliquidated, fixed or contingent, direct or indirect, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, now existing or hereafter arising, or asserted or unasserted; (d) seeking compensatory, special, proximate, general, economic, non-economic, punitive, exemplary or any other measure of damages or compensation, administrative or other costs or fees, injunctive or similar relief, or any other relief of any kind whatsoever; (e) brought under any legal, equitable or other theory whatsoever (including, without limitation, under any theory of (i) piercing the corporate veil; (ii) mere instrumentality, agency, domination or control; (iii) alter ego; (iv) successor liability; (v) vicarious liability; (vi) mere continuation; (vii) fraudulent transfer or conveyance; (viii) conspiracy; (ix) enterprise liability (including single business enterprise and common enterprise theories); (x) strict liability; (xi) market share; (xii) joint venture; (xiii) testing; (xiv) ordinary or gross negligence; (xv) reckless, intentional, willful, or wanton misconduct; (xvi) fraud; (xvii) misrepresentation; (xviii) aiding and abetting; (xix) loss of consortium; (xx) medical monitoring; (xxi) personal or bodily injury tort; (xxii) wrongful death; (xxiii) survivorship; or (xxiv) failure to warn); or (f) held by Persons residing within the United States or in any foreign jurisdiction. Direct Talc Personal Injury Claims include any such claims that have been resolved or are subject to resolution pursuant to any agreement, or any such claims that are based on a judgment or verdict; *provided,* that such claims were not paid in full more than ninety (90) days prior to the Petition Date.

Direct Talc Personal Injury Claims do not include any (a) claim or demand by any present or former employee of a predecessor or Affiliate of either Debtor for benefits under a policy of workers' compensation insurance or for benefits under any state or federal workers' compensation statute or other statute providing compensation to an employee from an employer; or (b) claim, commitment, obligation, suit, judgment, damage (whether compensatory, exemplary, punitive or otherwise), Demand, debt, cause of action or liability of any kind or nature, or any portion thereof, of any corporation (as defined in section 101(9) of the Bankruptcy Code), codefendant of a Debtor, or predecessor of a Debtor for (i) contribution, reimbursement, subrogation, or indemnity, whether contractual or implied by law (as those terms are defined by applicable non-bankruptcy law of the relevant jurisdiction), or (ii) any other harm, whether in the nature of or sounding in contract, tort, warranty, or other theory of law.

**"Direct Talc Personal Injury Claims Bar Date"** means the applicable bar date by which a Proof of Claim must be or must have been Filed for Direct Talc Personal Injury Claims, as established by the Direct Talc Personal Injury Claims Bar Date Order.

**"Direct Talc Personal Injury Claims Bar Date Order"** means the [ ● ] [Docket No. [ ● ]] entered by the Bankruptcy Court on [ ● ].

**"Disallowed"** means, when used with respect to a Claim against the Debtors, such Claim that: (a) is denied, dismissed, expunged, overruled, or disallowed in whole or in part (but solely in respect of such disallowance) by a Final Order; (b) has been reclassified, expunged, subordinated or estimated by a Final Order; (c) is unenforceable under section 502(b) of the Bankruptcy Code; or (d) where the Holder of such Claim is a Person or Entity from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, unless such Person, Entity or transferee has paid the amount, or turned over any such property, for which such Person, Entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of the Bankruptcy Code. In each case, a Disallowed Claim or a Disallowed Equity Interest is disallowed only in respect of such disallowance, reclassification, expungement, subordination, or estimation. For the avoidance of doubt, Claims that "pass through" or are otherwise Reinstated under this Plan shall be neither Allowed nor Disallowed, and the Reorganized Debtors shall retain all claims and defenses thereto.

**"Disbursing Agent"** means as applicable, the Reorganized Debtors or any Entity or Person selected by the Debtors or the Reorganized Debtors to make or facilitate Distributions pursuant to this Plan.

**"Disclosure Statement"** means the written disclosure statement that relates to this Plan, as the same may be amended, supplemented, or modified from time to time, including all exhibits and schedules thereto and references therein that relate to this Plan, that is prepared and distributed in accordance with the Bankruptcy Code, Bankruptcy Rules, and any other applicable law.

**"Disputed"** means a Claim that (a) is neither Allowed nor Disallowed under this Plan or a Final Order unless such Claim is deemed to "pass through" or is otherwise Reinstated under this Plan, nor deemed Allowed under sections 502, 503 or 1111 of the Bankruptcy Code; (b) any party in interest has interposed a timely objection or request for estimation (including, without limitation as contemplated in <u>ARTICLE VI</u>), and such objection or request for estimation has not been withdrawn or resolved by a Final Order or by agreement; or (c) is listed on the Schedules as disputed, contingent, or unliquidated.

**"Distribution"** means one or more payments or distributions under this Plan of: (a) Cash; (b) property; or (c) other interest in property, as applicable, to the Holders of Allowed Non-Talc Claims or the Talc Personal Injury Trust.

**"Distribution Record Date"** means the record date for determining an entitlement to receive Distributions under this Plan on account of Allowed Non-Talc Claims, which date shall be the Confirmation Date.

**"District Court"** means the United States District Court for the Southern District of Texas.

"**Effective Date**" means the date, as determined by the Debtors, on which all conditions to consummation of this Plan set forth in <u>Section 12.2</u> have been satisfied or waived in accordance with <u>Section 12.3</u>.

"**Encumbrance**" means, with respect to any property (whether real or personal, or tangible or intangible), any mortgage, Lien, pledge, charge, security interest, assignment, or encumbrance of any kind or nature in respect of such property, including, without limitation, any conditional sale or other title retention agreement, any security agreement, and the filing of, or agreement to give, any financing statement under the Uniform Commercial Code or comparable law of any jurisdiction, to secure payment of a debt or performance of an obligation.

"**Enjoined Matters**" shall have the meaning ascribed to it in <u>Section 11.8</u> of this Plan.

"**Entity**" means an entity as defined in section 101(15) of the Bankruptcy Code.

"**Equity Interests**" means any equity securities (as defined in section 101(16) of the Bankruptcy Code) of the Debtors, including all of the outstanding stock or membership interests in the Debtors, or any warrants, options, or contractual rights to purchase or acquire such equity securities at any time and all rights with respect thereto.

"**Estate**" means, as to each Debtor, the estate created under section 541 of the Bankruptcy Code in the Chapter 11 Cases.

"**Exculpated Parties**" means, collectively, each of (a) the Debtors and (b) BMI's independent director.

"**Exculpation**" means the exculpation provision set forth in <u>Section 11.5</u> hereof.

"**Executory Contract**" means any unexpired lease or executory contract of a Debtor that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

"**Federal Judgment Rate**" means the rate specified by 28 U.S.C. § 1961.

"**File**" or "**Filed**" or "**Filing**" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

"**Final Order**" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed or stayed, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument or rehearing shall have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice; *provided*, *however*, no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order or judgment.

US-DOCS\149447838.9

"**Future Claimants' Representative**" means Sander L. Esserman (or any court-appointed alternative or successor), in his capacity as the court-appointed legal representative for all Future Demand Holders pursuant to section 524(g) of the Bankruptcy Code.

"**Future Demand Holder**" means an Entity that holds or might subsequently hold a Demand.

"**General Bar Date Order**" means the *Amended Order (I) Setting Bar Dates for Filing Proofs of Claim Other than with Respect to Direct Talc Personal Injury Claims, (II) Establishing Amended Schedules Bar Date, (III) Approving the Form of and Manner for Filing Proofs of Claim, and (IV) Approving Notice of Bar Dates* [Docket No. 809] entered by the Bankruptcy Court on April 9, 2024.

"**General Claims Bar Date**" means the applicable date by which a Proof of Claim must be or must have been Filed for all Claims except Direct Talc Personal Injury Claims, as established by the General Bar Date Order.

"**General Unsecured Claim**" means a Claim against any Debtor that is not secured by a valid and enforceable Lien against property of such Debtor and that is not an Administrative Expense Claim, a DIP Claim, a Priority Tax Claim, an Other Priority Claim, a Talc Personal Injury Claim, or an Intercompany Claim.

"**GUC Cash Pool**" means $[ ● ], to be held, administered and distributed by the Reorganized Debtors.

"**Holder**" means any Person or Entity that is the owner of record of a Claim or an Equity Interest, as applicable.

"**Impaired**" means a Claim or an Equity Interest, or a Class of Claims or Equity Interests, as appropriate, that is impaired within the meaning of section 1124 of the Bankruptcy Code.

"**Indirect Talc Personal Injury Claim**" means any Claim, of any corporation (as defined in section 101(9) of the Bankruptcy Code), co-defendant of a Debtor, or predecessor of a Debtor for contribution, reimbursement, subrogation, or indemnity, whether contractual or implied by law (as those terms are defined by applicable non-bankruptcy law of the relevant jurisdiction), and any other derivative claim or theory of recovery against a Debtor whether in the nature of or sounding in contract, tort, warranty, or other theory of law, for, attributable to, arising out of, in connection with, based upon, or resulting from, directly or indirectly, death, bodily injury, sickness, disease, other personal or emotional injuries to Persons caused, or allegedly caused, directly or indirectly, by the sale of, manufacture of, presence of, or exposure to talc, asbestos, or talc-containing, asbestos-containing, or asbestos-contaminated products or things. For the avoidance of doubt, Indirect Talc Personal Injury Claims include claims, commitments, obligations, suits, judgments, damages, Demands, debts, causes of action and liabilities brought under any legal or equitable theory, other than any such claim that falls within the definition of Direct Talc Personal Injury Claim.

"**Intercompany Claim**" means any Claim against a Debtor held by another Debtor or an Affiliate of a Debtor.

"**Lien**" has the meaning ascribed to such term in section 101(37) of the Bankruptcy Code.

"**MTI**" means Minerals Technologies Inc., a publicly traded Delaware corporation and the indirect parent of the Debtors, and any successor or assign thereof.

"**MTI LLC**" means Minerals Technologies Investments LLC, a Delaware limited liability company.

"**Net Reserve Funds**" means no less than $[ ● ] million in Cash to be set aside by the Debtors on the Effective Date in accordance with <u>Section 8.7</u> of this Plan.

"**Non-524(g) Talc Claims Indemnification Agreement**" means, in the event the 524(g) Voting Threshold is not met, that certain agreement, which shall be substantially in the form attached as <u>Exhibit C-2</u> hereto and which may be filed with the Plan Supplement, whereby the Reorganized Debtors and the Talc Personal Injury Trust shall indemnify and hold harmless each Non-Debtor Affiliate and all Representatives of the Debtors and Non-Debtor Affiliates in respect of any liability, obligation, fee, judgment, settlement, or expense, including, without limitation, legal fees and expenses, arising from or incurred in connection with any action based upon, attributable to, or arising out a Talc Personal Injury Claim or an Affiliate Released Claim.

"**Non-524(g) Talc Personal Injury Trust Agreement**" means the agreement, substantially in the form attached as <u>Exhibit A-2</u> hereto and which may be filed with the Plan Supplement, to be dated as of the Effective Date, between the Reorganized Debtors and the Talc Personal Injury Trustees, governing the creation and the terms of the Talc Personal Injury Trust in the event the 524(g) Voting Threshold is not met.

"**Non-524(g) Trust Distribution Procedures**" means the trust distribution procedures for the Talc Personal Injury Trust, which shall be substantially in the form attached as <u>Exhibit B-2</u> hereto and which may be filed with the Plan Supplement, and such additional procedures as may subsequently be adopted by the Talc Personal Injury Trust in accordance with the Non-524(g) Talc Personal Injury Trust Agreement, which provide for the resolution, liquidation, and satisfaction of Allowed Talc Personal Injury Claims in the event the 524(g) Voting Threshold is not met.

"**Non-Debtor Affiliates**" means MTI and SMI and all of their respective current and former Affiliates after the Pfizer Spin Transaction other than the Debtors, and any of such Affiliates' successors or assigns, solely in their capacities as such.

"**Non-Talc Claim**" means any Claim against the Debtors that is not a Talc Personal Injury Claim.

"**Other Priority Claim**" means any Claim entitled to priority pursuant to section 507 of the Bankruptcy Code other than an Administrative Expense Claim, a Secured Claim, or a Priority Tax Claim.

"**Person**" means a person as defined in section 101(41) of the Bankruptcy Code.

"**Petition Date**" means October 2, 2023, the date on which the Debtors Filed their petitions for relief commencing the Chapter 11 Cases.

"**Pfizer**" means Pfizer Inc., a publicly traded Delaware corporation.

"**Pfizer Agreements**" means those contracts and/or agreements setting forth the Pfizer Indemnity, including, without limitation: (a) that certain Reorganization Agreement, dated September 28, 1992 and (b) that certain Letter Agreement, dated as of October 29, 1992.

"**Pfizer Indemnity**" means any and all indemnification obligations of Pfizer in favor of BMI and the Non-Debtor Affiliates for Talc Personal Injury Claims set forth in the Pfizer Agreements.

"**Pfizer Spin Transaction**" means, collectively, the restructuring transactions whereby Pfizer created BMI, SMI and MTI as wholly-owned subsidiaries and then spun them off through the Pfizer Agreements, effective as of October 23, 1992.

"**Plan**" means this *Joint Plan of Reorganization for BMI Oldco Inc. and Barretts Ventures Texas LLC Under Chapter 11 of the Bankruptcy Code*, including any supplements and exhibits hereto, either in its present form or as the same may be amended, modified or supplemented from time to time in accordance with the terms hereof.

"**Plan Documents**" means, collectively, (a) this Plan, (b) the Disclosure Statement, (c) all of the exhibits attached to this Plan and the Disclosure Statement, (d) the Plan Supplement and all documents and agreements contained therein, (e) the Talc Personal Injury Trust Documents, and (e) any other document necessary to implement this Plan.

"**Plan Supplement**" means the supplement to this Plan to be Filed with the Bankruptcy Court on or before the date that is seven (7) calendar days prior to the earlier of (a) the Voting Deadline or (b) the deadline to object to confirmation of this Plan, unless otherwise ordered by the Bankruptcy Court.

"**Post-Effective Date Future Claimants' Representative**" means the Future Claimants' Representative or such other Person appointed by the Bankruptcy Court and identified in the 524(g) Talc Personal Injury Trust Agreement (or any alternative or successor appointed as provided in the 524(g) Talc Personal Injury Trust Agreement), in his or her capacity as the legal representative of Future Demand Holders subsequent to the Effective Date pursuant to section 524(g) of the Bankruptcy Code.

"**Postpetition Interest**" means: (a) with respect to General Unsecured Claims and Other Priority Claims, postpetition interest at the Federal Judgment Rate in effect on the Petition Date; (b) with respect to Priority Tax Claims, interest consistent with section 511 of the Bankruptcy Code; and (c) with respect to Secured Claims, postpetition interest at the applicable contract rate or, if none, at the Federal Judgment Rate in effect on the Petition Date.

"**Prepetition Intercompany Loan Agreement**" means that certain Intercompany Loan Agreement, dated as of September 29, 2023 between BMI and MTI.

"**Prepetition Intercompany Note**" means that certain intercompany note evidencing amounts due under the Prepetition Loan Agreement, which as of the Petition Date had a balance of $39,027,284 and accrues interest at a rate per annum equal to 10%.

US-DOCS\149447838.9

"**Priority Tax Claim**" means any Claim entitled to priority pursuant to section 507(a)(8) of the Bankruptcy Code.

"**Professional**" means any Person retained or to be compensated in the Chapter 11 Cases pursuant to section 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code, including, without limitation, any professional retained by the Debtors, the Unsecured Creditors Committee, and/or the Future Claimants' Representative.

"**Professional Fee Claim**" means any Claim of (a) a Professional for allowance of compensation and/or reimbursement of costs and expenses pursuant to sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code, or (b) the Future Claimants' Representative or a Committee Member for reimbursement of costs and expenses, in each case incurred in the Chapter 11 Cases on or before the Effective Date, or, pursuant to Section 10.1 herein, after the Effective Date.

"**Professional Fee Claims Bar Date**" means the date that is forty-five (45) days after the Effective Date.

"**Professional Fee Escrow Account**" means an account funded by the Debtors in an amount equal to or greater than the Professional Fee Escrow Amount and maintained on and after the Effective Date solely for the purpose of paying Allowed and unpaid Professional Fee Claims and Allowed and unpaid fees and expenses of the Balloting Agent under section 156 of the Bankruptcy Code.

"**Professional Fee Escrow Agent**" means the escrow agent for the Professional Fee Escrow Account appointed pursuant to Section 2.2(c) of this Plan and the escrow agreement entered into in connection therewith.

"**Professional Fee Escrow Amount**" means the aggregate amount of all fees, costs and expenses accrued and incurred by (a) Professionals, (b) the Future Claimants' Representative, (c) the Committee Members, and (d) the Balloting Agent under section 156 of the Bankruptcy Code through the Effective Date as estimated in good faith and in accordance with Section 2.2(c).

"**Proof of Claim**" means any proof of claim Filed with the Bankruptcy Court or the Balloting Agent pursuant to section 501 of the Bankruptcy Code and Rule 3001 or 3002 of the Bankruptcy Rules that asserts a Claim against the Debtors.

"**Protected Party**" means each of the following: (a) the Debtors; (b) the Reorganized Debtors; (c) the Non-Debtor Affiliates; (d) the Buyer (but only with respect to liability that is asserted to exist as a result of its becoming a transferee or successor to BMI); (e) any Representative of any of the foregoing Entities; and (f) any other Person or Entity designated as a "Protected Party" pursuant to the Confirmation Order.

"**Reinstate**" or "**Reinstated**" or "**Reinstatement**" means with respect to a Claim or Equity Interest, that the Claim or Equity Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

"**Released Party**" means each of the following: (a) the Debtors; (b) the Non-Debtor Affiliates; (c), to the fullest extent permitted by applicable law, any Representatives of the foregoing Entities; and (d) any other Person or Entity designated as a "Released Party" pursuant to the Confirmation Order.

"**Releasing Parties**" means, collectively, (a) all Holders of Claims that vote to accept this Plan and who do not opt out of the releases provided for in Section 11.7 of this Plan; (b) all Holders of Claims that are deemed to accept this Plan and who do not opt out of the releases provided for in Section 11.7 of this Plan; (c) all Holders of Claims entitled to vote on this Plan and who vote against this Plan and do not opt out of the releases provided for in Section 11.7 of this Plan; and (d) all Holders of Claims entitled to, but do not, vote for or against this Plan and do not opt out of the releases provided for in Section 11.7 of this Plan.

"**Reorganized BMI**" means BMI, as reorganized pursuant to this Plan on and after the Effective Date, and its successors or assigns by merger, consolidation or otherwise, on and after the Effective Date.

"**Reorganized BMI Equity Interests**" means the new common equity interests of Reorganized BMI authorized to be issued pursuant to this Plan and the Amended Organizational Documents.

"**Reorganized BVT**" means BVT, as reorganized pursuant to this Plan on and after the Effective Date, and its successors or assigns by merger, consolidation or otherwise, on and after the Effective Date.

"**Reorganized Debtors**" means, collectively, Reorganized BVT and Reorganized BMI.

"**Representative**" means with respect to any Person, such Person's (a) predecessors, successors, permitted assigns, subsidiaries, and controlled affiliates, (b) current and former officers, directors, and managers, principals, members, employees, financial advisors, attorneys, accountants, investment bankers, consultants, experts, other professionals, and agents, and (c) respective heirs, executors, and estates, in each case solely in their capacity as such.

"**Sale Order**" means the Bankruptcy Court's *Order (I) Authorizing (A) the Sale of the Debtors' Assets, Free and Clear of All Liens, Claims, Encumbrances, and Other Interests and (B) the Debtors' Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (II) Granting Related Relief* [Docket No. 776], entered on March 25, 2024.

"**Schedule of Assumed Contracts**" means the schedule of Executory Contracts to be assumed by the Debtors, which schedule shall be Filed with the Plan Supplement, as may be amended, modified or supplemented pursuant to the terms hereof.

"**Schedules**" means the schedules of assets and liabilities and the statements of financial affairs of the Debtors as Filed with the Bankruptcy Court in accordance with section 521 of the Bankruptcy Code, as such schedules and statements may be amended or supplemented from time to time.

**"Secured Claim"** means a Claim, other than a DIP Claim or an Intercompany Claim, that is: (a) secured by a valid, duly perfected, non-avoidable Lien, mortgage, security interest, or other Encumbrance on or in an interest of the Estates in property, to the extent of the value, as of the Effective Date or such other date as is established by the Bankruptcy Court, of the Holder's interest in the Estates' interest in such property, as determined by a Final Order of the Bankruptcy Court pursuant to section 506(a) of the Bankruptcy Code or as otherwise agreed in writing by the Debtors and the Holder of the applicable Claim; or (b) secured by the amount of any valid, non-avoidable rights of setoff of the Holder thereof under section 553 of the Bankruptcy Code.

**"SMI"** means Specialty Minerals Inc., a Delaware corporation and the direct parent of BMI, and any successor or assign thereof.

**"Statutory Fees"** means all fees and charges assessed against the Estates under section 1930, chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1-4001.

**"Supplemental Settlement Injunction"** shall have the meaning ascribed to it in Section 11.9 of this Plan.

**"Talc Claimant Release"** means a release of all Talc Personal Injury Claims against the Protected Parties, and the Talc Personal Injury Trust and its related parties, which shall be in substantially the form attached as Exhibit D hereto and which may be filed with the Plan Supplement.

**"Talc Claims Indemnification Agreement"** means, as applicable, the 524(g) Talc Claims Indemnification Agreement or the Non-524(g) Talc Claims Indemnification Agreement, whereby the Reorganized Debtors and the Talc Personal Injury Trust shall indemnify and hold harmless each Non-Debtor Affiliate and all Representatives of the Debtors and Non-Debtor Affiliates in respect of any liability, obligation, fee, judgment, settlement, or expense, including, without limitation, legal fees and expenses, arising from or incurred in connection with any action based upon, attributable to, or arising out a Talc Personal Injury Claim, an Affiliate Released Claim, or any violation of the Channeling Injunction (if issued) by any Entity or Person.

**"Talc Personal Injury Claim"** means each of (a) a Direct Talc Personal Injury Claim, and (b) an Indirect Talc Personal Injury Claim.

**"Talc Personal Injury Trust"** means the trust established in accordance with this Plan, the Confirmation Order, the Talc Personal Injury Trust Agreement, and, if the 524(g) Voting Threshold is met, pursuant to section 524(g) of the Bankruptcy Code, which trust shall constitute a "qualified settlement fund" under section 468B of the Internal Revenue Code.

**"Talc Personal Injury Trust Agreement"** means, as applicable, the 524(g) Talc Personal Injury Trust Agreement or the Non-524(g) Talc Personal Injury Trust Agreement, governing the creation and the terms of the Talc Personal Injury Trust.

**"Talc Personal Injury Trust Assets"** means, collectively: (a) the Trust Contributions; (b) all other assets, rights, and benefits assigned, transferred or conveyed to the Talc Personal Injury Trust in connection with this Plan or any Plan Documents; and (c) all proceeds of the foregoing.

15

"**Talc Personal Injury Trust Documents**" means, collectively: (a) the Talc Personal Injury Trust Agreement; (b) the Trust Distribution Procedures; and (c) any other agreements, instruments and documents governing the establishment and administration of the Talc Personal Injury Trust, as the same may be amended or modified from time to time, subject to and in accordance with the terms thereof.

"**Talc Personal Injury Trust Expenses**" means any of the liabilities, costs, or expenses incurred by or on behalf of the Talc Personal Injury Trust (other than liabilities to Holders of Allowed Talc Personal Injury Claims in respect of such Claims), in carrying out the terms of the Talc Personal Injury Trust Agreement.

"**Talc Personal Injury Trustees**" means the individual or individuals set forth in the Talc Personal Injury Trust Agreement and appointed to serve as the trustee(s) for the Talc Personal Injury Trust in accordance with the terms of this Plan and the Talc Personal Injury Trust Agreement, and any successor trustee(s) thereto appointed in accordance with the Talc Personal Injury Trust Agreement.

"**Trust Contributions**" means, collectively, the Debtor Trust Contribution and the Affiliate Trust Contribution.

"**Trust Distribution Procedures**" means, as applicable, the 524(g) Trust Distribution Procedures or the Non-524(g) Trust Distribution Procedures, and such additional procedures as may subsequently be adopted by the Talc Personal Injury Trust, subject to the terms of the Talc Personal Injury Trust Agreement, which provide for the resolution, liquidation, and satisfaction of Allowed Talc Personal Injury Claims.

"**Trust Interests**" means the non-certificated beneficial interests of the Talc Personal Injury Trust allocable to Holders of Allowed Talc Personal Injury Claims in accordance with the terms, conditions, and priorities set out in this Plan, the Non-524(g) Talc Personal Injury Trust Agreement, and Trust Distribution Procedures entitling each Holder of an Allowed Talc Personal Injury Claim to Distributions from the Talc Personal Injury Trust in the event the 524(g) Voting Threshold is not met.

"**Unimpaired**" means a Claim or an Equity Interest, or a Class of Claims or Equity Interests, as appropriate, that is not Impaired under this Plan.

"**United States Trustee**" means the United States Trustee appointed under section 581 of title 28 of the United States Code to serve in the Southern District of Texas.

"**Unsecured Creditors Committee**" means the official committee of unsecured creditors appointed in the Chapter 11 Cases, as such committee may be reconstituted from time to time.

"**Voting Deadline**" means the date established by the Bankruptcy Court as the deadline for the return of ballots for voting on this Plan, which is [ ● ], 2025 at 4:00 p.m. (Prevailing Central Time), except that in the event the Debtors have extended such deadline to a subsequent date, the Voting Deadline shall mean the date as so extended.

"**Voting Record Date**" means [ ● ], 2025.

**1.2    Ancillary Documents**.  Each of the schedules and exhibits to this Plan, the Disclosure Statement, and the schedules and exhibits to the Disclosure Statement, and the schedules and exhibits to the Plan Supplement are an integral part of this Plan, and are hereby incorporated by reference and made a part of this Plan, including, without limitation, the Talc Personal Injury Trust Documents.

## ARTICLE II.

## ADMINISTRATIVE EXPENSE CLAIMS, DIP CLAIMS, AND PRIORITY TAX CLAIMS

**2.1    Summary**.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, DIP Claims, and Priority Tax Claims described below have not been classified and are excluded from those Classes of Claims and Equity Interests described in <u>ARTICLE III</u> of this Plan.

**2.2    Administrative Expense Claims**.

(a)    <u>General Administrative Expense Claims</u>.

Except with respect to Administrative Expense Claims that are Professional Fee Claims and Statutory Fees and subject to the Confirmation Order and this Plan, unless otherwise agreed by the Debtors and the Holder of an Allowed Administrative Expense Claim, each Holder of an Allowed Administrative Expense Claim shall receive Cash equal to the unpaid portion of such Allowed Administrative Expense Claim on or as soon as practicable after the latest of (a) the Effective Date, (b) the date the Administrative Expense Claim becomes Allowed, and (c) the date the Allowed Administrative Expense Claim becomes due and payable in the ordinary course of business, consistent with past practice and in accordance with the terms and conditions of any orders or agreement governing, instruments evidencing, or other documents establishing such liabilities; *provided*, *however* that any Administrative Expense Claim that is not a Professional Fee Claim or Statutory Fee that is Disputed as of the time for payment set forth herein that ultimately becomes Allowed shall be paid on or as soon as reasonably practicable after the date such Administrative Expense Claim becomes Allowed.  As of the Effective Date, the Reorganized Debtors, in their sole and absolute discretion, may settle Administrative Expense Claims in the ordinary course of business without further Bankruptcy Court approval.  A claimant's receipt of the Allowed amount of its Administrative Expense Claim shall be in full satisfaction, settlement, release, extinguishment, and discharge of such Claim, on the date such payment is received.

(b)    <u>Talc Personal Injury Trust Expenses</u>.

As of the Effective Date, liability for all Talc Personal Injury Trust Expenses incurred thereafter shall automatically, and without further act, deed or court order, be assumed by the Talc Personal Injury Trust and resolved in accordance with the terms, provisions and procedures of the Talc Personal Injury Trust Agreement.

(c)    <u>Professional Fee Claims</u>.

(i)  *Final Fee Applications*.

All Professionals or other Entities requesting compensation or reimbursement of expenses pursuant to sections 327, 328, 330, 331, 503(b) and/or 1103 of the Bankruptcy Code for services rendered on or before the Effective Date (including, without limitation, any compensation requested by any Professional or any other Entity for making a substantial contribution in the Chapter 11 Cases) shall File no later than the Professional Fee Claims Bar Date and serve on (a) counsel to the Reorganized Debtors or the Debtors, as applicable, and (b) the United States Trustee, an application for final allowance of compensation and reimbursement of expenses for services rendered on or before the Effective Date. Objections to Professional Fee Claims must be Filed and served on (a) counsel to the Reorganized Debtors or the Debtors, as applicable, (b) the United States Trustee, and (c) the requesting Professionals or other Entities, no later than fourteen (14) days after the Professional Fee Claims Bar Date.

*(ii) Professional Fee Escrow Account.*

On or before the Effective Date, the Debtors shall fund the Professional Fee Escrow Account with Cash equal to the aggregate Professional Fee Escrow Amount for all Professionals, the Committee Members, and the Future Claimants' Representative. Upon the establishment of the Professional Fee Escrow Account, the Debtors shall select the Professional Fee Escrow Agent to maintain the Professional Fee Escrow Account and to administer payments to and from such Professional Fee Escrow Account in accordance with this Plan. The Debtors and the Professional Fee Escrow Agent shall enter into an escrow agreement providing for the administration of Allowed Professional Fee Claims in accordance with this Plan.

The Professional Fee Escrow Account shall be maintained in trust for the Professionals, the Committee Members, and the Future Claimants' Representative. Such funds in the Professional Fee Escrow Account shall not constitute property of the Debtors' Estates or property of the Reorganized Debtors while they remain in the Professional Fee Escrow Account. The amount of Professional Fee Claims owing to the Professionals, the Committee Members, and the Future Claimants' Representative as of the Effective Date shall be paid in Cash to such Professionals, Committee Members, and the Future Claimants' Representative from funds held in the Professional Fee Escrow Account, without interest or other earnings therefrom, as soon as reasonably practicable after such Claims are Allowed by a Bankruptcy Court order. In the event that the funds held in the Professional Fee Escrow Account are not sufficient to satisfy all Allowed Professional Fee Claims in full, the Reorganized Debtors shall pay such additional Allowed amounts in Cash, without interest or other earnings therefrom, as soon as reasonably practicable after such Claims are Allowed by a Bankruptcy Court order. When all Allowed Professional Fee Claims have been paid in full, amounts remaining in the Professional Fee Escrow Account, if any, shall revert to MTI LCC without any further notice to or action, order, or approval of the Bankruptcy Court.

*(iii) Professional Fee Escrow Amount.*

The Professionals, the Committee Members, and the Future Claimants' Representative shall in good faith estimate their aggregate fees, costs, and expenses accrued and incurred prior to and as of the Confirmation Date, along with a good faith estimate of all fees, costs, and expenses to be incurred through and including the Effective Date, and shall deliver such estimates to the Debtors no later than seven (7) days prior to the Confirmation Hearing; *provided*, *however*, that

(a) the failure of any Professional, member of the Unsecured Creditors Committee, or the Future Claimants' Representative to provide such estimate shall not prejudice their respective rights to request or receive compensation or reimbursement of expenses and (b) such estimates shall not be considered an admission or limitation with respect to the fees and expenses of any such Professional, Committee Member, or the Future Claimants' Representative or a cap on the Allowed amount of any Professional Fee Claim. If a Professional, Committee Member, or the Future Claimants' Representative does not provide such estimates in good faith, the Debtors may estimate the unbilled fees and expenses of such Professional, Committee Member, or the Future Claimants' Representative. The total amount so estimated shall comprise the "**Professional Fee Escrow Amount**."

> (iv) *Post-Effective Date Fees and Expenses of the Reorganized Debtors' Professionals.*

Except as otherwise specifically provided in this Plan, from and after the Effective Date, the Reorganized Debtors shall, in the ordinary course of business and without any further notice to or action, order or approval of the Bankruptcy Court, pay in Cash the legal, professional or other fees and expenses related to the implementation and consummation of this Plan incurred by the Reorganized Debtors following the Effective Date. Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional for services rendered or expenses incurred after the Effective Date in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

      (d)    <u>Payment of Statutory Fees</u>.

All Statutory Fees due and payable prior to the Effective Date shall be paid by the Debtors on the Effective Date. After the Effective Date, the Reorganized Debtors shall pay any and all Statutory Fees when due and payable. The Debtors shall File all monthly and quarterly reports due prior to the Effective Date when they become due, in a form reasonably acceptable to the United States Trustee. Each Debtor and Reorganized Debtor, as applicable, shall remain obligated to pay quarterly fees to the United States Trustee until the earliest of that particular Debtor's Chapter 11 Case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

      **2.3**    **DIP Claims**. Effective on the Effective Date, as part of the Affiliate Settlement and corresponding Affiliate Trust Contribution and in consideration for (a) the Non-Debtor Affiliates being released from the Affiliate Released Claims, and (b) if the 524(g) Voting Threshold is met, the Protected Parties receiving all of the protections afforded them under this Plan, MTI LLC as the sole Holder of the DIP Claims, shall, by virtue of the entry of the Confirmation Order, be deemed to have fully, finally, and forever released, relinquished, forgiven, and discharged the Debtors and the Reorganized Debtors from each and every DIP Claim, including all interest and fees (if any), whether known or unknown, now or in the future, in law, equity, or otherwise, which has been, could have been, or may in the future have been brought by or on behalf of MTI LLC. As a result of the foregoing release, the Holder of the DIP Claims will

US-DOCS\149447838.9

receive no Distributions under this Plan on account of such DIP Claims and no consideration other than that contained in the first sentence of this section.

Upon the Effective Date, the DIP Credit Agreement and all related documents shall be deemed automatically canceled, extinguished, and of no further force or effect, with the Debtors and the Reorganized Debtors having no continuing obligations or duties or responsibilities thereunder. For avoidance of doubt, all funds provided pursuant to Section 8.7 of this Plan shall be part of the DIP Claims being settled pursuant to the terms and conditions of this Plan, including the Affiliate Settlement.

**2.4    Priority Tax Claims**. Except in the event that a Holder of an Allowed Priority Tax Claim has been paid by the Debtors prior to the Effective Date on account of such Priority Tax Claim or such Holder and the Debtors agree to a different treatment with respect thereto, each Holder of an Allowed Priority Tax Claim shall, in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, receive in full satisfaction, settlement, and discharge of such Allowed Priority Tax Claim, at the option of the Debtors, either (a) payment in Cash in an amount equal to the unpaid portion of such Allowed Priority Tax Claim plus Postpetition Interest (if any, and only in the event owed under contract or as a matter of applicable non-bankruptcy law), on the later of: (i) the Effective Date; (ii) the date such Priority Tax Claim becomes Allowed, or as soon thereafter as is practicable; and (iii) the date such Allowed Priority Tax Claim becomes due and payable under applicable non-bankruptcy law or (b) equal annual installment payments in Cash, of a total value equal to the Allowed amount of such Priority Tax Claim, over a period ending not later than five (5) years after the Petition Date.

# ARTICLE III.

## CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

**3.1    Summary**. Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims against and Equity Interests in the Debtors. A Claim or Equity Interest is classified in a particular Class only insofar as that Claim or Equity Interest qualifies within the description of the Class, and a Claim or Equity Interest is classified in a different Class insofar as the Claim or Equity Interest qualifies within the description of such other Classes. The categories of Claims and Equity Interests listed below are classified for all purposes, including voting, confirmation, and Distributions pursuant to this Plan. A Claim or Equity Interest is also classified in a particular Class for the purpose of receiving Distributions pursuant to this Plan only insofar as such Claim or Equity Interest is an Allowed Claim or Allowed Equity Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

US-DOCS\149447838.9

Summary of Classification and Treatment of Classified Claims and Equity Interests

| Class | Claim/Equity Interest | Status | Voting Rights |
|---|---|---|---|
| 1. | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2. | Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3. | Talc Personal Injury Claims | Impaired | Entitled to Vote |
| 4. | General Unsecured Claims | Impaired | Entitled to Vote |
| 5. | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept / Deemed to Reject) |
| 6. | BMI Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 7. | BVT Equity Interests | Unimpaired | Not Entitled to Vote (Deemed to Accept) |

**3.2    Treatment and Classification of Claims and Equity Interests**.

(a)    **Class 1 – Other Priority Claims**.

(i)    *Classification*:  Class 1 consists of Other Priority Claims.

(ii)    *Treatment*:  Except to the extent a Holder of an Allowed Other Priority Claim has been paid prior to the Effective Date or agrees to a different treatment, each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction, settlement, and discharge of, and in exchange for such Other Priority Claim, Cash in an amount equal to the unpaid portion of such Allowed Other Priority Claim plus Postpetition Interest thereon (if any, and only in the event owed under contract or as a matter of applicable non-bankruptcy law) on the later of: (a) the Effective Date; and (b) the date the Other Priority Claim becomes an Allowed Other Priority Claim, or as soon thereafter as practicable.  All Allowed Other Priority Claims not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof.

21

          (iii)    *Voting*:  Class 1 is Unimpaired under this Plan.  Each Holder of an Other Priority Claim is deemed to have accepted this Plan and is therefore not entitled to vote to accept or reject this Plan.

    (b)    **Class 2 – Secured Claims**.

          (i)    *Classification*:  Class 2 consists of Secured Claims.

          (ii)    *Treatment*:  All Allowed Secured Claims in Class 2 will be treated pursuant to one of the following alternatives: (a) payment in full in Cash plus Postpetition Interest (if any, and only in the event owed under contract or as a matter of applicable non-bankruptcy law) in accordance with section 506(a) of the Bankruptcy Code on the later of: (i) the Effective Date and (ii) the date the Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as practicable; (b) Reinstatement; (c) such other treatment as the Debtors or Reorganized Debtors and the Holder shall agree; or (d) such other treatment as may be necessary to render such Claim Unimpaired.  The failure of the Debtors or any other party in interest to file an objection, prior to the Effective Date, with respect to any Secured Claim that is Reinstated under this Plan shall be without prejudice to the rights of the Reorganized Debtors or any other party in interest to contest or otherwise defend against such Secured Claim in an appropriate forum when and if such Secured Claim is sought to be enforced.  Any amount that the Debtors may be required to pay pursuant to section 1124(2) of the Bankruptcy Code on account of any such Allowed Secured Claim shall be paid in full, in Cash, on, or as soon as practicable after, the latest of: (a) the Effective Date, (b) the date on which such Secured Claim becomes an Allowed Secured Claim, (c) the date such Secured Claim becomes due and payable according to its terms, or (d) such other date as mutually may be agreed to by and between the Holder of such Secured Claim and the Debtors or Reorganized Debtors.

          (iii)    *Voting*:  Class 2 is Unimpaired under this Plan.  Each Holder of a Secured Claim is deemed to have accepted this Plan and is therefore not entitled to vote to accept or reject this Plan.

    (c)    **Class 3 – Talc Personal Injury Claims**.

          (i)    *Classification*:  Class 3 consists of all Talc Personal Injury Claims.

          (ii)    *Treatment*:

              (a) In the event the 524(g) Voting Threshold is met, as of the Effective Date, liability for all Talc Personal Injury Claims shall automatically, and without further act, deed or court order, be channeled exclusively to and assumed by the Talc Personal Injury Trust in accordance with, and as set forth in, <u>ARTICLE IX</u> and <u>ARTICLE XI</u> below, the applicable Plan Documents, and the Confirmation Order.  Each Talc Personal Injury

Claim shall be resolved in accordance with the terms, provisions, and procedures of the 524(g) Talc Personal Injury Trust Agreement and the 524(g) Trust Distribution Procedures.  The Talc Personal Injury Trust shall be funded in accordance with the provisions of <u>Section 9.1</u> below.  The sole recourse of a Holder of a Talc Personal Injury Claim on account of such Talc Personal Injury Claim shall be to the Talc Personal Injury Trust, and each such Holder shall have no right whatsoever at any time to assert its Talc Personal Injury Claim against any Protected Party.

(ii) In the event the 524(g) Voting Threshold is not met, except to the extent that a Holder of an Allowed Talc Personal Injury Claim agrees to a different treatment of such Allowed Talc Personal Injury Claim, in full and final satisfaction, settlement, release, and discharge of the Allowed Talc Personal Injury Claim, each Holder of an Allowed Talc Personal Injury Claim shall receive its *pro rata* share of Trust Interests.

(iii)    *Voting*:  Class 3 is Impaired under this Plan.  Each Holder of a Talc Personal Injury Claim is entitled to vote to accept or reject this Plan.

(d)    **Class 4 – General Unsecured Claims**.

(i)    *Classification*:  Class 4 consists of all General Unsecured Claims.

(ii)    *Treatment*:  Each Holder of an Allowed General Unsecured Claim, in full satisfaction, settlement, and release of, and in exchange for such Allowed General Unsecured Claim, shall receive its *pro rata* share of the GUC Cash Pool on the later of: (a) the Effective Date; and (b) the date the General Unsecured Claim becomes an Allowed General Unsecured Claim, or as soon thereafter as practicable.

(iii)    *Voting*:  Class 4 is Impaired under this Plan.  Each Holder of a General Unsecured Claim is entitled to vote to accept or reject this Plan.

(a)    **Class 5 – Intercompany Claims**.

(i)    *Classification*:  Class 5 consists of all Intercompany Claims.

(ii)    *Treatment*:  On or after the Effective Date, all Intercompany Claims shall be paid, Reinstated, adjusted, waived, settled, canceled, discharged, or eliminated, in each case, at the option of the Debtors or the Reorganized Debtors, as applicable, or as otherwise provided for in this Plan, including <u>Sections 8.3</u> and <u>8.4</u>.

(iii)    *Voting*:  Class 5 is Unimpaired under this Plan if Intercompany Claims are Reinstated and Impaired under this Plan if Intercompany Claims are canceled.  Holders of Intercompany Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code or conclusively deemed to have rejected this Plan pursuant to section

23

1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject this Plan.

(a) **Class 6 – BMI Equity Interests**.

    (i) *Classification*: Class 6 consists of all BMI Equity Interests.

    (ii) *Treatment*: On the Effective Date, the BMI Equity Interests shall be canceled, released, discharged, and extinguished and shall be of no further force or effect, and the Holder of BMI Equity Interests shall not receive any distribution on account of such BMI Equity Interests.

    (iii) *Voting*: Class 6 is Impaired under this Plan, and the Holder of Class 6 BMI Equity Interests will be conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, the Holder of BMI Equity Interests in Class 6 will not be entitled to vote to accept or reject this Plan. SMI is the sole Holder of BMI Equity Interests and supports this Plan.

(b) **Class 7 – BVT Equity Interests**.

    (i) *Classification*: Class 7 consists of all BVT Equity Interests.

    (ii) *Treatment*: On the Effective Date, the BVT Equity Interests shall be Reinstated and the legal, equitable, and contractual rights to which BMI, as the sole Holder of BVT Equity Interests, is entitled shall remain unaltered as necessary to implement this Plan.

    (iii) *Voting*: Class 7 is Unimpaired under this Plan. The Holder of BVT Equity Interests in Class 7 is deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code and is therefore not entitled to vote to accept or reject the Plan.

**3.3    Elimination of Vacant Classes.** Any Class of Claims that is not occupied as of the commencement of the Confirmation Hearing by an Allowed Claim or a Claim temporarily Allowed under Bankruptcy Rule 3018, or as to which no vote is cast, shall be deemed eliminated from this Plan for purposes of voting to accept or reject this Plan and for purposes of determining acceptance or rejection of this Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

**3.4    Special Provision Governing Claims.** Nothing under this Plan shall affect the Debtors' or Reorganized Debtors' rights in respect of any Unimpaired or Reinstated Claims (or Equity Interests), including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Claims (or Equity Interests).

**3.5    Controversy Concerning Impairment**. If a controversy arises as to whether any Claims or Equity Interests, or any Class of Claims or Equity Interests, are Impaired, the Bankruptcy Court or the District Court, as applicable, shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

# ARTICLE IV.

## ACCEPTANCE OR REJECTION OF PLAN

**4.1     Deemed Acceptance of the Plan.**  Claims in Class 1 (Other Priority Claims), Class 2 (Secured Claims), and (in the event Unimpaired) Class 5 (Intercompany Claims), and Equity Interests in Class 7 (BVT Equity Interests) are Unimpaired under this Plan and are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, solicitation of votes of Holders of Claims and Equity Interests in Class 1, Class 2, Class 5, and Class 7 is not required.

**4.2     Deemed Rejection of Plan**.  Claims in Class 5 (Intercompany Claims) (in the event Impaired) and Equity Interests in Class 6 (BMI Equity Interests) are Impaired under this Plan and Holders of Claims and Equity Interests in such Classes shall receive no distribution under this Plan on account of such Claims or Equity Interests.  Therefore, the Holders of Claims and Equity Interests in such Classes are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, solicitation of votes of Holders of Claims and Equity Interests in Class 5 and Class 6 is not required.

**4.3     Voting Classes.**  Claims in Class 3 (Talc Personal Injury Claims) and Class 4 (General Unsecured Claims) are Impaired under this Plan and Holders of Claims in such Classes are entitled to vote to accept or reject this Plan.

**4.4     Class Acceptance Requirement**.  Acceptance of this Plan shall be determined in accordance with sections 524(g) and 1126 of the Bankruptcy Code.  Pursuant to section 524(g) of the Bankruptcy Code, Class 3 (Talc Personal Injury Claims) has accepted this Plan if the Holders of at least two-thirds (2/3) in dollar amount and more than three quarters (3/4) in number of those Holders of Class 3 Claims actually voting have voted to accept this Plan (collectively, the "**524(g) Voting Threshold**").  Pursuant to section 1126(c) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims has accepted this Plan if the Holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims in such Class actually voting have voted to accept this Plan.

**4.5     Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code; Cram Down**.  Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of confirmation by acceptance of this Plan by either of Class 3 or Class 4.  The Debtors request confirmation of this Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept this Plan pursuant to section 1126 of the Bankruptcy Code.  The Debtors reserve the right to modify this Plan or the Plan Supplement in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

**4.6     Issuance of Channeling Injunction.**  The Bankruptcy Court shall be asked to issue the Channeling Injunction if the 524(g) Voting Threshold has been reached, in accordance with section 524(g)(1) of the Bankruptcy Code.

**4.7     Votes Solicited in Good Faith**.  The Debtors have, and upon confirmation of this Plan shall be deemed to have, solicited votes on this Plan from the Holders of Claims in Classes 3

and 4 in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including, without limitation, sections 1125 and 1126 of the Bankruptcy Code, and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with the solicitation. Accordingly, the Debtors, the Reorganized Debtors, and each of their respective Representatives shall be entitled to, and upon confirmation of this Plan are granted, the protections of section 1125(e) of the Bankruptcy Code.

<h3 style="text-align:center">ARTICLE V.</h3>

<h3 style="text-align:center">DISTRIBUTIONS UNDER THE PLAN<br>ON ACCOUNT OF NON-TALC CLAIMS</h3>

**5.1     Distributions**.  Other than with respect to payments to be made on account of Allowed Talc Personal Injury Claims and Talc Personal Injury Trust Expenses from the Talc Personal Injury Trust, the Disbursing Agent shall make all Distributions required to be made under this Plan as provided under this ARTICLE V.  All payments to be made by the Talc Personal Injury Trust shall be made in accordance with the terms of the Talc Personal Injury Trust Agreement (including the Trust Distribution Procedures).  In the event that there are Disputed Non-Talc Claims against the Debtors, Distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in ARTICLE VI.

**5.2     Record Date for Holders of Non-Talc Claims**.  Except as otherwise provided in a Final Order, the transferees of Non-Talc Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to the Distribution Record Date shall be treated as the Holders of such Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to such transfer has not expired by the Distribution Record Date; *provided*, that, except as otherwise provided in Section 5.6 herein, the Disbursing Agent shall only be obligated to remit Distributions to Holders of Non-Talc Claims as they appear on the Debtors' books and records as of the Distribution Record Date.

**5.3     Date of Distributions**.  Except as otherwise provided herein, any Distributions and deliveries to be made hereunder on account of Allowed Non-Talc Claims shall be made in accordance with ARTICLE II or Section 3.2 of this Plan, as applicable.  In the event that any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on, or as soon as reasonably practicable after, the next succeeding Business Day, but shall be deemed to have been completed as of the required date, and no interest shall accrue or be payable on any such payment on the basis that such payment was not actually made on the required date.

**5.4     Postpetition Interest on Claims**.  Except as otherwise provided for in this Plan (including Section 3.2 of this Plan), the Plan Documents or the Confirmation Order, or any contract, instrument, release, settlement, or other agreement entered into in connection with this Plan, or unless required by applicable non-bankruptcy law, interest accruing on or after the Petition Date on account of any Claim shall not be paid.

**5.5     Means of Cash Payment**.  At the option of the Debtors or Reorganized Debtors, as applicable, any Cash payment to be made hereunder may be made by a check, automatic clearing house (ACH) or wire transfer or as otherwise required or provided in any applicable agreement.

**5.6     Delivery of Distributions.**  All Distributions to Holders of an Allowed Non-Talc Claim shall be made at the address for each such Holder as indicated on (a) such Holder's Proof of Claim, if applicable, (b) a notice Filed by such Holder with the Bankruptcy Court, if applicable, or (c) if neither (a) nor (b) are available, the Debtors' Schedules, or any more current address that is contained in the Debtors' books and records.

**5.7     Full Benefit of Distributions**.  Distributions under this Plan on account of Allowed Non-Talc Claims shall not be subject to levy, garnishment, attachment or similar legal process, so that each Holder of an Allowed Non-Talc Claim shall have and receive the benefit of the Distributions in the manner set forth in this Plan.  The Disbursing Agent shall not incur any liability whatsoever on account of any Distributions under this Plan except where such Distributions are found by Final Order to have been made with gross negligence, willful misconduct, or fraud.

**5.8     Undeliverable Distributions and Unclaimed Property**.

(a)     <u>Failure to Present Checks</u>.  Checks issued by the Disbursing Agent in respect of Distributions on Allowed Non-Talc Claims shall be null and void if not presented for payment within one hundred and eighty (180) days after the date of issuance thereof.  Requests for reissuance of any check shall be made in writing to the Debtors or Reorganized Debtors by the Holder of the Allowed Non-Talc Claim to whom such check originally was issued on or before the expiration of the one hundred and eighty (180) day period following the date of issuance of such check.  All funds held on account of a check voided in accordance with this <u>Section 5.8</u> shall be returned to the Reorganized Debtors and the Claim of any Holder to such Distributions shall be discharged and forever barred.

(b)     <u>Failure to Claim Undeliverable Distributions</u>.  In the event that any Distribution to any Holder on account of a Non-Talc Claim is returned as undeliverable, no Distribution to such Holder on account of a Non-Talc Claim shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such Distribution shall be made to such Holder without interest; *provided*, *however*, that such Distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of ninety (90) days from the date the Distribution was returned.  After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors and be returned to the Reorganized Debtors (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the Non-Talc Claim of any Holder to such property or interest in property shall be forever barred.  Nothing contained in this Plan shall require the Debtors or Reorganized Debtors to attempt to locate any Holder of an Allowed Non-Talc Claim.

**5.9     Prepayment of Non-Talc Claims**.  Except as otherwise provided in this Plan, the Plan Documents, or the Confirmation Order, the Debtors or the Reorganized Debtors shall have the right to prepay, without penalty, all or any portion of an Allowed Non-Talc Claim at any time;

*provided*, that any such prepayment shall not violate or otherwise prejudice the relative priorities among the Classes of Claims or Equity Interests or otherwise violate the terms of this Plan.

5.10 **Fractional Cents**. No payment of fractional cents will be made pursuant to this Plan. Whenever any payment of a fraction of a cent under this Plan would otherwise be required, the actual Distribution made will reflect a rounding of such fraction to the nearest whole penny (up or down), with fractions of more than half a penny being rounded up and fractions of half of a penny or less being rounded down.

5.11 **Setoff and Recoupment**. The Debtors or Reorganized Debtors, as applicable, may, but shall not be required to, set off and/or recoup against any Non-Talc Claim (for purposes of determining the Allowed amount of such Claim on which a Distribution shall be made), any claims of any nature whatsoever that the Debtors or Reorganized Debtors, as applicable, may have against the Holder of such Claim, and the failure to do so shall not constitute a waiver or release by the Debtors or Reorganized Debtors of any such claims that the Debtors or Reorganized Debtors may have against the Holder of such Claim.

5.12 **Surrender of Cancelled Instruments or Securities**. As a condition precedent to receiving any Distribution on account of its Allowed Non-Talc Claim, each Holder of a Non-Talc Claim shall be deemed to have surrendered the certificates or other documentation underlying each such Claim, and all such surrendered certificates and other documentations shall be deemed to be canceled, except as otherwise provided herein.

5.13 **De Minimis Distributions**. If an interim Distribution under this Plan to the Holder of an Allowed Non-Talc Claim would be less than $100.00 USD, the Disbursing Agent may reserve such Distribution to the next subsequent Distribution made to such Holder.

5.14 **Compliance with Tax Requirements and Allocations.** In connection with this Plan and all Distributions hereunder, including with respect to the implementation and administration of the Talc Personal Injury Trust, the Disbursing Agent, the Debtors, and the Reorganized Debtors shall comply with all tax withholding and reporting requirements imposed on them by any federal, state or local taxing authority, and all Distributions pursuant to this Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in this Plan to the contrary, the Disbursing Agent, the Debtors, or the Reorganized Debtors shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the Distribution to be made under this Plan, except for any Distribution to be made to the Talc Personal Injury Trust, to generate sufficient funds to pay applicable withholding taxes, withholding Distributions pending receipt of information necessary to facilitate such Distributions including tax certification forms, or establishing any other mechanisms the Disbursing Agent, the Debtors, or the Reorganized Debtors believe are reasonable and appropriate. No Holder of an Allowed Non-Talc Claim shall effectuate any withholding with respect to the cancellation or satisfaction of such Non-Talc Claim under this Plan. The Reorganized Debtors shall be authorized to request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all taxable periods of the Debtors ending after the Petition Date through and including the Effective Date.

For tax purposes, Distributions in full or partial satisfaction of Allowed Non-Talc Claims shall be allocated first to the principal amount of such Claims, with any excess allocated to unpaid interest that accrued on such Claims prior to the Petition Date.

## ARTICLE VI.

## PROCEDURES FOR RESOLVING AND
## TREATING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

**6.1** **Disputed Non-Talc Claims**. All Disputed Non-Talc Claims against the Debtors shall be subject to the provisions of this ARTICLE VI. All Administrative Expense Claims, including Professional Fee Claims shall be determined and, if Allowed, paid in accordance with Section 2.2 of this Plan.

**6.2** **Prosecution of Non-Talc Claims Generally**. A Non-Talc Claim shall only become an Allowed Claim in the event such Claim satisfies the definition of "Allowed" in Section 1.1 of this Plan. After the Effective Date, the Reorganized Debtors shall have and retain any and all rights and defenses the Debtors had prior to the Effective Date with respect to any Non-Talc Claim that has not been Allowed. Except as otherwise specifically provided in this Plan, after the Effective Date, the Reorganized Debtors shall have the sole authority to: (a) File and prosecute objections to Non-Talc Claims; (b) settle, compromise, withdraw, litigate to judgment, or otherwise resolve objections to any and all Non-Talc Claims, regardless of whether such Claims are in a Class or otherwise; (c) settle, compromise, or resolve any Disputed Non-Talc Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (d) administer and adjust the claims register maintained in the Chapter 11 Cases to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court. After the Effective Date, the Reorganized Debtors shall resolve Disputed Non-Talc Claims in accordance with their respective fiduciary duties and pursuant to the terms of this Plan.

**6.3** **Claims Objection Deadline**. Unless otherwise ordered by the Bankruptcy Court, objections to Non-Talc Claims (other than Administrative Expense Claims, including Professional Fee Claims) shall be filed with the Bankruptcy Court and served upon the Holders of each such Non-Talc Claims to which objections are made on or before the Claims Objection Deadline, unless extended by order of the Bankruptcy Court prior to the expiration of such period.

**6.4** **Estimation of Non-Talc Claims**. Subject in all respects to Section 3.4 hereof, the Debtors or Reorganized Debtors, as the case may be, may (a) request that the Bankruptcy Court estimate any contingent, unliquidated or Disputed Non-Talc Claim for any reason pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtors previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate such Claim at any time, including, without limitation, during the pendency of litigation concerning any objection to any Non-Talc Claim or of any appeal relating thereto and (b) shall be authorized to settle, compromise, withdraw or litigate to judgment such objections without further approval of the Bankruptcy Court.

**6.5     Disallowance of Non-Talc Claims**. Pursuant to the terms of the General Bar Date Order, if Proofs of Claim are not received by the Balloting Agent on or before the applicable Claims Bar Date, and except in the case of certain exceptions explicitly set forth in the General Bar Date Order, the Holders of the underlying Non-Talc Claims shall be forever barred from asserting such Non-Talc Claims against the Debtors and precluded from voting on any plans of reorganization, including this Plan, Filed in the Chapter 11 Cases and/or receiving Distributions from the Debtors on account of such Non-Talc Claims.   The Debtors or Reorganized Debtors, as applicable, shall be authorized to update the claims register to remove any Non-Talc Claims for which a Proof of Claim was not received by the Balloting Agent before the General Claims Bar Date and not subject to an exception as set forth above; *provided,* that the Debtors will provide notice to such claimant at the address or email address on the Proof of Claim, in the event such information is provided, informing such claimant that its Non-Talc Claim will be removed from the claims register as a result of being untimely Filed.

**Except as otherwise provided in this Plan or as agreed to by the Debtors or the Reorganized Debtors, any and all Proofs of Claim on account of Non-Talc Claims Filed after the General Claims Bar Date shall be deemed Disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Non-Talc Claims may not receive any Distributions on account of such Non-Talc Claims, unless such late Proof of Claim has been deemed timely Filed by a Final Order.**

**6.6     Payments and Distributions with Respect to Disputed Non-Talc Claims**. Notwithstanding any other provision hereof, no payments or Distributions shall be made with respect to all or any portion of a Non-Talc Claim unless and until any objections to such Claim have been settled or withdrawn or have been determined by Final Order or agreement.  In the event that a Disputed Non-Talc Claim ultimately becomes an Allowed Claim, Distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of this Plan.  As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Non-Talc Claim becomes a Final Order, the Reorganized Debtors shall provide to the Holder of such Claim the Distribution or payment (if any) on account of such Non-Talc Claim to which such Holder is entitled under this Plan as of the Effective Date.

**6.7     Resolution of Talc Personal Injury Claims; Disallowance of Talc Personal Injury Claims**. Unless adjudicated pursuant to one or more Final Orders prior to the Effective Date, all Talc Personal Injury Claims shall be resolved by the Talc Personal Injury Trust in accordance with, as applicable, <u>Section 9.1</u> or <u>Section 9.2</u> of this Plan, pursuant to the Talc Personal Injury Trust Agreement and the Trust Distribution Procedures.  In the event the 524(g) Threshold is reached, only the Talc Personal Injury Trust will have the right to object to and/or resolve Talc Personal Injury Claims not already adjudicated pursuant to a Final Order as of the Effective Date.  All Talc Personal Injury Claims must be submitted solely to the Talc Personal Injury Trust for payment, which shall be in accordance with the Talc Personal Injury Trust Agreement and the Trust Distribution Procedures.

Pursuant to the terms of (a) the General Bar Date Order, with respect to Indirect Talc Personal Injury Claims, and (b) the Direct Talc Personal Injury Claims Bar Date Order, with respect to Direct Talc Personal Injury Claims, if Proofs of Claim are not received by the Balloting

Agent on or before the applicable Claims Bar Date, except in the case of certain exceptions explicitly set forth in the applicable Bar Date Order, the Holders of the underlying Talc Personal Injury Claims shall be forever barred from asserting such Talc Personal Injury Claims against the Debtors, the Reorganized Debtors or the Talc Personal Injury Trust and precluded from voting on any plans of reorganization, including this Plan, Filed in the Chapter 11 Cases and/or receiving Distributions from the Debtors or the Talc Personal Injury Trust on account of such Talc Personal Injury Claims. The Debtors or Reorganized Debtors, as applicable, shall be authorized to update the claims register to remove any Talc Personal Injury Claims for which a Proof of Claim was not received by the Balloting Agent before the applicable Claims Bar Date and not subject to an exception as set forth above, and in the event the 524(g) Threshold is met, all Talc Personal Injury Claims, regardless of whether a Proof of Claim has been Filed, shall be expunged and removed from the claims register; *provided,* that the Debtors will provide notice to such claimant at the address or email address on the Proof of Claim, in the event such information is provided, informing such claimant (or its known counsel) that its Talc Personal Injury Claim will be removed from the claims register as a result of being untimely Filed.

**Except as otherwise provided in this Plan or in the applicable Bar Date Order, any and all Proofs of Claim on account of Direct Talc Personal Injury Claims and/or Indirect Talc Personal Injury Claims Filed after the Direct Talc Personal Injury Claims Bar Date or General Claims Bar Date, as applicable, shall be deemed Disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Direct Talc Personal Injury Claims and/or Indirect Talc Personal Injury Claims may not receive any Distributions on account of such Direct Talc Personal Injury Claims and/or Indirect Talc Personal Injury Claims, unless such late Proof of Claim has been deemed timely Filed by a Final Order.**

## ARTICLE VII.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**7.1    General Treatment**. Except as otherwise provided herein, as of the Effective Date, the Debtors shall be deemed to have rejected any and all Executory Contracts to which a Debtor is a party except for: (a) any Executory Contracts specifically listed on the Schedule of Assumed Contracts; (b) any Executory Contracts previously rejected, assumed, or assumed and assigned pursuant to an order of the Bankruptcy Court (including the Sale Order) entered on or before the Effective Date; or (c) any Executory Contract subject to a motion to reject, assume, or assume and assign pending as of the Effective Date.

The Debtors may amend the Schedule of Assumed Contracts to delete therefrom, or add thereto, any Executory Contract until the Effective Date. The Debtors shall File notice of any such amendment and shall serve any such notice on the parties to the Executory Contract(s) affected thereby. The fact that any contract or lease is listed on the Schedule of Assumed Contracts shall not constitute or be construed to constitute an admission that such contract or lease is an executory contract or unexpired lease within the meaning of section 365 of the Bankruptcy Code or that the Debtors or any successor in interest to the Debtors (including the Reorganized Debtors) have any liability thereunder.

The Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejections or assumptions, as the case may be, pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

**7.2     Preexisting Obligations to the Debtors under Executory Contracts.**  Except as otherwise set forth in Section 7.1 herein, rejection or repudiation of any Executory Contract pursuant to this Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors under such contracts or leases, insofar as such obligations continue under the terms of such contracts or leases or under applicable law.  The Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued performance from counterparties to rejected or repudiated Executory Contracts, as provided by applicable law.

**7.3     Cure of Defaults**.  Any monetary defaults under each Executory Contract to be assumed pursuant to this Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Claim in Cash on the later of (a) the Effective Date or (b) the date on which such Cure Claim is Allowed, or on such other terms as the parties to any such Executory Contract may otherwise agree.  In the event of a dispute regarding: (a) the existence or amount of the Cure Claim; (b) the ability of the Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract to be assumed; or (c) any other matter pertaining to assumption, the payments required by section 365(b)(1) of the Bankruptcy Code in respect of Cure Claims shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption.

The Debtors filed and served the Cure Notices notifying counterparties to Executory Contracts of the potential assumption and assignment of such party's Executory Contract to the Buyer, the proposed Cure Claim associated with such potential assumption and assignment, and the deadline to object to the proposed Cure Claim or to the assumption and assignment of the Executory Contract.  Any counterparty to an Executory Contract that failed to timely object to any Cure Claim in the applicable Cure Notice is deemed to have consented to such Cure Claim for purposes of this Plan.

Assumption of any Executory Contract pursuant to this Plan or otherwise shall result in the full release and satisfaction of any Cure Claims, other Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or any bankruptcy-related defaults, arising at any time prior to the effective date of assumption.  **Any and all Proofs of Claim based upon Executory Contracts that have been assumed in the Chapter 11 Cases, including pursuant to the Sale Order or Confirmation Order, shall be deemed Disallowed and expunged as of the later of (a) the date of entry of an order of the Bankruptcy Court (including the Sale Order or Confirmation Order) approving such assumption, (b) the effective date of such assumption, or (c) the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.**

**7.4     Rejection of Executory Contracts and Consequences Thereof**.     Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts, pursuant to this Plan or the Confirmation

Order, if any, must be Filed with the Bankruptcy Court within thirty days (30) after the later of (a) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (b) the effective date of such rejection, or (c) the Effective Date. **Any Claims arising from the rejection of an Executory Contract not Filed with the Bankruptcy Court within such time will be automatically Disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates, or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Proof of Claim to the contrary.**

7.5     **Nonoccurrence of Effective Date.**  In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Executory Contracts pursuant to section 365(d)(4) of the Bankruptcy Code.

## ARTICLE VIII.

## MEANS FOR IMPLEMENTATION OF THE PLAN

8.1     **Generally**.  Except as otherwise provided in the Plan Documents, on and after the Confirmation Date, the Debtors shall be empowered and authorized to take or cause to be taken, prior to the Effective Date, all actions necessary to enable them to implement the provisions of this Plan without the need for any further state or local regulatory approvals or approvals by any non-Debtor parties, and without any requirement for further action by the Debtors, their respective board of directors or managers, as applicable, their equity-holders, or any other Person or Entity, including, without limitation, the creation of the Talc Personal Injury Trust and the preparations for the transfer of the Talc Personal Injury Trust Assets to the Talc Personal Injury Trust.  From and after the Effective Date, the Reorganized Debtors shall be governed pursuant to the Amended Organizational Documents and other applicable governing documents.

8.2     **[Reserved]**

8.3     **Affiliate Settlement**.  Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration of the distributions and other benefits provided under this Plan which are only possible through the Affiliate Settlement, the provisions of this Plan and the other documents entered into in connection with this Plan effect and implement a global and good faith compromise and settlement among the Debtors, MTI, and SMI of all Claims, Causes of Action, and controversies among such parties, including the Affiliate Released Claims.  A full description of the Affiliate Settlement, including the terms which apply in the event the 524(g) Voting Threshold is reached and the terms which apply in the event the 524(g) Voting Threshold is not reached, is set forth in Section [ ● ] of the Disclosure Statement.  This Plan, including the explanation set forth in the Disclosure Statement, which is incorporated herein by reference, shall be deemed a motion (a) to authorize and approve the Affiliate Settlement and (b) to approve the release of all the Affiliate Released Claims, including, without limitation, all Causes of Action, against each of the Non-Debtor Affiliates.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Affiliate Settlement, in all respects, under section 1123 of the

Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that the Affiliate Settlement is fair, equitable, reasonable, and in the best interests of the Debtors, their Estates, and all Holders of Claims against the Debtors. Entry of the Confirmation Order shall confirm the Bankruptcy Court's approval, as of the Effective Date of this Plan, of all components of the Affiliate Settlement and the Bankruptcy Court's finding that the Affiliate Settlement is in the best interests of the Debtors and their respective Estates, and is fair, equitable, and reasonable under the circumstance of the Chapter 11 Cases.

**8.4** **Transactions on the Effective Date**.

(a) On the Effective Date, the following shall be deemed for all purposes to have occurred simultaneously:

(i) the establishment of the Talc Personal Injury Trust;

(ii) the making of the Trust Contributions to the Talc Personal Injury Trust;

(iii) the vesting in the Talc Personal Injury Trust of the Talc Personal Injury Trust Assets, as more fully described in, and subject to the conditions set forth in, ARTICLE IX below;

(iv) [Reserved];

(v) the effectiveness of the Affiliate Settlement and release of the Affiliate Released Claims;

(vi) the effectiveness of the Talc Claims Indemnification Agreement; and

(vii) **solely in the event the 524(g) Voting Threshold is met**, the channeling of all Talc Personal Injury Claims to the Talc Personal Injury Trust.

(b) Also on the Effective Date, but after the occurrence of the events in each of Section 8.4(a)(i) through 8.4(a)(vii) herein, the following events shall be deemed for all purposes to have occurred simultaneously:

(i) the effectiveness of the Amended Organizational Documents;

(ii) the appointment of the individual(s) who will act as the officers and the directors or managers, as applicable, of the Reorganized Debtors, as identified in the Plan Supplement; and

(iii) any Distributions required to be made on the Effective Date (or as soon thereafter as is reasonably practicable).

(c) Unless this Plan or the Confirmation Order provides otherwise, actions required to be taken on the Effective Date or as soon thereafter as is

34

reasonably practicable shall be deemed to have been made on the Effective Date.

**8.5     The Talc Personal Injury Trust**.  On the Effective Date, the Talc Personal Injury Trust shall be created in accordance with <u>ARTICLE IX</u> of this Plan, other applicable Plan Documents, and the Talc Personal Injury Trust Documents.

**8.6     Amended Organizational Documents.**  The Amended Organizational Documents shall contain such provisions as are necessary to satisfy the provisions of this Plan and, if necessary, to prohibit the issuance of nonvoting equity securities as required by section 1123(a)(6) of the Bankruptcy Code.  Notwithstanding the foregoing, the Amended Organizational Documents may be amended after the Effective Date as permitted by applicable law.  Except as otherwise provided herein, such Amended Organizational Documents shall contain indemnification provisions applicable to the officers and employees of the Reorganized Debtors and such other Entities as may be deemed appropriate in the discretion of the Reorganized Debtors and will provide for the authorization and issuance of the Reorganized BMI Equity Interests in accordance with the terms of this Plan.

**8.7     Net Reserve Funds**.  No later than six (6) Business Days prior to the Effective Date, the Debtors shall issue a borrowing notice to MTI LLC pursuant to the DIP Credit Agreement as is necessary to ensure that, as of the Effective Date, the Debtors shall be able to fully fund the Professional Fee Escrow Account and shall hold no less than $[ ● ] million in Cash as of the Effective Date in Net Reserve Funds.  The Net Reserve Funds shall be used for the sole purpose of (a) satisfying Claims which are Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, and Allowed Secured Claims insofar as such Claims are not otherwise addressed or satisfied in accordance with this Plan, including the payment of any interest on such Claims that may be Allowed under this Plan or required to be paid by the Bankruptcy Code and (b) funding the GUC Cash Pool.  Any Net Reserve Funds remaining after (a) the satisfaction in full of Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, and Allowed Secured Claims, including the payment of any interest on such Claims that may be Allowed under this Plan or required to be paid by the Bankruptcy Code, and (b) funding the GUC Cash Pool, shall revert to MTI LLC without any further notice to or action, order, or approval of the Bankruptcy Court.  For the avoidance of doubt, (i) the amount funded by MTI (through MTI LLC) pursuant to this <u>Section 8.7</u> shall be included in the total DIP Claim held by MTI LLC and included in the Affiliate Trust Contribution and (ii) nothing contained herein shall require MTI LLC to fund any amount that exceeds the DIP Loan Commitment Amount (as defined in the DIP Credit Agreement).

**8.8     Corporate Governance of Reorganized Debtors**.  On the Effective Date, (a) the current officers, and directors or managers, as applicable, of each Debtor shall be deemed to resign from their respective positions by operation of this Plan and (b) the individual(s) identified in the Plan Supplement shall be appointed to serve as the officers and the directors or managers, as applicable, of each Reorganized Debtor.

**8.9     Director and Officer Liability Insurance**.  Notwithstanding anything in this Plan to the contrary, the Reorganized Debtors shall be deemed to have assumed all of the Debtors' D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code effective as of the

Effective Date. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the foregoing assumption of each of the unexpired D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in this Plan, confirmation of this Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the applicable Debtor under this Plan.

In addition, after the Effective Date, the Reorganized Debtors shall not terminate, commute, or otherwise reduce the coverage under any D&O Liability Insurance Policies in effect on or after the Petition Date, with respect to conduct occurring prior to the Effective Date, and all directors, managers, and officers, as applicable, of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy, as set forth therein, regardless of whether such directors, managers, and officers, as applicable, remain in such positions after the Effective Date. Furthermore, the Reorganized Debtors shall provide and/or purchase any D&O Liability Insurance Policies intended to cover the Reorganized Debtors' directors and officers, which shall include reasonable "tail" or "runoff" protections and entry of the Confirmation Order shall constitute the Bankruptcy Court's authorization for the Reorganized Debtors to take such actions, and to execute and deliver such documents, as may be reasonably necessary or appropriate to implement, maintain, cause the binding of, satisfy any terms or conditions of, or otherwise secure for the insureds the benefits of the D&O Liability Insurance Policies.

**8.10    Operations of the Debtors Between Confirmation and the Effective Date**. The Debtors shall continue to operate as debtors and debtors-in-possession during the period from the Confirmation Date through and until the Effective Date.

**8.11    Corporate Action**. All matters provided for under this Plan involving the corporate structure of the Debtors or Reorganized Debtors, or any corporate action to be taken by, or required of the Debtors or Reorganized Debtors, shall be deemed to have occurred and be effective as provided herein, and shall be authorized and approved in all respects without any requirement for further action by the equity-holders, managers or directors of such entity.

**8.12    Effectuating Documents; Further Transactions**. Any officer, member or manager of or director of the Debtors or Reorganized Debtors, as the case may be, shall be, and hereby is, authorized to execute, deliver, File, and record such contracts, instruments, releases, indentures, certificates, and other agreements or documents, and take such other actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan. The Secretary or other appropriate officer of each Debtor is hereby authorized to certify or attest to any of the foregoing, if necessary.

The Debtors or Reorganized Debtors, and all other parties, including all Holders of Claims entitled to receive Distributions under this Plan, shall execute any and all documents and instruments that must be executed under or in connection with this Plan in order to implement the terms of this Plan or to effectuate the Distributions under this Plan.

36

**8.13    Closing of the Chapter 11 Cases**.  The Reorganized Debtors shall, promptly after the required administration of each Chapter 11 Case, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close such Chapter 11 Case.

**8.14    Notice of Effective Date**.  As soon as practicable, but not later than three (3) Business Days following the Effective Date, the Reorganized Debtors shall file a notice of the occurrence of the Effective Date with the Bankruptcy Court.

# ARTICLE IX.

# TALC PERSONAL INJURY TRUST

**9.1    524(g) Talc Personal Injury Trust**.  In the event the 524(g) Voting Threshold is met, this Section 9.1 shall govern the creation and certain terms of the Talc Personal Injury Trust.

(a)    Creation of the Talc Personal Injury Trust.  On the Effective Date, the Talc Personal Injury Trust shall be created in accordance with the Plan Documents, the Talc Personal Injury Trust Documents, and section 524(g) of the Bankruptcy Code.

(b)    Purpose of the Talc Personal Injury Trust.  The purpose of the Talc Personal Injury Trust shall be to assume all liabilities and responsibility for all Talc Personal Injury Claims, and, among other things, to direct the processing, liquidation, and payment of all Talc Personal Injury Claims in accordance with this Plan, the 524(g) Talc Personal Injury Trust Agreement, the Confirmation Order, and the 524(g) Trust Distribution Procedures. The Talc Personal Injury Trust is intended to qualify at all times as a qualified settlement fund within the meaning of section 468B of the Internal Revenue Code.  The Talc Personal Injury Trust shall use the Talc Personal Injury Trust Assets to resolve and pay Allowed Talc Personal Injury Claims in accordance with the 524(g) Talc Personal Injury Trust Agreement, and the 524(g) Trust Distribution Procedures and in such a way as to provide reasonable assurance that the Talc Personal Injury Trust will value, and be in a financial position to pay, Talc Personal Injury Claims in substantially the same manner, and to otherwise comply in all respects with the requirements of a trust set forth in section 524(g)(2)(B) of the Bankruptcy Code.

(c)    Talc Personal Injury Trust Assets.  On the Effective Date, by virtue of confirmation of this Plan, all right, title, and interest in and to the Talc Personal Injury Trust Assets will be transferred to, and vested in, the Talc Personal Injury Trust, free and clear of all Claims, Demands, Equity Interests, Encumbrances, and other interests of any Entity, without any further action of the Bankruptcy Court or any other Entity, but subject to the remaining provisions of this Section 9.1.  The Talc Personal Injury Trustees shall agree to accept and hold the Talc Personal Injury Trust Assets in the Talc Personal Injury Trust for the benefit of the Holders of Talc Personal Injury Claims, subject to the terms of this Plan and the 524(g) Talc Personal Injury Trust Agreement.  The Debtors, the Reorganized Debtors, and the Talc Personal Injury Trustees, and any party under the control of such parties will execute any documents or other instruments and shall take all other steps as

US-DOCS\149447838.9

necessary to cause title to the Talc Personal Injury Trust Assets to be transferred to the Talc Personal Injury Trust.

(d)     Appointment of Talc Personal Injury Trustees; No Trust Advisory Committee.  On the Effective Date, the Bankruptcy Court shall appoint the individuals identified in the 524(g) Talc Personal Injury Trust Agreement to serve as the initial Talc Personal Injury Trustees.  Such appointments shall be effective as of the Effective Date. All subsequent Talc Personal Injury Trustees shall be appointed in accordance with the terms of the 524(g) Talc Personal Injury Trust Agreement.  The Talc Personal Injury Trustees shall administer the Talc Personal Injury Trust pursuant to the 524(g) Talc Personal Injury Trust Agreement and this Plan.  For purposes of performing the duties and fulfilling the obligations under the 524(g) Talc Personal Injury Trust Agreement and this Plan, the Talc Personal Injury Trustees shall be deemed to be a party or parties in interest within the meaning of section 1109(b) of the Bankruptcy Code. To minimize the expenses of administering Talc Personal Injury Claims, the Talc Personal Injury Trust will not have, and the 524(g) Talc Personal Injury Trust Agreement shall provide that the Talc Personal Injury Trust will not have, a trust advisory committee.

(e)     Appointment of Post-Effective Date Future Claimants' Representative.  On the Effective Date, [ ● ] shall be appointed, pursuant to this Plan, the Confirmation Order, and the 524(g) Talc Personal Injury Trust Agreement, as the Post-Effective Date Future Claimants' Representative.  The Post-Effective Date Future Claimants' Representative shall have the functions, duties, and rights provided in, and shall serve in accordance with, the 524(g) Talc Personal Injury Trust Agreement.  In addition to the foregoing, the Post-Effective Date Future Claimants' Representative also may, at his (or her) option, participate in any: (a) appeal of the Confirmation Order; (b) hearing on a Professional Fee Claim; and (c) adversary proceeding pending on the Effective Date to which the Future Claimants' Representative was a party.  Successor Post-Effective Date Future Claimants' Representatives will be appointed as provided in the 524(g) Talc Personal Injury Trust Agreement.

(f)     Transfer of Talc Personal Injury Claims and Demands to the Talc Personal Injury Trust.  In consideration for the property transferred to the Talc Personal Injury Trust, on the Effective Date, all liabilities, obligations, and responsibilities relating to all present and future Talc Personal Injury Claims, including, without limitation, Demands, shall be transferred and channeled to the Talc Personal Injury Trust and shall be satisfied solely by the Talc Personal Injury Trust Assets.  The Talc Personal Injury Trust shall have no liability for any Claims other than Talc Personal Injury Claims, and no Claims other than Talc Personal Injury Claims shall be transferred and channeled to the Talc Personal Injury Trust.

(g)     Transfer of Rights and Defenses Related to Talc Personal Injury Claims. With the exception of those claims released by the Debtors pursuant to Section 11.6 of this Plan, on the Effective Date all claims, defenses, rights and Causes of Action of the Debtors and Reorganized Debtors relating to Talc Personal Injury Claims shall be transferred and assigned to the Talc Personal Injury Trust.  In accordance with section 1123(b) of the Bankruptcy Code, the Talc Personal Injury Trust shall retain and may enforce such claims, defenses, rights, and Causes of Action and shall retain and may enforce all defenses and

counterclaims to all Claims or Demands asserted against the Talc Personal Injury Trust, including, but not limited to, setoff, recoupment, and any rights under section 502(d) of the Bankruptcy Code; *provided*, *however*, that no such claims, defenses, Causes of Action, or counterclaims may be asserted against any Protected Party. The Talc Personal Injury Trust shall be deemed to be the appointed representative of the Debtors and Reorganized Debtors as to Talc Personal Injury Claims, and may pursue, litigate, compromise, and settle any rights, claims, or Causes of Action transferred to it, as appropriate.

(h)     Talc Claimant Release. In connection with the resolution of Allowed Talc Personal Injury Claims, the 524(g) Trust Distribution Procedures shall provide on the Effective Date, and shall not thereafter cease to provide, that all Holders of Talc Personal Injury Claims shall execute a Talc Claimant Release as a precondition to receiving payment on account of their Allowed Talc Personal Injury Claims from the Talc Personal Injury Trust. The Talc Personal Injury Trustees may modify the provisions of the Talc Claimant Release; *provided*, *however*, that no such change shall be inconsistent with the terms of this Plan or the Confirmation Order and/or modify in any way the releases and injunctions contained in this Plan or the Confirmation Order.

(i)     Talc Personal Injury Trust Indemnification. The Talc Personal Injury Trust shall, pursuant to the 524(g) Talc Personal Injury Trust Agreement, indemnify and hold harmless each of the Protected Parties, against any liability arising out of any Talc Personal Injury Claim, Affiliate Released Claim, or any violation of the Channeling Injunction by any Entity, as provided in the Talc Claims Indemnification Agreement.

(j)     Institution and Maintenance of Legal and Other Proceedings. From and after the Effective Date, the Talc Personal Injury Trust shall be empowered and entitled, in its sole and absolute discretion and at its own expense, to pursue, compromise or settle all legal actions and other proceedings related to any asset, liability, or responsibility of the Talc Personal Injury Trust that is not released or otherwise enjoined pursuant to this Plan or the Confirmation Order.

(k)     Trust Expenses. The Talc Personal Injury Trust shall pay all Trust Expenses from the Talc Personal Injury Trust Assets. No other party (including the Non-Debtor Affiliates) shall have any obligation to pay any Trust Expenses or any other liabilities of the Talc Personal Injury Trust.

**9.2     Non-524(g) Talc Personal Injury Trust**. In the event the 524(g) Voting Threshold is not met, this Section 9.2 shall govern the creation and certain terms of the Talc Personal Injury Trust.

(a)     Creation of the Talc Personal Injury Trust. On the Effective Date, the Talc Personal Injury Trust shall be created in accordance with the Plan Documents and the Talc Personal Injury Trust Documents.

(b)     Purpose of the Talc Personal Injury Trust. The purpose of the Talc Personal Injury Trust shall be to, among other things, (i) receive and hold the Talc Personal Injury Trust Assets; (ii) administer, dispute, object to, compromise, or otherwise resolve all Talc Personal Injury Claims; (iii) make distributions to the Holders of Allowed Talc Personal Injury Claims in

accordance with this Plan and the Talc Personal Injury Trust Documents; and (iv) maximize recoveries for the benefit of Holders of Talc Personal Injury Claims. The Talc Personal Injury Trust is intended to qualify at all times as a qualified settlement fund within the meaning of section 468B of the Internal Revenue Code.

(c) <u>Talc Personal Injury Trust Assets</u>. On the Effective Date, by virtue of confirmation of this Plan, all right, title, and interest in and to the Talc Personal Injury Trust Assets will be transferred to, and vested in, the Talc Personal Injury Trust, free and clear of all Claims, Demands, Equity Interests, Encumbrances, and other interests of any Entity, without any further action of the Bankruptcy Court or any other Entity, but subject to the remaining provisions of this <u>Section 9.2</u>. The Talc Personal Injury Trustee(s) shall agree to accept and hold the Talc Personal Trust Assets in the Talc Personal Injury Trust for the benefit of the Holders of Allowed Talc Personal Injury Claims, subject to the terms of this Plan and the Non-524(g) Talc Personal Injury Trust Agreement. The Debtors, the Reorganized Debtors, and the Talc Personal Injury Trustee(s), and any party under the control of such parties will execute any documents or other instruments and shall take all other steps as necessary to cause title to the Talc Personal Injury Trust Assets to be transferred to the Talc Personal Injury Trust.

(d) <u>Appointment of Talc Personal Injury Trustee(s)</u>. On the Effective Date, the Bankruptcy Court shall appoint the individual(s) identified in the Non-524(g) Talc Personal Injury Trust Agreement to serve as the initial Talc Personal Injury Trustee(s). Such appointment(s) shall be effective as of the Effective Date. All subsequent Talc Personal Injury Trustees shall be appointed in accordance with the terms of the Non-524(g) Talc Personal Injury Trust Agreement. The Talc Personal Injury Trustee(s) shall administer the Talc Personal Injury Trust pursuant to the Non-524(g) Talc Personal Injury Trust Agreement and this Plan. For purposes of performing the duties and fulfilling the obligations under the Non-524(g) Talc Personal Injury Trust Agreement and this Plan, the Talc Personal Injury Trustee(s) shall be deemed to be a party or parties in interest within the meaning of section 1109(b) of the Bankruptcy Code.

(e) <u>Resolution of Talc Personal Injury Claims by the Talc Personal Injury Trust</u>. In full and final satisfaction, settlement, release, and discharge of its Allowed Talc Personal Injury Claim against the Debtors, each Holder of an Allowed Talc Personal Injury Claim shall receive its *pro rata* share of the Trust Interests entitling such Holder to receive a recovery, if any, from the Talc Personal Injury Trust in accordance with and subject to the terms of the Non-524(g) Talc Personal Injury Trust Agreement and Non-524(g) Trust Distribution Procedures. The sole recourse Holders of Allowed Talc Personal Injury Claims shall have against the Debtors is to the Talc Personal Injury Trust and Talc Personal Injury Trust Assets.

(f) <u>Transfer of Rights and Defenses Related to Talc Personal Injury Claims</u>. The Talc Personal Injury Trust shall be deemed to be the appointed representative of the Debtors and Reorganized Debtors as to Talc Personal Injury Claims, and may pursue, litigate, compromise, and settle any rights, claims, or Causes of Action transferred to it, as appropriate.

(g) <u>Talc Personal Injury Trust Indemnification</u>. The Talc Personal Injury Trust shall, pursuant to the Non-524(g) Talc Personal Injury Trust Agreement, indemnify and hold harmless each of the Released Parties against any liability arising out of or related to any claims,

Causes of Action, or rights released pursuant to the Debtor Release, as provided in the Talc Claims Indemnification Agreement.

(h)     _Institution and Maintenance of Legal and Other Proceedings_.  From and after the Effective Date, the Talc Personal Injury Trust shall be empowered and entitled, in its sole and absolute discretion and at its own expense, to pursue, compromise or settle all legal actions and other proceedings related to any asset, liability, or responsibility of the Talc Personal Injury Trust that is not released or otherwise enjoined pursuant to this Plan or the Confirmation Order.

(i)     _Trust Expenses_.  The Talc Personal Injury Trust shall pay all Trust Expenses from the Talc Personal Injury Trust Assets.  No other party (including the Non-Debtor Affiliates) shall have any obligation to pay any Trust Expenses or any other liabilities of the Talc Personal Injury Trust.

(j)     _Non-Transferability of Trust Interests_.  The Trust Interests shall be non-transferable other than if transferred by will, intestate succession or otherwise by operation of law.

## ARTICLE X.

## EFFECT OF CONFIRMATION

**10.1     Dissolution of Unsecured Creditors Committee; Discharge of the Future Claimants' Representative**.  Effective on the Effective Date, the Unsecured Creditors Committee shall be dissolved automatically, whereupon its members, Professionals, and agents shall be released and discharged from any further authority, duties, obligations and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code.  Notwithstanding the foregoing, the Unsecured Creditors Committee may, at its option and without taking any action or seeking or receiving any approval, continue to serve and function after the Effective Date for the purposes of participating in any: (a) appeal of any order entered in the Chapter 11 Cases, including without limitation the Confirmation Order; (b) hearing on a Professional Fee Claim; (c) adversary proceeding pending on the Effective Date to which the Unsecured Creditors Committee was a participant; and/or (d) motions or other actions seeking enforcement or implementation of the provisions of this Plan or the Confirmation Order, in which the Unsecured Creditors Committee is a participant as of the Effective Date.  In the event that the Unsecured Creditors Committee determines to continue to serve and function after the Effective Date pursuant to the preceding sentence, the Unsecured Creditors Committee shall dissolve upon the termination of all (a) appeals of any orders entered in the Chapter 11 Cases, including without limitation the Confirmation Order; (b) hearings on any Professional Fee Claims; (c) adversary proceedings pending on the Effective Date to which the Unsecured Creditors Committee was a participant; and/or (d) motions or other actions seeking enforcement or implementation of the provisions of this Plan or the Confirmation Order, in which the Unsecured Creditors Committee is a participant as of the Effective Date.

Effective on the Effective Date, the Future Claimants' Representative shall be discharged from his duties in such capacity, whereupon the Future Claimants' Representative and his Professionals and agents shall be released and discharged from any further authority, duties, obligations and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code.

US-DOCS\149447838.9

The Reorganized Debtors shall pay, in accordance with any applicable fee and expense procedures promulgated during the Chapter 11 Cases and with <u>Section 2.2(c)</u> above, the reasonable and documented fees and expenses incurred by the Future Claimants' Representative, the Unsecured Creditors Committee, and their respective Professionals through the Effective Date. The Reorganized Debtors shall not be liable for any post-Effective Date fees and expenses of the professionals retained by the Unsecured Creditors Committee and the Post-Effective Date Future Claimants' Representative, if applicable.

**10.2     Vesting of Assets**.  Pursuant to section 1141(b) of the Bankruptcy Code, except as otherwise provided in this Plan (including but not limited to <u>Section 7.1</u>), the Plan Documents, or the Confirmation Order, the property of the Debtors' Estates (except for any other property of the Debtors distributed pursuant to this Plan) shall vest in the Reorganized Debtors on the Effective Date free and clear of any and all Liens, Claims, Encumbrances and other interests of any Entity. From and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property free of any restrictions imposed under or by the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court.  Without limiting the generality of the foregoing, the Reorganized Debtors may, without application to, or approval by, the Bankruptcy Court, pay professional fees and expenses that the Reorganized Debtors may incur after the Effective Date.

**10.3     Preservation of Certain Causes of Action, Rights to Settle Claims and Compromise Controversies, and Defenses**.  With the exception of those claims released by the Debtors pursuant to <u>Section 11.6</u> of this Plan, enjoined by the Channeling Injunction under <u>Section 11.4</u>, if applicable, or transferred to the Talc Personal Injury Trust pursuant to, as applicable, <u>Section 9.1</u> or <u>Section 9.2</u> of this Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors, as successor in interest to the Debtors and their Estates, shall retain and may enforce, sue on, settle, or compromise (or decline to do any of the foregoing), all claims, rights, causes of action, suits and proceedings, whether in law or in equity, whether known or unknown, accruing to, or that are property of, the Debtors and their Estates pursuant to the Bankruptcy Code or any statute or legal theory, including any rights, claims, and Causes of Action against third parties based upon, attributable to, or arising out of Allowed Claims, in their sole and absolute discretion, without the necessity for Bankruptcy Court approval under Bankruptcy Rule 9019, and, in the event the 524(g) Voting Threshold is not met, the Reorganized Debtors shall retain and may enforce all defenses and counterclaims to all Claims asserted against the Debtors or their Estates, including, but not limited to, setoff, recoupment and any rights under section 502(d) of the Bankruptcy Code.  From and after the Effective Date, the Talc Personal Injury Trust and/or the Reorganized Debtors, as appropriate based on the assets and liabilities retained or owed by each respectively, shall be authorized to compromise any controversies on such terms as each may determine, in their sole discretion, to be appropriate, without notice to any other party or approval of or notice to the Bankruptcy Court.  Notwithstanding anything in this <u>Section 10.3</u> to the contrary, neither the Debtors nor the Reorganized Debtors shall have any rights to pursue any Avoidance Actions or other claims against any Non-Debtor Affiliate.

**10.4     Terms of Injunction and Automatic Stay**.  All of the injunctions and/or stays in existence immediately prior to the Confirmation Date provided for in or in connection with the Chapter 11 Cases, whether pursuant to section 105, 362, or any other provision of the Bankruptcy Code, the Bankruptcy Rules, or other applicable law, shall remain in full force and effect until the

injunctions set forth in this Plan become effective, and shall continue to remain in full force and effect thereafter as provided by this Plan, the Confirmation Order, or by their own terms. For the avoidance of doubt, upon effectiveness of the injunctions set forth in this Plan, the automatic stay imposed by section 362 of the Bankruptcy Code shall be terminated. In addition, on and after the Confirmation Date, the Debtors may seek such further orders as they may deem necessary or appropriate to preserve the status quo during the time between the Confirmation Date and the Effective Date.

Each of the injunctions contained in this Plan or the Confirmation Order shall become effective on the Effective Date and shall continue in effect at all times thereafter unless otherwise provided in this Plan or the Confirmation Order.

**10.5     No Successor Liability**. Except as otherwise expressly provided in this Plan (including, for the avoidance of doubt, those provisions of this Plan providing for the Reinstatement and/or pass-through of Claims or Equity Interests), the Debtors, the Reorganized Debtors, the Non-Debtor Affiliates, and the Talc Personal Injury Trust do not, nor shall they be deemed to, assume, agree to perform, pay, or indemnify creditors for any liabilities or obligations of the Debtors relating to or arising out of the operations of, or assets of, the Debtors whether arising prior to or resulting from actions, events, or circumstances occurring or existing at any time prior to the Confirmation Date. None of the Reorganized Debtors, the Non-Debtor Affiliates, or the Talc Personal Injury Trust is, or shall be, a successor to either of the Debtors by reason of any theory of law or equity, and none shall have any successor or transferee liability of any kind or character, except that the Reorganized Debtors and the Talc Personal Injury Trust shall assume the obligations specified expressly in this Plan, the applicable Plan Documents, and the Confirmation Order.

# ARTICLE XI.

## RELEASES, INJUNCTIONS, AND INDEMNIFICATION OF CLAIMS

**11.1     Settlement of Claims and Equity Interests**. Except as otherwise provided in this Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, Distributions, releases, and other benefits provided under this Plan, upon the Effective Date, the provisions of this Plan, including the Affiliate Settlement, shall constitute a good faith compromise and settlement of all Claims, Equity Interests, Causes of Action, and controversies released, settled, compromised, discharged, satisfied, or otherwise resolved pursuant to this Plan, including any disputes concerning in any way the validity, classification, effectiveness, or priority of the Intercompany Claims and the release of the Affiliate Released Claims. This Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Equity Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors, their Estates, and Holders of Claims and Equity Interests.

US-DOCS\149447838.9

**11.2     Discharge of Debtors**.  Except as specifically provided in this Plan or in the Confirmation Order, pursuant to sections 524 and 1141(d)(1)(A) of the Bankruptcy Code, confirmation of this Plan shall discharge the Debtors and the Reorganized Debtors on the Effective Date from any and all Claims of any nature whatsoever, including, without limitation, all Claims and liabilities that arose before the Effective Date and all debts of the kind specified in sections 502(g), 502(h) and 502(i) of the Bankruptcy Code whether or not: (a) a Proof of Claim based on such Claim was Filed under section 501 of the Bankruptcy Code, or such Claim was listed on any of the Schedules; (b) such Claim is or was allowed under section 502 of the Bankruptcy Code; or (c) the Holder of such Claim has voted on or accepted this Plan.  Except as otherwise specifically provided for in this Plan, as of the Effective Date, the rights provided in this Plan to Holders of Claims and Equity Interests shall be in exchange for and in complete satisfaction, settlement, release and discharge of all Claims (including, without limitation, Talc Personal Injury Claims and the Affiliate Released Claims) against, Liens on, and Equity Interests in the Debtors and all of their assets and properties.

**11.3     Discharge Injunction.  Except as specifically provided in this Plan or the Confirmation Order, all Entities who have held, hold or may hold Claims or Demands against the Debtors are permanently enjoined, on and after the Effective Date, from: (a) commencing or continuing in any manner any action or other proceeding of any kind against the Debtors, the Reorganized Debtors, or their respective property with respect to such Claim or Demand, other than to enforce any right to a Distribution pursuant to this Plan; (b) enforcing, attaching, collecting, or recovering by any manner or means of any judgment, award, decree, or order against the Debtors, the Reorganized Debtors, or their respective property with respect to such Claim or Demand, other than as permitted pursuant to (a) above; (c) creating, perfecting, or enforcing any Encumbrance of any kind against the Debtors, the Reorganized Debtors, or their respective property with respect to such Claim or Demand; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due to the Debtors or against the property or interests in property of the Debtors, with respect to such Claim or Demand; and/or (e) commencing or continuing any action, in any manner and in any place in the world, against the Debtors, the Reorganized Debtors, or their respective property that does not comply with or is inconsistent with the provisions of this Plan or the Confirmation Order.  The foregoing injunction shall extend to the successors of the Debtors (including, without limitation, the Reorganized Debtors) and their respective properties and interests in property.  The discharge provided in this provision shall void any judgment obtained against any Debtor at any time, insofar as such judgment relates to a discharged Claim or Demand.**

**11.4     Channeling Injunction**.  **In the event the 524(g) Voting Threshold is met, all Talc Personal Injury Claims shall be subject to the following Channeling Injunction:**

         (a)     **Terms.  Pursuant to section 524(g) of the Bankruptcy Code, from and after the Effective Date, the sole recourse of any Holder of a Talc Personal Injury Claim on account of such Talc Personal Injury Claim shall be to the Talc Personal Injury Trust pursuant to this Section 11.4 and the 524(g) Trust Distribution Procedures, and such Holder shall have no right whatsoever at any time to assert its Talc Personal Injury Claim against any Protected Party or any property or interest in property of any Protected Party.  On and after the Effective Date, all present and**

44

future Holders of Talc Personal Injury Claims shall be permanently and forever stayed, restrained, barred and enjoined from taking any actions for the purpose of, directly or indirectly or derivatively collecting, recovering, or receiving payment of, on, or with respect to any Talc Personal Injury Claim other than from the Talc Personal Injury Trust pursuant to the Talc Personal Injury Trust Documents, including, but not limited to, the following:

      (i)      commencing, conducting, or continuing in any manner, directly, indirectly or derivatively, any suit, action, or other proceeding of any kind (including a judicial, arbitration, administrative, or other proceeding) in any forum in any jurisdiction around the world against or affecting any Protected Party or any property or interests in property of any Protected Party;

      (ii)      enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any means or in any manner, whether directly or indirectly, any judgment, award, decree, or other order against any Protected Party or any property or interests in property of any Protected Party;

      (iii)      creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Encumbrance against any Protected Party or any property or interests in property of any Protected Party;

      (iv)      setting off, seeking reimbursement of, contribution from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability owed to any Protected Party or any property or interests in property of any Protected Party; and

      (v)      proceeding in any manner in any place with regard to any matter that is within the scope of the matters designated by this Plan to be subject to resolution by the Talc Personal Injury Trust, except in conformity and compliance with the 524(g) Talc Personal Injury Trust Agreement and the 524(g) Trust Distribution Procedures.

(b)      <u>Reservations</u>. This Channeling Injunction shall not stay, restrain, bar, or enjoin:

      (i)      the rights of Holders of Talc Personal Injury Claims to the treatment accorded to Class 3 as described in this Plan, including without limitation the right to assert Talc Personal Injury Claims against the Talc Personal Injury Trust in accordance with the 524(g) Trust Distribution Procedures;

      (ii)      the rights of Entities to assert any Claim, debt, obligation, or liability for payment of Talc Personal Injury Trust Expenses against the Talc Personal Injury Trust; and

45

         **(iii)** the rights of Entities to assert any Claim, debt, obligation, or liability for payment against an Entity that is not a Protected Party unless otherwise enjoined by order of the Bankruptcy Court (including but not limited to the Confirmation Order).

         **(c)** <u>**Modifications**</u>. There shall be no modification, dissolution, or termination of the Channeling Injunction, which shall be a permanent injunction.

         **(d)** <u>**Non-Limitation of Channeling Injunction**</u>. Nothing in the 524(g)Talc Personal Injury Trust Agreement or the 524(g) Trust Distribution Procedures shall be construed in any way to limit the scope, enforceability, or effectiveness of the Channeling Injunction issued in connection with this Plan or the Talc Personal Injury Trust's assumption of all liabilities and responsibility for the Talc Personal Injury Claims.

         **(e)** Any Protected Party may enforce the Channeling Injunction as a defense to any Claim brought against such Protected Party that is enjoined under this Plan as to such Protected Party and may seek to enforce such injunction in a court of competent jurisdiction, including but not limited to the Bankruptcy Court.

**11.5** **Exculpation**. None of the Exculpated Parties shall have or incur any liability to any Person or Entity for any claims or Causes of Action or for any act or omission taken or to be taken on or after the Petition Date through and including the Effective Date in connection with, related to, or arising out of: (a) the commencement or administration of the Chapter 11 Cases; (b) negotiation, formulation and preparation of this Plan and the other Plan Documents, including the Talc Personal Injury Trust Documents, and any of the terms and/or settlements and compromises reflected in this Plan and the other Plan Documents; (c) pursuit of confirmation of this Plan; (d) consummation of this Plan, or administration of this Plan or the property to be distributed under this Plan or the Trust Distribution Procedures; (e) the issuance or distribution of securities under this Plan; (f) the establishment of the Talc Personal Injury Trust in accordance with this Plan; or (g) the releases and injunctions contained in this Plan, except for any liability that results from such Entity's criminal acts, actual fraud, willful misconduct, or gross negligence as determined by a Final Order, and, in all respects, the Debtors and the Reorganized Debtors shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities in and under the Chapter 11 Cases, this Plan and the Plan Documents. The Exculpated Parties have, and upon confirmation of this Plan, shall be deemed to have, participated in good faith and in compliance with all applicable laws with regard to the solicitation and Distribution of consideration pursuant to this Plan and, therefore, are not, and on account of such Distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or such Distributions made pursuant to this Plan. The exculpation provided in this <u>Section 11.5</u> shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability.

**11.6    Releases by Debtors and Their Estates and Related Injunction.**

(a)    **Except as otherwise expressly provided in this Plan or the Confirmation Order, on the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors, the Reorganized Debtors, and any Entity seeking to exercise or taking any action that would require or could fall within the scope of exercising the rights of the Estates, in each case, whether individually or collectively and whether directly or indirectly, including, without limitation, any successor to the Debtors or any Estate representative appointed or selected pursuant to the applicable provisions of the Bankruptcy Code, shall, and shall be deemed to, irrevocably, completely and forever release, waive and discharge unconditionally the Released Parties from any and all claims, obligations, suits, judgments, remedies, theories of recovery, damages, demands, debts, rights, Causes of Action and liabilities which any of the Debtors, the Reorganized Debtors, or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of any other Entity, including but not limited to, the Holder of any Claim, Demand, or Equity Interest, whether known or unknown, liquidated or unliquidated, fixed or contingent, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, whether direct, indirect, or derivative, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' assets and properties, the conduct of the Debtors (or any predecessor's) current and former business and operations, their Estates, the Chapter 11 Cases, this Plan (including the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated by this Plan), the Plan Documents, or the Reorganized Debtors, or any related agreements, instruments, and other documents created or entered into before or during the Chapter 11 Cases or the negotiation, formulation, preparation or implementation thereof, the pursuit of confirmation of this Plan, the administration and implementation of this Plan, the solicitation of votes with respect to this Plan, the Distribution of property under this Plan, any act, omission, transaction, event, occurrence, or other circumstance taking place on or prior to the Effective Date (including prior to the Petition Date), the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim, Demand, or Equity Interest that is treated in this Plan, the business or contractual arrangements between any Debtor and any Released Party (including the exercise of any common law or contractual rights of setoff or recoupment by any Released Party at any time on or prior to the Effective Date), the restructuring of any Claim, Demand, or Equity Interest before or during the Chapter 11 Cases, the Disclosure Statement, and related agreements, instruments, and other documents, and the negotiation, formulation, preparation or implementation thereof, or any other act or omission.**

(b)    **Except as provided in this Plan or the Confirmation Order, the Debtors, the Reorganized Debtors, and any Entity seeking to exercise, or taking any action that would require or could fall within the scope of exercising, the rights of the Estates, in each case, whether individually or collectively and whether directly or indirectly, including, without limitation, any successor to the Debtors or any Estate**

representative appointed or selected pursuant to the applicable provisions of the Bankruptcy Code, are permanently enjoined from taking any actions on account of, in connection with, related to, or based upon any and all Claims, obligations, suits, judgments, remedies, damages, Demands, debts, rights, Causes of Action and liabilities released pursuant to this <u>Section 11.6</u>, including but not limited to the following: (a) commencing or continuing any action or other proceeding against the Released Parties or their respective property; (b) enforcing, attaching, collecting or recovering any judgment, award, decree or order against the Released Parties or their respective property; (c) creating, perfecting or enforcing any Encumbrance against the Released Parties or their respective property; (d) asserting any setoff, right of subrogation, or recoupment of any kind against any obligation due to the Released Parties or against their respective property; and (e) commencing, continuing, or taking any action, in any manner and in any place in the world, against the Released Parties that does not comply with or is inconsistent with the provisions of this Plan or the Confirmation Order.

(c) **In furtherance of the Affiliate Settlement, on the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors, on their own behalf and as representatives of their respective Estates, and the Reorganized Debtors are deemed to irrevocably and unconditionally, fully, finally, and forever waive, release, acquit, and discharge each and all of the Non-Debtor Affiliates of and from the Affiliate Released Claims.**

**11.7    Releases by Holders of Claims. As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Releasing Parties, in each case on behalf of themselves and their respective successors and assigns, representatives and any other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, shall be deemed to irrevocably and forever release, waive, and discharge all claims, obligations, suits, judgments, remedies, damages, demands, debts, theories of recovery, rights, Causes of Action, losses, and liabilities whatsoever against the Released Parties, whether known or unknown, liquidated or unliquidated, fixed or contingent, foreseen or unforeseen, matured or unmatured, existing or hereinafter arising, in law, equity, contract, tort or otherwise, based in whole or in part upon any act, omission, event, transaction, occurrence, or any other circumstance taking place on or prior to the Effective Date (including prior to the Petition Date) in any way relating or connected to the Debtors, the Estates, the Debtors' assets and properties, the conduct of the Debtors' (or any predecessor's) businesses, the Chapter 11 Cases, this Plan (including the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated by this Plan), the Plan Documents, or the Reorganized Debtors, or any related agreements, instruments, and other documents created or entered into before or during the Chapter 11 Cases or the negotiation, formulation, preparation or implementation thereof, the pursuit of confirmation of this Plan, the administration and implementation of this Plan, the solicitation of votes with respect to this Plan, the Distribution of property under this Plan, or any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing (other than the rights under this Plan, the Plan Documents, and the contracts, instruments, releases and other agreements or documents delivered or to be delivered hereunder), including, for the avoidance of doubt,**

any and all Causes of Action that the Holder of a Talc Personal Injury Claim, the Unsecured Creditors Committee, the Talc Personal Injury Trust, or the Future Claimants' Representative did or could have commenced against any current or former officer, manager, or director of the Debtors (in such capacity) that is based upon, related to, or arising from any acts or omissions of such officer, manager, or director occurring prior to the Effective Date on account of such Talc Personal Injury Claim, to the fullest extent permitted under applicable law (as now in effect or subsequently extended), other than Claims or Causes of Action arising out of any act or omission of a Released Party that is determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted a criminal act.

**11.8    Injunction Related to Releases; Injunction Against Interference with Plan.** Except as otherwise provided in this Plan or the Confirmation Order, the Confirmation Order shall permanently enjoin the commencement or prosecution by any Entity, whether directly, derivatively or otherwise, of any of the following released pursuant to this Plan: Claims, commitments, obligations, suits, judgments, damages, demands, debts, theories of liability, remedies, losses, causes of action and liabilities (collectively, the "Enjoined Matters").  Furthermore, upon entry of the Confirmation Order, all Holders of Claims and Equity Interests shall be precluded and enjoined from taking any actions to interfere with the implementation and consummation of this Plan.

**11.9    Supplemental Settlement Injunction**.  In order to preserve and promote the Affiliate Settlement, which is incorporated herein, and pursuant to the exercise of the equitable jurisdiction and power of the Bankruptcy Court under section 105(a) of the Bankruptcy Code, to the extent the Bankruptcy Court grants the relief sought in the Affiliate Adversary Proceeding, the Confirmation Order shall provide for the following permanent injunction to take effect as of the Effective Date (the "Supplemental Settlement Injunction").

(a)    **Terms**.  All Persons that have held or asserted, that hold or assert, or that may in the future hold or assert any Affiliate Released Claims against the Non-Debtor Affiliates (or any of them) shall be permanently stayed, restrained, and enjoined from pursuing now, or at any time in the future, any Affiliate Released Claims.

(b)    Any Non-Debtor Affiliate may enforce the Supplemental Settlement Injunction as a defense to any claim brought against such Non-Debtor Affiliate that is enjoined under this Plan as to such Non-Debtor Affiliate and may seek to enforce such injunction in a court of competent jurisdiction, including but not limited to the Bankruptcy Court.

**11.10    Certain Waivers**.  Although the Debtors do not believe that California law is applicable to this Plan, nevertheless, in an abundance of caution, the Debtors hereby understand and waive the effect of section 1542 of the California Civil Code in the event that such section is applicable to the Debtors or the Estates.  Section 1542 of the California Civil Code provides:

> §1542.  A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER

FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

**THE DEBTORS AGREE TO ASSUME THE RISK OF ANY AND ALL UNKNOWN, UNANTICIPATED OR MISUNDERSTOOD DEFENSES, CLAIMS, CAUSES OF ACTION, CONTRACTS, LIABILITIES, INDEBTEDNESS AND OBLIGATIONS WHICH ARE RELEASED BY THIS PLAN, AND THE DEBTORS HEREBY WAIVE AND RELEASE ALL RIGHTS AND BENEFITS WHICH THEY OR THE ESTATES MIGHT OTHERWISE HAVE UNDER THE AFOREMENTIONED SECTION 1542 OF THE CALIFORNIA CIVIL CODE WITH REGARD TO THE RELEASE OF SUCH UNKNOWN, UNANTICIPATED OR MISUNDERSTOOD DEFENSES, CLAIMS, CAUSES OF ACTION, CONTRACTS, LIABILITIES, INDEBTEDNESS AND OBLIGATIONS. IN THE EVENT ANY OTHER LAWS (IF ANY) SIMILAR TO SECTION 1542 OF THE CALIFORNIA CIVIL CODE MAY BE APPLICABLE, THE DEBTORS WAIVE AND RELEASE ANY BENEFIT, RIGHT OR DEFENSE WHICH THEY OR THE ESTATES MIGHT OTHERWISE HAVE UNDER ANY SUCH LAW WITH REGARD TO THE RELEASE OF UNKNOWN, UNANTICIPATED OR MISUNDERSTOOD DEFENSES, CLAIMS, CAUSES OF ACTION, CONTRACTS, LIABILITIES, INDEBTEDNESS AND OBLIGATIONS.**

**11.11   Gatekeeper Provision**.  No Person or Entity may assert, commence, continue, amend, or otherwise pursue, join in, or otherwise support any other party asserting, commencing, continuing, amending, or pursuing, a Claim or Cause of Action of any kind against the Debtors, the Reorganized Debtors, the Exculpated Parties, the Released Parties, or the Non-Debtor Affiliates, as applicable, that is exculpated pursuant to Section 11.5, released by the Debtors pursuant to Section 11.6, or released as to such party pursuant to Section 11.7, as applicable, without first (a) requesting a determination from the Bankruptcy Court, after notice and a hearing, that such Claim or Cause of Action represents a colorable claim against a Debtor, a Reorganized Debtor, an Exculpated Party, a Released Party, or a Non-Debtor Affiliate and is not a Claim or Cause of Action that has been released, discharged, compromised, or channeled pursuant to this Plan, which request must attach the complaint or petition proposed to be filed by the requesting party and (b) obtaining from the Bankruptcy Court a Final Order granting specific authorization for such party to bring such Claim or Cause of Action against any such Debtor, Reorganized Debtor, Exculpated Party, Released Party, or Non-Debtor Affiliate.  For the avoidance of doubt, any party that obtains such determination and authorization and subsequently wishes to amend the authorized complaint or petition to add any Claims or Causes of Action not explicitly included in the authorized complaint or petition must obtain authorization from the Bankruptcy Court before filing any such amendment in the court where such complaint or petition is pending.  The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a Claim or Cause of Action is colorable and not otherwise released, discharged, compromised, or channeled and, only as legally permissible, will have jurisdiction to adjudicate the underlying colorable Claim or Cause of Action.

**11.12   Disallowed Claims**.  On and after the Effective Date, the Debtors and their Estates shall be fully and finally discharged from any liability or obligation on all Disallowed Claims, and

any order creating a Disallowed Claim that is not a Final Order as of the Effective Date solely because of an Entity's right to move for reconsideration of such order pursuant to section 502 of the Bankruptcy Code or Bankruptcy Rule 3008 shall nevertheless become and be deemed to be a Final Order on the Effective Date.

**11.13   Indemnification Obligations**.  For purposes of this Plan, the obligations of the Debtors to indemnify and reimburse Persons who are or were managers, directors, or officers of any Debtor prior to or following the Petition Date against and for any obligations as provided in each Debtor's organizational documents, bylaws, applicable state law, or other agreement, or any combination of the foregoing, shall survive confirmation of this Plan, remain unaffected thereby, and not be discharged in accordance with section 1141 of the Bankruptcy Code, irrespective of whether indemnification or reimbursement is owed in connection with an event occurring before, on, or after the Petition Date; *provided*, *however*, that, pursuant to the Talc Claims Indemnification Agreement, such obligations shall be assumed by the Talc Personal Injury Trust on the Effective Date and the Talc Personal Injury Trust shall agree to indemnify, defend, pay the defense costs for, and hold harmless the Non-Debtor Affiliates and the Debtors' current and former directors, officers and employees, and the respective Representatives of the foregoing, from and against any and all Talc Personal Injury Claims and Affiliate Released Claims and any and all associated costs, expenses, actions, Causes of Action, suits, controversies, damages, demands, debts, liabilities or obligations of any nature, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, liquidated or unliquidated, matured or not matured, contingent or direct, whether arising at common law, in equity or under any statute.  In furtherance of the foregoing, in accordance with Section 8.9 hereof, the Reorganized Debtors shall use their commercially reasonable efforts to maintain or procure, as of the Effective Date, insurance for the benefit of such managers, directors, and officers.

## ARTICLE XII.

## CONDITIONS PRECEDENT TO CONFIRMATION
## AND CONSUMMATION OF THE PLAN

**12.1   Conditions Precedent to Confirmation of the Plan**.  Unless satisfied or waived pursuant to the provisions of Section 12.3 hereof, the following are conditions precedent to confirmation of this Plan.

(a)   The Bankruptcy Court shall have entered an order, acceptable in form and substance to the Debtors, approving the Disclosure Statement as containing adequate information within the meaning of section 1125 of the Bankruptcy Code;

(b)   The Bankruptcy Court shall have entered the Affiliate Adversary Proceeding Order;

(c)   All provisions, terms, and conditions hereof are approved in the Confirmation Order;

(d)   The Confirmation Order shall be entered in form and substance acceptable to the Debtors;

(e)     The Confirmation Order shall, among other things:

(1)     order that the Confirmation Order shall supersede any Bankruptcy Court orders issued prior to the Confirmation Date that may be inconsistent with the Confirmation Order;

(2)     authorize the implementation of this Plan in accordance with its terms;

(3)     provide that the Talc Personal Injury Trust shall receive the Trust Contributions on the Effective Date (or as soon as reasonably practicable thereafter);

(4)     provide that the Talc Personal Injury Trust and the other parties thereto shall execute and deliver the Talc Claims Indemnification Agreement;

(5)     provide that all transfers of assets of the Debtors contemplated under this Plan shall be free and clear of all Claims and Encumbrances against or on such assets;

(6)     except as otherwise provided in this Plan or Confirmation Order, provide that the assets revesting in the Reorganized Debtors shall be free and clear of all Liens, Claims and Encumbrances;

(7)     provide that any transfers effected or entered into, or to be effected or entered into, under this Plan shall be and are exempt under section 1146(a) of the Bankruptcy Code from any state, city or other municipal transfer taxes, mortgage recording taxes and any other stamp or similar tax;

(8)     provide that the transfers of property by the Debtors pursuant to the Plan (A) are or will be legal, valid, and effective transfers of property; (B) vest or will vest the recipients thereof with good title to such property; (C) do not and will not constitute avoidable transfers under the Bankruptcy Code or under other applicable bankruptcy or non-bankruptcy law; and (D) do not and will not subject the recipients to any liability by reason of such transfer under the Bankruptcy Code or applicable non-bankruptcy law, including, without limitation, any laws affecting or effecting successor or transferee liability;

(9)     provide that all Executory Contracts assumed or assumed and assigned by the Debtors during the Chapter 11 Cases or under this Plan, if any, shall remain in full force and effect for the benefit of the Reorganized Debtors or the assignee thereof notwithstanding any provision in such contract (including those provisions described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits such assignment or transfer or that enables or requires termination of such contract or lease;

(10)     provide that any Executory Contract shall be deemed rejected as of the Effective Date as set forth in, and consistent with, ARTICLE VII hereof; and

(11)  approve in all respects the settlements provided for in this Plan, including the Affiliate Settlement;

(12)  approve in all respects the transactions and agreements to be effected pursuant to this Plan, including, without limitation, the Talc Personal Injury Trust Agreement, the Trust Distribution Procedures, and the other Talc Personal Injury Trust Documents,

(13)  approve in all respects the releases of the Released Parties contained in this Plan; and

(14)  if the 524(g) Voting Threshold is met:

    a)  approve the Channeling Injunction set forth in this Plan; and

    b)  require that as a condition to receiving any distributions of any kind from the Talc Personal Injury Trust, each Holder of an Allowed Talc Personal Injury Claim execute a Talc Claimant Release.

(f)  In addition to the foregoing, the Confirmation Order shall contain the following findings of fact and conclusions of law, among others:

(1)  This Plan complies with all applicable provisions of the Bankruptcy Code, including, without limitation, those requiring that this Plan be proposed in good faith and that the Confirmation Order not be procured by fraud;

(2)  This Plan and its acceptance comply with section 1126 of the Bankruptcy Code, and confirmation of this Plan is in the best interests of all creditors;

(3)  This Plan does not provide for the liquidation of all or substantially all of the property of the Debtors, the Reorganized Debtors will operate as an ongoing business and continue in business, and confirmation of this Plan is not likely to be followed by the liquidation of the Reorganized Debtors or the need for their further financial reorganization;

(4)  The Supplemental Settlement Injunction—if issued in accordance with its terms—is fair, equitable, in the best interests of the Debtors' Estates, and shall be entered in connection with the Affiliate Settlement;

(5)  The Affiliate Settlement (a) represents a sound exercise of the Debtors' business judgment, (b) is in the best interests of the Debtors and their Estates, (c) is fair, reasonable, and equitable, and the consideration exchanged under the Affiliate Settlement constitutes a fair and reasonable settlement of the settling parties' disputes, and (d) complies with section 1123 of the Bankruptcy Code, and is approved pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019;

(6)      The Talc Personal Injury Trust is to be funded by the contribution of the Talc Personal Injury Trust Assets, including the Trust Contributions;

(7)      The Talc Personal Injury Trust is to use its assets and income to pay Allowed Talc Personal Injury Claims and Talc Personal Injury Trust Expenses;

(8)      The Affiliate Contribution is essential to the feasibility of this Plan and the successful reorganization of the Debtors;

(9)      The releases received by the Debtors, the Representatives of the Debtors, and the Released Parties in exchange for the Affiliate Contribution are essential to the global settlement of the Affiliate Released Claims and the Talc Personal Injury Claims arising from the conduct or products of the Debtors reflected in this Plan;

(10)    upon the Effective Date, the Talc Personal Injury Trust shall assume the liabilities of the Debtors with respect to Allowed Talc Personal Injury Claims; and

(11)    In the event the 524(g) Voting Threshold is met, that:

      a)      as of the Petition Date, BMI had been named as a defendant in personal injury, wrongful death or property damage actions seeking recovery for damages allegedly caused by the sale of, manufacture of, presence of, or exposure to, asbestos or asbestos-containing products;

      b)      the Talc Personal Injury Trust, by the operation of this Plan, will own a majority of the voting shares of the Reorganized Debtors;

      c)      the Debtors are likely to be subject to substantial Demands for payment arising out of the same or similar conduct or events that gave rise to the Talc Personal Injury Claims, and all such Demands are subject to the Channeling Injunction;

      d)      the actual amounts, numbers, and timing of Demands cannot be determined;

      e)      pursuit of Demands outside the procedures prescribed by this Plan and the 524(g) Trust Distribution Procedures is likely to threaten this Plan's purpose to deal equitably with Talc Personal Injury Claims and Demands;

      f)      this Plan separately classifies Talc Personal Injury Claims in Class 3, and at least two-thirds (2/3) in amount and seventy-five percent (75%) of the members in such Class that actually voted on this Plan have voted to accept this Plan;

g) the Future Claimants' Representative was appointed by the Bankruptcy Court pursuant to section 524(g) of the Bankruptcy Code as part of the proceedings leading to the issuance of the Channeling Injunction for the purpose, among other things, of protecting the interests of Future Demand Holders;

h) the Channeling Injunction is essential to this Plan and the Debtors' reorganization efforts;

i) the Channeling Injunction is to be implemented in accordance with this Plan and the Talc Personal Injury Trust;

j) the terms of the Channeling Injunction and the other injunctions contained in this Plan, including any provisions barring actions against third parties, are set forth in this Plan and the Disclosure Statement;

k) pursuant to: (i) the 524(g) Trust Distribution Procedures; (ii) court order; or (iii) otherwise, the Talc Personal Injury Trust will operate through mechanisms such as structured, periodic, or supplemental payments, *pro rata* distributions, matrices, or periodic review of estimates of the numbers and values of Talc Personal Injury Claims or other comparable mechanisms, that provide reasonable assurance that the Talc Personal Trust will value, and be in a financial position to pay, current and future Talc Personal Injury Claims in substantially the same manner regardless of the timing of the assertion of such Talc Personal Injury Claims;

l) the Affiliate Contribution constitutes a sufficient basis upon which to provide the Protected Parties with the protections afforded to them under this Plan, the Plan Documents, and the Confirmation Order;

m) in light of the benefits provided, or to be provided, to the Talc Personal Injury Trust by or on behalf of each Protected Party, the Channeling Injunction is fair and equitable to all holders of current and future Talc Personal Injury Claims;

n) this Plan and its acceptance otherwise comply with section 524(g) of the Bankruptcy Code; and

o) the Talc Personal Injury Trust will have the sole and exclusive authority as of the Effective Date to satisfy or defend against all Talc Personal Injury Claims.

US-DOCS\149447838.9

**12.2** **Conditions Precedent to the Effective Date of the Plan**. The following are conditions precedent to occurrence of the Effective Date that must be satisfied, unless waived in accordance with Section 12.3 below:

(a)     All conditions precedent to the Confirmation Date set forth in Section 12.1 shall have been satisfied or waived in accordance with Section 12.3 and shall continue to be satisfied or waived, and the Confirmation Date shall have occurred;

(b)     No request for revocation of the Confirmation Order under section 1144 of the Bankruptcy Code shall have been made, or, if made, shall remain pending;

(c)     The Talc Claims Indemnification Agreement shall have been executed and delivered, and no fact or circumstance shall exist that prevents the Talc Claims Indemnification Agreement from being in full force and effect immediately upon the occurrence of the Effective Date;

(d)     The Talc Personal Injury Trust shall have been formed in accordance with ARTICLE IX and the Talc Personal Injury Trust Agreement;

(e)     The Debtors shall have received any Cash requested from MTI LLC pursuant to Section 8.7 above;

(f)     All Plan Documents shall have been executed and delivered;

(g)     All other actions, documents and agreements necessary to implement those provisions of this Plan to be effectuated on or prior to the Effective Date, in form and substance satisfactory to the Debtor, shall have been effected or executed and delivered; and

(h)     In the event the 524(g) Voting Threshold is met, no fact or circumstance shall exist that would prevent the Channeling Injunction from coming into full force and effect immediately upon the occurrence of the Effective Date.

**12.3** **Waiver of Conditions Precedent**. To the fullest extent permitted by law, any of the conditions precedent set forth in Sections 12.1 and Section 12.2 above may be waived or modified, in whole or in part, by the Debtors, or by order of the Bankruptcy Court. Any such waiver or modification may be effected at any time without leave or order of the Bankruptcy Court or District Court, and without any other formal action.

**12.4** **Failure to Achieve the Effective Date**. If each of the conditions to the Effective Date is not met or duly waived in accordance with Section 12.3, then upon motion by the Debtors, and notice to such parties in interest as the Bankruptcy Court may direct, the Confirmation Order shall be vacated by the Bankruptcy Court. If (a) the Debtors revoke or withdraw this Plan, (b) the Confirmation Order is vacated, (c) the Confirmation Order does not become a Final Order, or (d) this Plan is confirmed and does not become effective for any other reason, then the rights of all parties in interest in the Chapter 11 Cases are and shall be reserved in full. In any such event, this Plan shall become null and void in all respects; any settlement or compromise embodied in this Plan, any assumption or rejection of Executory Contracts effected by this Plan, and any document

56

or agreement executed pursuant to this Plan, shall be deemed null and void; and nothing contained in this Plan or the Confirmation Order, if previously entered, and no acts taken in preparation for consummation of this Plan, shall: (a) constitute or be deemed to constitute a waiver, release or settlement of any Claims by or against, or any Equity Interests in, the Debtors or any other Entity, (b) prejudice in any manner the rights of the Debtors or any Entity in any further proceedings involving the Debtors, or (c) constitute an admission of any sort by the Debtors or any other Entity.

## ARTICLE XIII.

## JURISDICTION OF BANKRUPTCY COURT

**13.1    Retention of Jurisdiction**. Pursuant to sections 105(a) and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court and, if applicable, the District Court, shall, on and after the Effective Date, to the fullest extent permitted by law, retain and have exclusive jurisdiction over all matters arising out of and related to the Chapter 11 Cases and this Plan, including, among other things, jurisdiction to:

(a)    hear and determine any and all objections to and proceedings involving the allowance, estimation, classification, and subordination of Claims that have been or properly should have been brought in the Bankruptcy Court;

(b)    hear and determine all objections to the termination of the Talc Personal Injury Trust;

(c)    hear and determine such other matters that may be set forth in or arise in connection with this Plan, the Confirmation Order, the Channeling Injunction (if issued), the Talc Personal Injury Trust Agreement, or the Trust Distribution Procedures;

(d)    hear and determine any proceeding that involves the validity, application, construction, enforceability, or modification of the Channeling Injunction (if issued);

(e)    hear and determine any conflict or other issues that may arise in the Chapter 11 Cases, including the interpretation, implementation and enforcement of all orders entered by the Bankruptcy Court in the Chapter 11 Cases, and in the administration of the Talc Personal Injury Trust;

(f)    enter such orders as are necessary to interpret, implement and enforce the releases, discharges, and injunctions described herein, including the Debtor Releases, the Affiliate Released Claims, and, if necessary, in connection with application of the protections afforded by section 524 of the Bankruptcy Code and/or this Plan to the Protected Parties;

(g)    hear and determine any and all applications for allowance of Professional Fee Claims and any other fees and expenses authorized to be paid or reimbursed under the Bankruptcy Code or this Plan;

US-DOCS\149447838.9

(h)     enter such orders authorizing non-material modifications to this Plan as may be necessary to comply with section 468B of the Internal Revenue Code with respect to the Talc Personal Injury Trust;

(i)     hear and determine any applications pending on the Effective Date for the assumption, assumption and assignment, or rejection, as the case may be, of Executory Contracts, and to hear and determine and, if necessary, liquidate any and all Claims arising therefrom;

(j)     hear and determine any and all applications, Claims, Causes of Action, adversary proceedings, and contested or litigated matters that may be pending in the Chapter 11 Cases on the Effective Date or commenced by the Reorganized Debtors or any other party in interest (including, without limitation, any Non-Debtor Affiliate and the Talc Personal Injury Trust) in the Chapter 11 Cases subsequent to the Effective Date;

(k)     consider any modifications of this Plan, and remedy any defect or omission or reconcile any inconsistency or make any other necessary modifications in or to this Plan, the Talc Personal Injury Trust Documents, or any order of the Bankruptcy Court, including the Confirmation Order, as may be necessary to carry out the purposes and intent of this Plan; *provided*, that there shall be no modification made at any time that would reduce or eliminate any of the protections provided herein to the Protected Parties, the Debtor Release, or other releases or injunctions provided hereunder;

(l)     hear and determine all controversies, suits, and disputes that may arise in connection with the interpretation, enforcement, or consummation of this Plan or any Entity's obligations hereunder and issue orders in aid of confirmation, consummation and execution of this Plan, including, but not limited to, compelling the conveyance of property and other performance contemplated under this Plan and documents executed in connection herewith;

(m)     hear and determine all questions and disputes and enter such orders or judgments, including, but not limited to, injunctions, as are necessary to (i) enforce the title, rights and powers of the Reorganized Debtors and the Talc Personal Injury Trust and (ii) enable Holders of Claims to pursue their rights against any Entity that may be liable therefor pursuant to applicable law or otherwise, subject to the releases and injunctions contained herein;

(n)     hear and determine any proposed compromise and settlement of any Claim against or cause of action by or against the Debtors that has been or properly should have been brought in the Bankruptcy Court in the event requested by the Reorganized Debtors;

(o)     hear and determine all questions and disputes regarding, and enforce, the Affiliate Settlement;

(p)     hear and determine any timely objections to Administrative Expense Claims asserted or to Proofs of Claim Filed, both before and after the Effective Date, including any objections to the classification of any Claim, and to allow or disallow any Disputed Claim, in whole or in part;

(q)     hear and determine matters concerning state, local and federal taxes, tax refunds, tax attributes, tax benefits, and similar or related matters with respect to the Debtors, the

US-DOCS\149447838.9

Reorganized Debtors, or the Talc Personal Injury Trust arising on or prior to the Effective Date, arising on account of transactions contemplated by the Plan Documents, or relating to the period of administration of the Chapter 11 Cases;

(r)     hear and determine such other matters as may be set forth in the Confirmation Order or other orders of the Bankruptcy Court, or which may arise in connection with this Plan, the Confirmation Order, or the Effective Date, as may be authorized under the provisions of the Bankruptcy Code or any other applicable law;

(s)     hear and determine all controversies, suits, and disputes that may arise in connection with the interpretation, enforcement, or consummation of this Plan or any Entity's obligations hereunder, including, but not limited to, performance of the Debtors' duties under this Plan;

(t)     hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in this Plan, including under **ARTICLE XI** hereof;

(u)     hear and determine all controversies, suits, and disputes regarding interpretation or enforcement of the Talc Claims Indemnification Agreement;

(v)     enforce remedies upon any default under this Plan;

(w)     hear and determine any other matter not inconsistent with the Bankruptcy Code;

(x)     hear and determine any claim that in any way challenges or is based on any provision in the Confirmation Order; and

(y)     enter a final decree closing each Chapter 11 Case.

If the Bankruptcy Court is not permitted under applicable law to exercise jurisdiction over any of the matters specified above, the reference to the "Bankruptcy Court" in the preamble to this Section 13.1 shall be deemed to be a reference to the "District Court."

**13.2     Modification of Plan**. Subject to the limitations contained in the Plan Documents, the Debtors may alter, amend, or modify this Plan or any exhibits thereto under section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Date and may include any such amended exhibits in this Plan, provided that this Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code, and the Debtors shall have complied with section 1125 of the Bankruptcy Code, as necessary. Further, the Debtors may alter, amend, or modify this Plan or any exhibits thereto at any time after entry of the Confirmation Order and before this Plan's substantial consummation, provided that: (a) this Plan, as modified, altered, or amended, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code and (b) the Bankruptcy Court, after notice and a hearing, confirms this Plan as modified, under section 1129 of the Bankruptcy Code, and finds that the circumstances warrant such modification. A Holder of a Claim that has accepted or rejected this Plan shall be deemed to have accepted or rejected, as the case may be, this Plan as modified, unless, within the time fixed by the Bankruptcy Court, if any,

such Holder changes its previous acceptance or rejection, in the event such Holder is afforded the opportunity to do so under section 1127(d) of the Bankruptcy Code.

Notwithstanding the prior paragraph, between the Confirmation Date and the Effective Date, the Debtors may remedy any defects or omissions or reconcile any inconsistencies in the Plan Documents for the purpose of implementing this Plan in such manner as may be necessary to carry out the purposes and intent of this Plan, so long as the interests of the Holders of Allowed Claims and other applicable parties in interest are not adversely affected thereby.

On and after the Effective Date, the authority to amend, modify or supplement the Plan Documents, other than this Plan, will be as provided in such Plan Documents.

Notwithstanding anything in this Section 13.2, there shall be no modification to this Plan made at any time that would reduce or eliminate any of the protections provided herein, or in the releases provided hereunder or under the Channeling Injunction, to the Protected Parties, without the consent of the Debtors.

**13.3     Consent to Jurisdiction**.  Upon any default under this Plan, the Debtors, the Reorganized Debtors, the Talc Personal Injury Trust, and the Talc Personal Injury Trustee(s), respectively, consent to the jurisdiction of the Bankruptcy Court, consent to the entry by the Bankruptcy Court of any Final Orders, and agree that the Bankruptcy Court shall be the preferred forum for all proceedings relating to any such default.

## ARTICLE XIV.

## MISCELLANEOUS PROVISIONS

**14.1     Governing Law**.  Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), or an exhibit hereto, or an instrument, agreement or other document executed in connection with this Plan provides otherwise, the rights, duties and obligations arising under this Plan, and the instruments, agreements and other documents executed in connection with this Plan, shall be governed by, and construed and enforced in accordance with, the internal laws of the State of Delaware without giving effect to the principles of conflicts of law thereof.

**14.2     Notices**.  To be effective, all notices, requests and demands to or upon the Debtors shall be in writing and, unless otherwise expressly provided herein, shall be addressed as follows and mailed by registered or certified mail, return receipt requested, and shall be deemed to have been duly given or made when actually delivered:

**If to the Debtors:**

BMI Oldco Inc.
5605 North MacArthur Boulevard, Suite 1000,
PMB 139, Irving, Texas 75038
Attn: Chief Restructuring Officer
Email: dgordon@djoservicesllc.com

with copies (which alone will not constitute notice) to:

| | |
|---|---|
| Latham & Watkins LLP | Porter Hedges LLP |
| 355 South Grand Avenue, Suite 100 | 1000 Main Street, 36th Floor |
| Los Angeles, California 90071 | Houston, TX 77002 |
| Attn: Jeffrey E. Bjork, Esq. | Attn: John F. Higgins, Esq. |
|     Kimberly A. Posin, Esq. |     Megan Young-John, Esq. |
|     Christina M. Craige, Esq. |     Jack M. Eiband, Esq. |
|     Shawn P. Hansen, Esq. | Telephone:  (713) 226-6000 |
| Telephone: (213) 485-1234 | Emails:  jhiggins@porterhedges.com |
| Emails:  jeff.bjork@lw.com |     myoung-john@porterhedges.com |
|     kim.posin@lw.com |     jeiband@porterhedges.com |
|     chris.craige@lw.com | |
|     shawn.hansen@lw.com | |

**14.3**  **Exhibits and Schedules; Conflicts**.  All exhibits and schedules to this Plan, the Plan Supplement, and the exhibits and schedules to the Plan Supplement are incorporated into and are a part of this Plan as if set forth in full herein.  In the event this Plan is inconsistent with the Disclosure Statement, the provisions of this Plan shall be controlling.  In the event this Plan is inconsistent with the Confirmation Order, the provisions of the Confirmation Order shall be controlling.

**14.4**  **Exemption from Transfer Taxes**.  Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of notes or equity securities under this Plan, the creation of any mortgage, deed of trust, pledge or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with this Plan shall be exempt from all stamp, transfer, or similar taxes, as provided in section 1146(a).

**14.5**  **Recordable Order**.  Upon entry by the Bankruptcy Court, the Confirmation Order shall be deemed to be in recordable form, and shall be accepted by any recording officer for filing and recording purposes without further or additional orders, certifications, or other supporting documents.

**14.6**  **Binding Effect**.  The rights, benefits and obligations of any Entity named or referred to in this Plan, or whose actions may be required to effectuate the terms of this Plan, shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity (including, but not limited to, any trustee appointed for the Debtors under Chapters 7 or 11 of the Bankruptcy Code).  The Confirmation Order shall provide that the terms and provisions of this Plan and the Confirmation Order shall survive and remain effective after entry of any order which may be entered converting the Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code, and the terms and provisions of this Plan shall continue to be effective in the Chapter 11 Cases or any superseding case under the Bankruptcy Code.

**14.7**  **Severability**.  After the Effective Date, any provision of this Plan, the Plan Documents, the Confirmation Order, or any of the exhibits to this Plan that is determined to be prohibited, unenforceable, or invalid by a court of competent jurisdiction or any other

governmental Entity with appropriate jurisdiction may be deemed ineffective as to any jurisdiction in which such provision is prohibited, unenforceable, or invalidated in respect of such prohibition, unenforceability, or invalidation, without invalidating the effectiveness of the remaining provisions of this Plan, the Plan Documents, the Confirmation Order, and the exhibits to this Plan or affecting the validity or enforceability of such provision and such remaining provisions in any other jurisdiction.

**14.8   Further Assurances**.  The Protected Parties, the Talc Personal Injury Trust, all Entities receiving Distributions under this Plan, and all other parties in interest shall, and shall be authorized to, from time to time, prepare, execute, and deliver any agreements or documents and take any other action consistent with the terms of this Plan as may be reasonably necessary to effectuate the provisions and intent of this Plan, with each such Entity to bear its own costs incurred after the Effective Date in connection therewith.

**14.9   Further Authorizations**.  Prior to the Effective Date, the Debtors may seek such orders, judgments, injunctions, and rulings that they deem necessary to carry out further the intentions and purposes of, and to give full effect to the provisions of, this Plan or any of the Plan Documents, and any costs incurred in connection therewith shall be borne by the Debtors' Estates. On and after the Effective Date, the Reorganized Debtors and the Talc Personal Injury Trust may seek such orders, judgments, injunctions, and rulings that either of them deems necessary to carry out or further the intentions and purposes of, and to give full effect to the provisions of, this Plan or any of the Plan Documents, with each such Entity to bear its own costs in connection therewith.

**14.10   General Statements**.  Statements of a general nature set forth in this Plan shall not be construed to limit or restrict the specific provisions herein.

**14.11   Entire Agreement**.  The Plan Documents set forth the entire agreement and undertakings relating to the subject matter thereof and supersede all prior discussions, negotiations, understandings and documents.  No Entity shall be bound by any terms, conditions, definitions, warranties, understandings, or representations with respect to the subject matter of the Plan Documents other than as expressly provided for in this Plan or the other Plan Documents or as may hereafter be agreed to by the affected parties in writing.

**14.12   2002 Notice Parties**.  After the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed a renewed request after the Effective Date to receive documents pursuant to Bankruptcy Rule 2002.

Respectfully submitted, as of the date first set forth above,

Dated: April 2, 2025

**BMI OLDCO INC.**
(on behalf of itself and Barretts Ventures Texas LLC)

*/s/ David J. Gordon*
David J. Gordon
Chief Restructuring Officer

US-DOCS\149447838.9

# EXHIBIT A-1

## 524(G) TALC PERSONAL INJURY TRUST AGREEMENT

### [To come]

**EXHIBIT A-2**

**NON-524(G) TALC PERSONAL INJURY TRUST AGREEMENT**

**[To come]**

**<u>EXHIBIT B-1</u>**

**524(G) TRUST DISTRIBUTION PROCEDURES**

**[To come]**

**EXHIBIT B-2**

**NON-524(G) TRUST DISTRIBUTION PROCEDURES**

**[To come]**

**<u>EXHIBIT C-1</u>**

**524(G) TALC PERSONAL INJURY CLAIMS INDEMNIFICATION AGREEMENT**

**[To come]**

**EXHIBIT C-2**

**NON-524(G) TALC PERSONAL INJURY CLAIMS INDEMNIFICATION
AGREEMENT**

**[To come]**

# EXHIBIT D

## TALC CLAIMANT RELEASE

### [To come]

# EXHIBIT 4

**DECLARATION OF R. MARK BAILEY, P.G.**

I, R. MARK BAILEY, P.G., declare:

1.      I have practiced as a professional geologist in the State of California for more than twenty-eight years and have specialized competence in naturally occurring asbestos (NOA) analysis. I am a Certified Professional Geologist in the State of California (License No. 4548) and am currently employed as the President and Founder of Asbestos TEM Laboratories, Inc. in Berkeley, California. I hold Bachelor of Arts and Master of Arts degrees in Geology, both from University of Berkeley, California. I have been retained by the law firm of Bradley & Gmelich, counsel for Defendants American International Inc. ("American") to render expert opinions in this matter. The following facts are within my own personal knowledge. If called as a witness, I could and would competently testify to the fact set forth below.

2.      As President and Founder of Asbestos TEM Laboratories, Inc., I provide a wide-range of consulting and analysis services including teaching/research in mineralogy/crystallography, minerals exploration and mining, drilling, field geology, field sampling, geochemistry, and asbestos analysis. I have over twenty-eight years of experience analyzing asbestos samples by PLM, PCM, TEM, XRD and Energy Dispersive X-ray Spectroscopy techniques. I have qualified on numerous occasions in both state and federal court regarding asbestos analysis.

3.      Exhibit 11 is a true and current copy of my *curriculum vitae.*

4.      Exhibit 12 is a full and complete copy of my report containing my analysis and conclusions which are within a reasonable degree of scientific and engineering certainty. In that report I conclude that talc produced by Barretts Minerals from its Dillon Montana Regal and Treasure mines has been repeatedly tested and that for all practical purposes, it meets USP purity standards and can be considered asbestos free. Based on my research and investigation, it is my opinion that the talc produced from the above mines has historically been asbestos free. I note that this opinion is in harmony with the opinion of the American Cancer Society which states on its website that "All talcum products used in homes in the United States have been asbestos-free since the 1970s."

1    I declare under penalty of perjury under the laws of the State of California that the

2    foregoing is true and correct.

3        Executed June 12, 2015, at Berkeley, California.

4

5    R. MARK BAILEY, P.G.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BRADLEY  GMELICH

2

# EXHIBIT 5



IARC MONOGRAPHS

# TALC AND ACRYLONITRILE

### VOLUME 136

IARC MONOGRAPHS
ON THE IDENTIFICATION
OF CARCINOGENIC HAZARDS
TO HUMANS

Advance publication, 30 June 2025

International Agency for Research on Cancer
World Health Organization

IARC MONOGRAPHS

# TALC AND ACRYLONITRILE

## VOLUME 136

This publication represents the views and expert opinions of an IARC Working Group on the Identification of Carcinogenic Hazards to Humans, which met in Lyon, France, 11–18 June 2024

LYON, FRANCE - 2025

IARC MONOGRAPHS
ON THE IDENTIFICATION
OF CARCINOGENIC HAZARDS
TO HUMANS

Advance publication, 30 June 2025

International Agency for Research on Cancer

World Health Organization

## IARC MONOGRAPHS

In 1969, the International Agency for Research on Cancer (IARC) initiated a programme on the evaluation of the carcinogenic hazard of chemicals to humans, involving the production of critically evaluated monographs on individual chemicals. The programme was subsequently expanded to include evaluations of carcinogenic hazards associated with exposures to complex mixtures, lifestyle factors and biological and physical agents, as well as those in specific occupations. The objective of the programme is to elaborate and publish in the form of monographs critical reviews of data on carcinogenicity for agents to which humans are known to be exposed and on specific exposure situations; to evaluate these data in terms of cancer hazard to humans with the help of international working groups of experts in carcinogenesis and related fields; and to identify gaps in evidence. The lists of IARC evaluations are regularly updated and are available on the internet at https://monographs.iarc.who.int/.

This programme has been supported since 1982 by Cooperative Agreement U01 CA33193 with the United States National Cancer Institute, Department of Health and Human Services. Additional support has been provided since 1986 by the European Commission Directorate-General for Employment, Social Affairs, and Inclusion, initially by the Unit of Health, Safety and Hygiene at Work, and since 2014 by the European Union Programme for Employment and Social Innovation "EaSI" (for further information please consult: https://ec.europa.eu/social/easi). Support has also been provided since 1992 by the United States National Institute of Environmental Health Sciences, Department of Health and Human Services. The contents of this volume are solely the responsibility of the Working Group and do not necessarily represent the official views of the United States National Cancer Institute, the United States National Institute of Environmental Health Sciences, the United States Department of Health and Human Services, or the European Commission.



Co-funded by the European Union

Published by the International Agency for Research on Cancer,
25 avenue Tony Garnier, CS 90627, 69366 Lyon Cedex 07, France
©International Agency for Research on Cancer, 2025
Online publication, June 2025 (Talc only)

Publications of the World Health Organization enjoy copyright protection in accordance with the provisions of Protocol 2 of the Universal Copyright Convention. All rights reserved.

*IARC Monographs* (and Corrigenda) are published online at https://publications.iarc.who.int.
To report an error, please contact: imo@iarc.who.int.

Distributed by WHO Press, World Health Organization, 20 Avenue Appia, 1211 Geneva 27, Switzerland
(tel.: +41 22 791 3264; fax: +41 22 791 4857; website: https://apps.who.int/bookorders; email: bookorders@who.int).

Permissions and rights: Some rights reserved. This work is available under the Creative Commons Attribution-NonCommercial-NoDerivs 3.0 IGO licence (CC BY-NC-ND 3.0 IGO; https://creativecommons.org/licenses/by-nc-nd/3.0/igo/).

Under the terms of this licence, you may copy and redistribute the work for non-commercial purposes, provided the work is appropriately cited, as indicated below. In any use of this work, there should be no suggestion that WHO endorses any specific organization, products, or services. The use of the WHO logo is not permitted. Any mediation relating to disputes arising under the licence shall be conducted in accordance with the mediation rules of the World Intellectual Property Organization.

To submit requests for adaptations or commercial use and queries on rights and licensing, see the IARC Publications website (https://publications.iarc.who.int/Rights-And-Permissions).

Third-party materials: If you wish to reuse material from this work that is attributed to a third party, such as tables, figures or images, it is your responsibility to determine whether permission is needed for that reuse and to obtain permission from the copyright holder. The risk of claims resulting from infringement of any third-party-owned component in the work rests solely with the user.

General disclaimers: The designations employed and the presentation of the material in this publication do not imply the expression of any opinion whatsoever on the part of the Secretariat of the World Health Organization concerning the legal status of any country, territory, city, or area or of its authorities, or concerning the delimitation of its frontiers or boundaries.

The mention of specific companies or of certain manufacturers' products does not imply that they are endorsed or recommended by WHO in preference to others of a similar nature that are not mentioned. Errors and omissions excepted, the names of proprietary products are distinguished by initial capital letters.

All reasonable precautions have been taken by WHO to verify the information contained in this publication. However, the published material is being distributed without warranty of any kind, either expressed or implied. The responsibility for the interpretation and use of the material lies with the reader. In no event shall WHO or contributing agencies be liable for damages arising from its use.

The *IARC Monographs* Working Group alone is responsible for the views expressed in this publication.



About the cover: The cover photo shows draining activities at the wreck of a train that was transporting acrylonitrile and that derailed in Wetteren, Belgium, in May 2013. The incident led to the emergency evacuation of some 500 local residents.

Source: © Belga News Agency / Alamy Stock Photo

How to cite: IARC (2025). Talc. *IARC Monogr Identif Carcinog Hazards Hum*. 136:1–488. Advance publication.

**IARC Library Cataloguing-in-Publication Data**

Names: IARC Working Group on the Identification of Carcinogenic Hazards to Humans.

Title: Talc and acrylonitrile

Description: Lyon: International Agency for Research on Cancer, 2025. | Series: IARC monographs on the identification of carcinogenic hazards to humans, ISSN 1017-1606; v. 136. | "This publication represents the views and expert opinions of an IARC Working Group on the Identification of Carcinogenic Hazards to Humans, which met in Lyon, France, 11–18 June 2024." | Includes bibliographical references.

Identifiers: ISBN 9789283245339 (pbk.) | ISBN 9789283202936 (ebook)

Subjects: MeSH: Neoplasms--etiology. | Acrylonitrile. | Talc. | Risk Factors. | Lung neoplasms. | Urinary bladder neoplasms. | Ovarian neoplasms.

Classification: NLM W1



The *IARC Monographs* Working Group and Secretariat for Volume 136, Talc and Acrylonitrile, who met in Lyon, France, on 11–18 June 2024.

# CONTENTS

**NOTE TO THE READER** .................................................................. **1**

**LIST OF PARTICIPANTS** ................................................................ **3**

**PREAMBLE** ................................................................................ **9**
  A. GENERAL PRINCIPLES AND PROCEDURES ............................ 9
    1.  Background ...................................................................... 9
    2.  Objective and scope ......................................................... 10
    3.  Selection of agents for review ........................................... 11
    4.  The Working Group and other meeting participants .............. 11
    5.  Working procedures ......................................................... 13
    6.  Overview of the scientific review and evaluation process ....... 14
    7.  Responsibilities of the Working Group ............................... 16
  B. SCIENTIFIC REVIEW AND EVALUATION ................................ 17
    1.  Exposure characterization ................................................ 17
    2.  Studies of cancer in humans ............................................. 20
    3.  Studies of cancer in experimental animals .......................... 25
    4.  Mechanistic evidence ...................................................... 28
    5.  Summary of data reported ................................................ 31
    6.  Evaluation and rationale .................................................. 32
  References ............................................................................ 37

**PRELIMINARY GENERAL REMARKS** ............................................ **41**

**TALC** ...................................................................................... **45**
  1.  Exposure Characterization ..................................................... 45
    1.1  Identification of the agent ................................................ 45
    1.2  Production and use .......................................................... 51
    1.3  Detection and quantification ............................................. 62
    1.4  Occurrence and exposure ................................................. 70
    1.5  Regulations and guidelines ............................................... 108
    1.6  Quality of exposure assessment in key epidemiological studies of cancer and mechanistic
        studies in humans ......................................................... 111

2.   Cancer in Humans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .130
     Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .130
     2.1   Description of the studies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .131
     2.2   Cancer of the ovary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .246
     2.3   Cancers of the respiratory system and mesothelium . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .259
     2.4   Cancers of the digestive system . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .288
     2.5   Cancers of the cervix and corpus uteri . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .308
     2.6   Cancers of the urinary tract, lymphatic and haematopoietic tissue, and other sites . . . . . . . . . . .313
     2.7   Evidence synthesis for cancer in humans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .332
3.   Cancer in Experimental Animals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .345
     3.1   Mouse . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .345
     3.2   Rat . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .350
     3.3   Hamster . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .366
     3.4   Evidence synthesis for cancer in experimental animals . . . . . . . . . . . . . . . . . . . . . . . . . . . . .369
4.   Mechanistic Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .371
     4.1   Absorption, distribution, metabolism, and excretion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .371
     4.2   Evidence relevant to key characteristics of carcinogens . . . . . . . . . . . . . . . . . . . . . . . . . . . .378
     4.3   Other relevant evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .427
5.   Summary of Data Reported . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .428
     5.1   Exposure characterization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .428
     5.2   Cancer in humans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .428
     5.3   Cancer in experimental animals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .430
     5.4   Mechanistic evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .430
6.   Evaluation and Rationale . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .431
     6.1   Cancer in humans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .431
     6.2   Cancer in experimental animals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .431
     6.3   Mechanistic evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .432
     6.4   Overall evaluation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .432
     6.5   Rationale . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .432
     References . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 433

LIST OF ABBREVIATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .469

ANNEX 1. Supplementary material for Section 1, Exposure Characterization . . . . . . . . . . . . . . . . . . . .473

ANNEX 2. Quantitative bias analysis for exposure misclassification for the effects of ever versus never
          use of talc on ovarian cancer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .475

Advance publication, 30 June 2025

used baby powder from 1985 (JNJ1985) and found: vanadium, 10.5–10.7 mg/kg; chromium, 394.7–404.3 mg/kg; cobalt, 52.7–56.9 mg/kg; and nickel, 1344–1447.5 mg/kg.

Minerals associated with talc deposits have been described in Section 1.1.

*(iv)   Exploited talc deposits*

A list of the major past abandoned and active talc deposits of commercial interest worldwide is reported in Table 1.1. [The Working Group noted that this does not necessarily describe workers' exposure or products derived from this mine.] For each deposit, the table includes the presumed origin, the type of talc, and occurrence of asbestos and quartz. The table does not report deposits of sedimentary origin (iii) of minor importance. The indication of the presence of asbestos was based on the following data: "no" means that, in the surveyed literature describing that occurrence, the presence of one or more of the six mineral species classified as asbestos was not reported or that the absence of one or more of the six mineral species classified as asbestos was stated; "possible" means that presence of serpentine has been reported; and "probable" means that the presence of amphibole minerals tremolite, anthophyllite and actinolite has been reported, but not in the asbestiform habit. If these minerals were reported in the asbestiform habit, then this was marked as the type of asbestos (without "probable" or "possible").

*(b)   Mining and mineral processing of talc*

Talc is mined from both open-pit and underground mines. The raw rock is drilled and blasted and then undergoes primary and/or secondary crushing by jaw crushers and screening. Hammer mills and jaw crushers are used to reduce the size of the largest ore received (Radosta and Trivedi, 1978; Virta, 1989). Eventually hand sorting or optical sorters are used to produce a high-grade feed for the mill (Virta, 1989). Sometimes the talc ore is washed to remove fine dust and impurities

(Roe and Olson, 1983). Roller mills can be used to produce the final product. When used in conjunction with air classifiers, roller mills can grind talc to an approximate mean particle size of 5–10 μm (Virta, 1989). The grinding mills are sometimes equipped with heating combustion chambers to achieve simultaneous grinding and drying of the product (US EPA, 1995). Fluid-energy mills or pulverizing mills can be used for ultra-fine grinding of the talc product (Radosta and Trivedi, 1978; Clifton, 1985; Virta, 1989; Soln Pharma, 2024).

Beneficiation of talc usually involves grinding, froth flotation, and magnetic separation of the iron oxide minerals. Froth flotation is the preferred separation technique because talc is naturally floatable (Virta, 1989; Yehia and Al-Wakeel, 2000; Bazar et al., 2021), although a variety of mineral processing techniques (including gravity separation, electrostatic separation, and hydrometallurgy) have been employed to separate talc from other valuable minerals like sulfides (Yuan et al., 2019). Water and air surface interaction with talc has been extensively studied to understand and optimize talc behaviour in suspension and froth flotation yield. Talc is an anisotropic mineral considered to be hydrophobic in most cases (Atluri et al., 2019). The treated ore is passed through rougher and cleaner cells before being dewatered and thickened. The filter cake is dried in a flash dryer and ground in a pulverizer system (Virta, 1989; Clifton, 1985).

For some applications, additional processing of the talc products is desirable or required. For example, green or black talcs (containing higher contents of organic matter) are calcined to remove organic matter and increase their whiteness. Sometimes talc is surface-treated with organic compounds (Radosta and Trivedi, 1978; Virta, 1989).

Advance publication, 30 June 2025

**Table 1.1 Characteristics of talc ores of past or present commercial interest worldwide**

| Mine location | Mineral origin of talc | Talc type | Occurrence of asbestos[a] | Occurrence of quartz[b] | Estimated period of mine exploitation[c] | Reference | Reference for cancer or mechanistic study in humans with setting in the mine |
|---|---|---|---|---|---|---|---|
| Afghanistan, Nangarhar Province | Hydrothermal talc-carbonate | Industrial, cosmetic | Tremolite | Yes | 1970?–to date | Tahir et al. (2018) | NA |
| Austria, Lassing, Liezen, Styria | Hydrothermal talc-carbonate | Industrial | No[d] | Probable | 1901–1998 | Prochaska (1989) | Wild et al. (2002) |
| Austria, Rabenwald, Pöllau, Hartberg-Fürstenfeld, Styria | Hydrothermal talc-carbonate | Industrial | No | Probable | 1947?–to date | Prochaska (1989) | Wild et al. (2002) |
| Brazil, Bahia district | Hydrothermal talc-carbonate | Industrial | Chrysotile probable, actinolite, tremolite | Yes | 1950?–to date | Gondim and Jiang (2004) | NA |
| Brazil, Brumado, Bahia | Hydrothermal talc-carbonate | Cosmetic, pharmaceutical | No | No | 1969–to date | Xilolite (2012) | Vargas et al. (2001) |
| Brazil, Paraná district, Ponta Grossa and Castro | Ultramafic talc-carbonate | Industrial | Chrysotile probable, tremolite | Yes | 1988–to date? | Gondim and Jiang (2004) | NA |
| Canada, Madoc, Ontario | Ultramafic talc-carbonate | Industrial | Tremolite, actinolite possible | Yes | 1896–2010 | Sabina (1987) | NA |
| Canada, Saint-Pierre-de-Broughton, Chaudière-Appalaches, Québec | Ultramafic talc-chlorite | Industrial | Actinolite probable, tremolite probable | probable | 1938–2001 | Horváth and Pfenninger Horváth (2010) | NA |
| China, Guangxi Province | Hydrothermal talc-carbonate | Industrial, cosmetic | Tremolite possible | Yes | 1970?–to date | Schober (1998) | NA |
| China, Jiangxi Province | Contact metamorphism talc-carbonate | Industrial | No | Yes | <2013–to date | Li et al. (2013) | NA |
| China, Liaoning Province | Hydrothermal talc-carbonate | Industrial | Chrysotile probable, tremolite possible | Yes | 1995?–to date | Misch et al. (2018) | Fu and Zhang (1992) |

Advance publication, 30 June 2025

53

**Table 1.1 (continued)**

| Mine location | Mineral origin of talc | Talc type | Occurrence of asbestos[a] | Occurrence of quartz[b] | Estimated period of mine exploitation[c] | Reference | Reference for cancer or mechanistic study in humans with setting in the mine |
|---|---|---|---|---|---|---|---|
| USA, Montana, Dillon-Ennis district, Treasure and Regal mines | Hydrothermal talc-carbonate | Industrial, cosmetic | No | Quartz probable | 1940–2023 | Chidester (1962); Buzon and Gunter (2017) | NA |
| USA, Montana, Dillon-Ennis district, Yellowstone | Hydrothermal talc-carbonate | Industrial | Tremolite probable | Yes | 1940–2019 | IARC (2010); Van Gosen et al. (2004) | NA |
| USA, Montana, Dillon-Ennis district, Willow creek and Beaverhead mine | Hydrothermal talc-carbonate | Industrial | Tremolite probable | Yes | 1940?–1979 | Van Gosen et al. (2004) | NA |
| USA, Nevada, Palmetto and Sylvania Districts | Hydrothermal talc-carbonate | Industrial | No | Yes | 1903–1980 | Greene (1995) | NA |
| USA, New Mexico, Red Rock | Ultramafic talc-chlorite | Industrial | No | Yes | 1926–1945 | Fitzsimmons and Kelly (1980) | NA |
| USA, New York, Gouverneur District, St Lawrence County, Talcville | Ultramafic talc-chlorite) | Industrial | Anthophyllite, tremolite | Yes | 1878–2012? | Chidester (1962); Van Gosen et al. (2004); IARC (2010); Gunter et al. (2018) | Honda et al. (2002) (mine and millers' facilities in upper state New York) |
| USA, New York, Gouverneur District, St Lawrence County, Fowler | Ultramafic talc-chlorite) | Industrial | Chrysotile possible, anthophyllite, tremolite | Yes | 1878–2008 | Wylie et al. (1997); IARC (2010); Van Gosen et al. (2004); Gunter et al. (2018) | Honda et al. (2002) (mine and millers' facilities in upper state New York) |
| USA, New York, Lewis County, Natural Bridge | Ultramafic talc-chlorite | Industrial | Chrysotile possible | Yes | 1900–1970 | Engel (1949), IARC (2010); Van Gosen et al. (2004) | Honda et al. (2002) (mine and millers' facilities in upper state New York) |