```
 1                IN THE UNITED STATES DISTRICT COURT

 2                FOR THE SOUTHERN DISTRICT OF TEXAS

 3                         HOUSTON DIVISION

 4   BMI OLDCO INC., et al.,      § CASE NO. 4:25-cv-02193
                                  § HOUSTON, TX
 5                                § THURSDAY, AUGUST 21, 2025
     -----------------------------§ 11:13 a.m. to 11:52 a.m.
 6   OFFICIAL COMMITTEE OF        §
     UNSECURED CREDITORS,         § CASE NO: 4:25-cv-02201
 7                                §
     IN RE:  BMI OLDCO INC., et al.§

 8

 9                      STATUS CONFERENCE

10        BEFORE THE HONORABLE GEORGE C. HANKS, JR.
                  UNITED STATES DISTRICT JUDGE
11
                        APPEARANCES:
12

13       FOR THE PARTIES:           SEE NEXT PAGE

14       ELECTRONIC RECORDING OFFICER: BRAD WILLIAMS

15       COURT CLERK:               KIMBERLY PICOTA

16

17                 TRANSCRIPTION SERVICE BY:

18

19

20

21

22                 Veritext Legal Solutions
                 330 Old Country Road, Suite 300
23                     Mineola, NY 11501
                Tel: 800-727-6396 ▼ www.veritext.com
24
       Proceedings recorded by electronic sound recording; transcript
25              produced by transcription service.
```

```
 1                              APPEARANCES:

 2     For BMI OLDCO:           AMY QUARTARLO
                                JEFF BJORK
 3                              Latham & Watkins LLP
                                555 West Fifth Street, Suite 300
 4                              Los Angeles, CA 90013

 5                              JONATHAN J. WEISCHELBAUM
                                Latham & Watkins, LLP
 6                              1271 Avenue of the Americas
                                New York, NY 10020
 7
                                JOHN V. HIGGINS, IV
 8                              ERIC WADE
                                Porter Hedges LLP
 9                              1000 Main Street, 36th Floor
                                Houston, TX 77002
10
       For Official Committee   KEVIN DAVIS
11     Of Unsecured Creditors:  KEVIN MACLAY
                                Caplin Drysdale, Chartered
12                              1200 New Hampshire Avenue NW
                                Suite 8th Floor
13                              Washington, DC 20036

14                              JEFFREY L. JONAS
                                Brown Rudnick LLP
15                              One Financial Center
                                Boston, MA 02111
16
                                DAVID MOLTON
17                              GERARD CICERO
                                Brown Rudnick LLP
18                              7 Times Square
                                New York, NY 10036
19
       For Sander Esserman:     EDWIN J. HARRON
20                              Young Conaway Stargatt & Taylor LLP
                                Rodney Square
21                              1000 North King Street
                                Wilmington, DE 19801
22

23

24

25
```

```
 1   For Minerals          MARC A. WEINSTEIN
     Technologies, Inc.    CHRISTOPHER K. KIPLOK
 2   and Specialty Minerals,  ERIN DIERS
     Inc.:                 WILLIAM BEAUSOLEIL
 3                         Hughes Hubbard & Reed, LLP
                           1 Battery Park, 17th Floor
 4                         New York, NY 10004

 5                         SAVANNAH LEE EZELLE
                           Hogan Thompson Schuelke LLP
 6                         1001 Fannin Street, Suite 4775
                           Houston, TX 77002
 7
     For Special Committee:  ALBERT TOGUT
 8                         Togut Segal & Segal, LLP
                           One Pennsylvania Plaza, Suite 3335
 9                         New York, NY 10119

10
     For AII:              DAVID M. MEDINA
11                         ROBERT E. THACKSTON
                           Nelson Mullins
12                         3333 Lee Parkway, Suite 750
                           Dallas, TX 75219
13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1              HOUSTON, TEXAS; WEDNESDAY, JUNE 4, 2025; 1:56 PM

2             THE COURT:  Good morning, everyone.  The next case

3    on the Court's docket this morning is cause numbers 4:25-cv-

4    2163 and 4:25-cv-2201, the BMI bankruptcy.  Can Counsel on

5    the line just introduce themselves to the Court and state

6    the parties you represent?  And anyone can start.  I see a

7    lot of faces.

8             MS. QUARTAROLO:  I'll go first, Your Honor or,

9    actually, I'm not sure if Mr. Wade -- I don't see Mr. Wade

10   on.  Your Honor, I'm Amy Quartarolo, of Latham & Watkins, on

11   behalf of BMI OLDCO and its affiliated Debtor.  On the line

12   with me is Jeff Bjork, also from Latham & Watkins and Eric

13   Wade from Porter Hedges.

14            THE COURT:  Okay.  Welcome, everyone.

15            MR. DAVIS:  Good morning, Your Honor.  This is

16   Kevin Davis representing the Committee for BMI.  And I'm

17   joined on the line by a few of my colleagues, but I'll be

18   the only one speaking today.

19            THE COURT:  Okay.  Great.

20            MR. HARRON:  Good morning, Your Honor.  My name is

21   Ed Harron.  I represent Sander Esserman.  Esserman -- Mr.

22   Esserman also is on the Zoom line today.

23            THE COURT:  Okay.

24            MR. HARRON:  Mr. Esserman has been appointed by

25   the Bankruptcy Court to represent the interests of the
```

1    future claimants in this proceeding.

2         THE COURT:  Great.  Welcome.

3         MR. HARRON:  Thank you.

4         MR. JONAS:  Good morning, Your Honor.  Jeff Jonas

5    from Brown Rudnick also for the Official Committee of

6    Unsecured Creditors, and I'll be speaking with Mr. Davis

7    this morning.

8         THE COURT:  Okay.  Great.  Welcome.

9         MR. JONAS:  Thank you.

10        MR. WEINSTEIN:  Morning, Your Honor.  Marc

11   Weinstein from Hughes Hubbard & Reed on behalf of Minerals

12   Technologies, Inc., and Specialty Minerals, Inc.  With me on

13   the line, I believe, are Chris Kiplok, Erin Diers, and Bill

14   Beausoleil.

15        THE COURT:  Okay.

16        MR. WEINSTEIN:  Perhaps others.

17        THE COURT:  Welcome.

18        MS. WEINSTEIN:  A lot of folks here.  Thank you.

19        MR. TOGUT:  Your Honor, I'm Al Togut from the firm

20   of Togut Seigal & Seigal.  We are special -- we are General

21   Counsel to the Special Committee of the Board of BMI, which

22   consists of retired Bankruptcy Judge Robert Drain, Roger

23   Frankel, and Shepherd Hoffman, the three independent

24   directors.

25        THE COURT:  Okay.  Welcome.

 1              MR. TOGUT:  Thank you.

 2              MS. EZELLE:  Good morning, Your Honor.  My name is

 3    Savannah Ezelle and I'm with Hogan Thompson & Schuelke.  I

 4    represent the non-Debtor affiliate Specialty Minerals and

 5    Minerals Technologies.

 6              THE COURT:  Okay.  Welcome.  Anyone else?  Judge

 7    Medina?

 8              MR. MEDINA:  Good morning, Your Honor.  I'm here

 9    with my -- good to see you.

10              THE COURT:  Good to see you, sir.

11              MR. MEDINA:  I'm here with -- likewise -- my

12    partner Robert Thackston.  He's lead Counsel here.  We

13    represent AII.  Mr. Thackston will be leading our argument

14    to the extent Your Honor allows us to present one.

15              THE COURT:  Okay.  Great.  Thank you, guys.

16              MR. THACKSTON:  Good morning, Your Honor.

17              THE COURT:  Good morning.  I think we've got

18    everyone on the line.  Well, thank you all for being

19    available this morning.  I wanted to have a status

20    conference and hear argument regarding Judge Isgur's

21    recommendation, and here's my concern I'd like the parties

22    to address.

23              After looking at the file in this case and looking

24    at the cases of Arnold versus Garlock and also the Jenkins

25    versus Raymark case -- the Fifth Circuit cases in this

1   matter -- I don't think that I can follow Judge Isgur's

2   recommendation.  I don't see how to get around -- you know,

3   around those cases in the arguments that Judge Isgur is

4   making, and others have made, that the Court should take

5   this matter.

6           So, I'd like to hear argument on that, and I'd

7   also like to hear exactly how much talc are we talking

8   about.  Is this like one or two shipments?  Dozens of

9   shipments?  It's not really clear for me, either the number

10  of shipments and the quantities that we're dealing with

11  here.

12          So, if the parties could just address that issue

13  and talk to me about the Arnold case and also the Jenkins

14  case, why those cases don't preclude me from adopting Judge

15  Isgur's recommendation.  And then, also if you could address

16  in your argument the proposal by one of the parties, that

17  maybe what should happen is this matter goes back to Judge

18  Isgur and then he waits for a couple of bellwether cases to

19  be tried and then use that as a basis to try to get this

20  case resolved.

21          Looking at the file, I saw there were over I think

22  thousands of docket entries in this matter, if I'm not

23  mistaken.  It was a lot.  And this matter needs to get

24  resolved, but the most efficient way to do it is what we're

25  trying to accomplish here.

1          So, I'll let the parties argue on that issue and

2     then we'll talk about what to do next regarding some of the

3     pending motions I have before me.

4          MS. QUARTAROLO:  Thank you, Your Honor.  Amy

5     Quartarolo for the record on behalf of the Debtors.

6          Obviously, we supported Judge Isgur's report and

7     recommendation.  I think what -- I definitely want to

8     address Your Honor's questions.  What I think is important

9     is the context --

10          THE COURT:  Okay.

11          MS. QUARTAROLO:  -- in which the report and

12     recommendation was issued, and so I propose that we start

13     there --

14          THE COURT:  Sure.

15          MS. QUARTAROLO:  -- which is, the Debtors filed

16     their bankruptcy cases in October of 2023, and but what

17     followed was a lengthy mediation that was approaching 18

18     months.  Unfortunately, that mediation broke down earlier

19     this year, and what Judge Isgur recognized as that mediation

20     broke down and in consideration of a motion to dismiss the

21     bankruptcy case that was filed by the Official Committee, as

22     well as a proposed Plan of Reorganization that was filed by

23     the Debtors, is that there was a central and threshold issue

24     that he viewed that this Court was most appropriate to

25     decide.

1          And I think that threshold issue goes to general

2    causation.  That threshold issue goes to whether BMI's talc

3    is capable of causing asbestos-related disease because that

4    is the issue that goes to how many valid claims there are if

5    there are valid claims and the value of those claims.

6          The -- what I -- I'll hit upon a few of the points

7    that you raised, and thank you for raising those.  In terms

8    of how much talc is at issue, BMI sold talc into the market

9    between 1992 and 2016.  Obviously, this is a bit of an

10   unusual circumstance in terms of the posture of bringing

11   this to Your Honor, but we actually think that Your Honor is

12   well positioned to address this issue.

13         And I think touching upon the Arnold case and the

14   Jenkins case -- I think both of those cases actually

15   recognized that this -- you know, while it is not

16   necessarily a common occurrence for these sorts of issues to

17   be centralized and decided by a District Court, that they

18   certainly can be.

19         And even in the Arnold case, the Court recognized

20   -- and this is at Page 440 -- that there are circumstances

21   that might be consolidated with bankruptcy proceedings in a

22   single district in accordance with Section 157(b)(5).  And I

23   think the issue there is what are the issues that are

24   common.

25         THE COURT:  Right.

```
 1              MS. QUARTAROLO:  And under Jenkins, the Court
 2    again centralized certain claims and adjudicated common
 3    issues.  And here, we do think that there is a threshold
 4    issue that is both capable of resolution by this Court.
 5    Certainly, it is most efficient for this Court to adjudicate
 6    that issue and I think with an appropriate process and
 7    schedule, this Court would be well-positioned to deal with
 8    that.
 9              What I am concerned about is that the Committee
10    seems to be arguing that there is no forum that these issues
11    can be addressed.  Certainly, to the extent 157(b)(5) speaks
12    to what it says, the District Court and not the Bankruptcy
13    Court is the appropriate forum for resolution of personal
14    injury type claims.  And so, it cannot be that the
15    Bankruptcy Court is unable to decide this threshold issue
16    and the District Court is unable to decide this threshold
17    issue.
18              This threshold issue around general causation
19    speaks to capability.  So, if you look at BMI's talc
20    produced, sourced, sold over time, that talc was sold
21    subject to the specifications similar to, you know, when
22    you're talking about a pharmaceutical or other drugs, where
23    there are common elements that can be capable of determining
24    under the general causation standard, under scientific
25    evidence and consistent with 702 -- can that talc be capable
```

1    of causing asbestos-related disease as Claimants claim here?

2            And we think that under 157(b)(5), and consistent

3    with the Arnold case and consistent with the Jenkins case

4    and the other cases that we have cited in our papers, that

5    this is the appropriate forum for resolution of that matter.

6    We would ask that the Court take that up and set a schedule

7    with the, you know, appropriate time for discovery and

8    expert analysis followed by Daubert proceedings and

9    ultimately a resolution on the merits on that discreet

10   issue.

11           THE COURT:  Okay.  Well, isn't -- I mean, if I

12   looked at Jenkins versus Raymark, I mean, in that case, we

13   have a certified class action.  So, you know, isn't where --

14   in Arnold where the Court said at almost every turn the

15   circuit has rejected attempts at aggregation and issue

16   preclusion in asbestos cases; and where they do sort of look

17   at aggregation issue preclusion, it's in the context of a

18   certified class action.  We don't really have that here, do

19   we?

20           MS. QUARTAROLO:  We don't have a certified class

21   action, but I think what we have is a proceeding, being the

22   bankruptcy case, where there is a discreet issue that the

23   Court is proposing -- would draw the reference as to.

24           And so, while it is not in the context of a class

25   action, and oftentimes, these issues arise in the context of

1    a class action, I don't think there's anything in any of the

2    cases that says that only when it is in the context of a

3    class action, may the District Court remove and address

4    common issues.

5           Those common issues are capable of adjudication,

6    and they must be capable of adjudication in some forum.  And

7    I think under 157(b)(5), it points to the District Court as

8    the appropriate forum for adjudicating those issues.

9           And here, the -- it isn't a piece of a broader

10   dispute, right?  There is a bankruptcy case, and what Judge

11   Isgur has proposed is that the specific issue as to whether

12   BMI's talc contains sufficient type and quantity of asbestos

13   to cause asbestos-related disease -- that that discreet

14   issue, because it is a personal injury-related issue, that

15   under 157(b)(5), that issue be taken up by the District

16   Court.

17          THE COURT:  Okay.  Thank you, Counsel.  Next

18   argument?  Whoever'd like to jump in.  The -- well, let --

19          MS. WEINSTEIN:  Yeah, Your Honor.  If I may on

20   behalf of -- it's Marc Weinstein again, on behalf of the

21   non-Debtor affiliates just -- we're aligned with the Debtors

22   on this issue, so if I just can add to the argument just

23   made.

24          I think if we step back, aggregation of a common

25   issue in an asbestos case makes a whole lot of sense for a

1    lot of reasons.  I actually think that that is what Jenkins

2    essentially stands for, which is, if you can find common

3    themes -- oftentimes, you can't.  You can't certify a class

4    -- but when you can, you should, because it just makes a

5    whole lot of sense.

6            THE COURT:  Well, let's talk --

7            MR. WEINSTEIN:  The only --

8            THE COURT:  -- let's talk about that.  I mean, is

9    this -- I mean, in this situation, do we have an analogous

10   situation to a class?  I mean, walk me through that

11   analysis, how I would use Jenkins to say that we have the

12   commonality in other issues that are similar to a class

13   here, so that I can use Jenkins as authority for aggregating

14   and deciding this one issue.

15           MS. WEINSTEIN:  Yeah.  I mean --

16           THE COURT:  So --

17           MR. WEINSTEIN:  -- on that (indiscernible) you

18   don't have a class because we're not in the context of a

19   class action, but we still have a multitude of claims, all

20   with one clear common issue.  I don't think it's even being

21   disputed that there is a common issue here that underlies

22   every single claim despite the fact that it's not in the

23   context of a class action, and that is, was there asbestos

24   in this talc sufficient to cause disease?

25           That issue is ripe for some form of aggregate

1    proceeding.  And granted, we're not in the context of a

2    class but in Jenkins itself, you know, considering the

3    context of asbestos litigation, the Fifth Circuit said --

4    because certifying that class was -- it was pretty unique at

5    the time as well.  You know, the Court was hearing that you

6    can't do that in an asbestos case.  And the Circuit said,

7    necessity moves us to change and invent.

8         So, while we're just in a different forum, the

9    issue is the same.  We've got an unbelievable amount of

10   claims, all with one underlying threshold issue, that for a

11   variety of reasons I don't think are really disputed, that

12   it makes sense to adjudicate all together.

13        THE COURT:  In Jenkins, didn't the party -- didn't

14   the Court still talk about having to make individual

15   determinations of causation and damages?

16        MS. WEINSTEIN:  Yeah.  And that will ultimately

17   happen, if it turns out, if Your Honor were to find after

18   this proceeding that, in fact, Claimants can meet their

19   burden that there was talc in sufficient form and quantity

20   to cause disease, then we do go back to that world of, there

21   will be individualized adjudications as to specific

22   causation, damages, and any other issues you need to -- a

23   particular Claimant.

24        But what's key is that the bankruptcy proceeding

25   will now have the threshold ruling one way or the other,

1    favorable or not favorable, for the Debtors and non-Debtor

2    affiliates in order for the bankruptcy proceeding to

3    actually move forward in a streamlined fashion.

4              THE COURT:  Okay.  Thank you, Counsel.

5              MR. THACKSTON:  Your Honor, if I could.  This is

6    Robert Thackston on behalf of AII with Judge Medina because

7    we're on the same side.  My client, American International

8    Industries, is a family-owned company that made a product

9    called Clubman Talc, which -- Your Honor's been to a barber

10   shop lately.  I have not.

11             THE COURT:  Neither have I.

12             MR. THACKSTON:  You've probably seen it in the

13   barber shop over the years.  And we have a unique position

14   because we are a distributor and retailer of the Barretts

15   talc.  And I've (indiscernible) having been involved in a

16   special litigation for more decades than I want to talk

17   about including -- in Texas.  I've reviewed the idea, and

18   I've argued to the Court that we can reject the idea that

19   the Court asbestos cases "apply".

20             So, that's begging the question here.  You're

21   assuming that this product contains asbestos.  In those

22   cases, there was no dispute that a product contained

23   asbestos, but part of the problem was -- and in trying to

24   extrapolate the results of a case or a trial was that they

25   owned the products -- undisputably contained something that

1    could be called asbestos, but they would get a lot of

2    different types of minerals that were in the products in

3    different amounts and in different forms, right?

4            Some were thermal insulation, where if you broke

5    it, you'd have asbestos in the air, and others were in, you

6    know, phenolic molding compounds -- it's a hard plastic --

7    where you couldn't get it out.  And so, the Court was

8    saying, you can't take the results of a case involving one

9    of these products and try to extrapolate it to other

10   completely different kinds of products just because you can

11   say one of the ingredients may have been the same.

12           What's completely different here is, like a class

13   action, you have one common question, and that is, this

14   material -- this Barretts talc -- did it contain a mineral

15   that has been shown to cause mesothelioma?  Right?  And

16   we're a distributor of just that one product and if that

17   question is answered in the negative -- it did not -- then

18   that would resolve a lot of different cases with a lot of

19   different consumer products.

20           But we're kind of in the middle.  We don't -- we

21   are a party in the interest that files a claim for

22   indemnity.  We don't think we needed a motion to intervene,

23   but we filed a motion to intervene, just in case.

24           THE COURT:  Right.

25           MR. THACKSTON:  But I want to give the Court that

1    perspective, that we distributed it for decades, and we have

2    decades' worth of testing on just this particular talc.  And

3    we don't think -- and our testing showed it didn't contain

4    asbestos.

5           Barretts told us when they sold it to us it did

6    not contain asbestos.  The plant's experts have tested it,

7    said it did not contain asbestos.  And so, we think that

8    that that issue, if resolved here in this context, would do

9    a lot to put to bed whether this is a legitimate -- these

10   are legitimate claims and what the value of a bankruptcy

11   ought to be.

12          And I can speak to the Court's other questions

13   about how much is involved -- how much talc -- but for us,

14   you know, the allegation is, if you take a Clubman container

15   that there were what they call ultra trace contamination,

16   and you can find like parts per billion of something you

17   could call asbestos.

18          And the question that the Bankruptcy Court, to

19   consider answering is, is that really something that can

20   fairly, scientifically be called asbestos?  And has that --

21   what you're saying is in this product -- has that been

22   sufficiently linked to disease?  And if it hasn't been

23   scientifically linked to disease, then that's a significant

24   factor that underlies all of these claims.

25          THE COURT:  Okay.

 1              MR. THACKSTON:  Thank you, Your Honor.

 2              THE COURT:  Thank you.

 3              MS. QUARTAROLO:  Your Honor, if I can have one

 4    follow-up point --

 5              THE COURT:  Sure.

 6              MS. QUARTAROLO:  -- in response to one of your

 7    questions to Mr. Weinstein specifically?  And I think that

 8    your question is a fair one, which is that Jenkins obviously

 9    is in the context of a class action, and we don't have a

10    class action here, but what we do have is a bankruptcy case.

11              And the bankruptcy case itself centralizes and

12    aggregates claims against the Debtors.  And for that reason,

13    common issues related to those claims are capable of

14    resolution.  And they would be capable of resolution by the

15    Bankruptcy Court itself through an estimation process or

16    otherwise, but for 157(b)(5).

17              THE COURT:  Right.

18              MS. QUARTAROLO:  And so, I think it is really

19    important to view the context of the bankruptcy case and

20    claims against the Debtors in light of 157(b)(5) that speaks

21    to what is the appropriate forum for resolving those issues

22    regarding claims against the Debtors.

23              THE COURT:  Thank you.  So, let me hear from the

24    other side on this.  And can you start with -- we don't want

25    to start, but address the argument that Counsel just made

1   that I can use Jenkins in the sense that this is an

2   aggregation like, similar to, you know, bankruptcies and

3   aggregation with common -- you know, aggregation of claims

4   sort of like a class action to allow me to follow Judge

5   Isgur's recommendation.

6           MR. DAVIS:  Thank you, Your Honor.  For the

7   record, Kevin Davis for the Committee.  We're in the

8   privileged position of agreeing with Your Honor's initial

9   statements about Arnold and Jenkins.

10           I do think the Court hit the nail on the head,

11   which is that Jenkins is a very specific situation in which

12   a specific defense was brought up for -- as a common issue

13   in a class action that was sought by Plaintiffs, who were

14   all in the same district, had all filed their claims in the

15   Eastern District of Texas.

16           Since 1984, when Jenkins was ruled on, there has

17   not been another case in the Fifth Circuit, where that type

18   of aggregation has been allowed, and there certainly has

19   been none since 1997, when the Supreme Court issued Amchem

20   and essentially said that the predominant standard that was

21   applied in Jenkins was wrong -- although not directly, that

22   can be read there -- and that the predominant standard is

23   generally not going to be met for class certification in

24   Jenkins.

25           I'll note that in Jenkins, the Court is discussing

1   using the class as an available tool for aggregation on this

2   issue of the state of the art defense was heavily favored by

3   the Court specifically because it was supported by the

4   Plaintiffs themselves.

5            Here, there is no Plaintiff who is moving for a

6   class.  There is nobody moving for class certification.  And

7   the other issue I'll note is that -- and this, I think was

8   overlooked -- is that Jenkins certified the class under Rule

9   23(a) -- or, 23(b)(3), and refused to use other vehicles for

10  class certification under Rule 23(b).  And 23(b)(3) requires

11  that everyone who is to be a member of the class receive

12  notice and have an invitation to opt out of the class.

13           So, that, too, is something that is not included

14  in the report and recommendation and is nowhere in the

15  procedures, notice or otherwise, that have been promoted by

16  the Debtors or the non-Debtor affiliates.

17           They're anticipating using this procedure to

18  aggregate disparate state court claims into this court so

19  that you will decide one single question for all of them and

20  use it as binding precedent for all cases current and

21  future.

22           There is absolutely no procedure, case law,

23  statute or other authority that you can look to in order to

24  do that.  In fact, each time that that has been attempted,

25  it has been pushed back on by the courts vociferously such

1    as when it happened in Arnold.

2            The idea that this bankruptcy case aggregates

3    claims is just an absolute fiction.  In bankruptcy, you

4    know, allowance proceedings, they proceed as individual

5    claims.  There are procedures for omnibus objections to

6    claims, but those are only for technical deficiencies or

7    additional leave of court.

8            You can't just move for summary judgment on a

9    whole swath of claims.  In fact, in the Babcock and Wilcox

10    case in the Eastern District of Louisiana, the District

11    Court there specifically rejected an attempt to do that, to

12    have a summary judgment motion that would wipe out all of

13    the individual asbestos claims in the aggregate, saying that

14    it was not only unfair.  It was unworkable and it was

15    against precedent and the statutes.

16            The Bankruptcy Court's ability to estimate claims

17    is severely limited when it comes to personal injury claims.

18    It specifically does not have the authority to estimate

19    claims in a way that would result in their disallowance or

20    in their liquidation.  So, the idea that the Bankruptcy

21    Court through estimation would be able to somehow bring all

22    of these claims together and answer this asbestos talc

23    question is just not accurate under the state of the law

24    there.

25            And then, I think we just get to Arnold, which I

1    think hits the nail on the head.  I think you read in our

2    briefing that, you know, we take issue with the idea that

3    this is a general causation question.  We take issue with

4    this idea that we need to figure out whether or not this

5    talc contains asbestos.

6         The Debtors have themselves admitted in court that

7    they have found asbestos in their mines, that they have

8    continued to attempt to test for asbestos because they know

9    that it's a possibility, and that they have found asbestos

10   in amounts that have caused them to hold back the

11   distribution of certain batches of talc.

12        Now, I believe that a number of Plaintiffs have

13   questions about the validity, the accuracy, and the

14   frequency of that testing, but suffice it to say that

15   whether or not this talc mine has talc with asbestos in it

16   is a question that the Debtors themselves have already

17   answered.

18        So, that brings us to Arnold, where really it's on

19   all fours here.  They're using 157 -- or the Bankruptcy

20   Court is recommending the use of 157(b)(5) -- to bring

21   multiple cases together to answer a single question -- the

22   same question that was in Arnold, which is, are these

23   products capable of causing disease?  And the Court said,

24   absolutely not.  Look at all of our precedent.  Absolutely

25   not.

 1              And just to speak a little bit more about

 2    causation.  The cases that are referred where Courts are

 3    deciding issues of general causation en masse are almost

 4    uniformly -- I think that they are actually completely in

 5    the briefing -- limited to class actions and UDLs, neither

 6    of which exists here.  Indeed, there's no proceeding

 7    underlying what's being attempted to have the reference

 8    withdrawn in the first place.

 9              In fact, the proceedings that may in the future

10    implicate this question -- if you go down then, you'll see

11    that if you were to withdraw the reference as to the entire

12    case or as to any one of those, it wouldn't be ripe for a

13    decision.  There would be no case in controversy.  So, we

14    have that hurdle at the start and we briefed that.

15              But once we get to -- you know, if we get past

16    that hurdle, and I don't think that you can -- I think that

17    Arnold answers the question.  It's the exact same fact

18    pattern.  It's the exact same type of question being asked.

19    It's the same exact gambit.  In the Fifth Circuit it said,

20    absolutely not.

21              No one has provided a single case post-Arnold that

22    says anything to the contrary.  And the cases -- even in the

23    class actions and NDLs, where there have been discussion

24    about causation on an aggregate level, it is generally in

25    single, uniform products, such as pharmaceuticals and other

1    types of sort of manufactured products.  What it's not about

2    is things that we took out of the ground and packaged,

3    especially when the things that are taken out of the ground

4    are already admitted to be contaminated with asbestos.

5           And so, I don't think that Arnold allows you to do

6    any of this.  I don't think there's any precedent that

7    allows you to do any of this, and I want to respond very

8    briefly to the Debtor's concern that the Committee is saying

9    that there's no forum where this can be decided.  That's not

10   accurate.

11          Obviously, 157 provides that personal injury

12   claims will be tried in the District Court, but there is no

13   authority that allows this Court to take disparate personal

14   injury cases and forcibly aggregate them together to answer

15   a question that the Bankruptcy Court thinks may be of

16   interest to future proceedings.

17          All of the -- every single link of that chain is

18   problematic.  These are cases that need to be tried

19   individually under case law, under the seventh amendment,

20   and there's nothing that's been presented that is to the

21   contrary.

22          I also want to note that the non-Debtor affiliates

23   presented an argument that this Court could somehow create a

24   mandatory class action here.  I just want to be clear that

25   it seems like they're indicating that you can compel a class

1    action, which is not the case.  You know, mandatory class

2    actions are a specific species of class actions, and

3    asbestos and personal injury claims, as far as I'm aware,

4    have never been put into either the mandatory class action

5    categories under 24 -- 3(b).  They are relegated to

6    23(b)(3).  But we don't have to worry about that.  We have

7    no class here.

8            THE COURT:  Okay.  Thank you, Mr. Davis.  Anyone

9    who has not spoken in this matter that wishes to be heard?

10   I would like to give them an opportunity to speak.

11           MR. HARRON:  Hello, again, Your Honor.  This is Ed

12   Harron on behalf of the future Claimants' rep.

13           THE COURT:  All right.  And actually, I'm glad you

14   spoke up, Mr. Harron, because your proposal was kind of

15   interesting with respect to the bellwether trials.  Talk to

16   me a little bit about how that would work.  But -- and I'm

17   sorry -- I'm interrupting your argument.  But as part of

18   your argument, can you tell me how that proposal would work?

19           MR. HARRON:  I'm happy to do so, Your Honor.  You

20   anticipated my argument.

21           THE COURT:  I'm sorry -- I didn't mean to

22   interrupt.

23           MR. HARRON:  As you can tell from our papers, we

24   agree with the Committee and Mr. Davis why the report and

25   recommendation from Judge Isgur is unworkable as a matter of

1   precedent and procedure.

2          But to your point, Your Honor, we do recognize

3   those cases at a bit of an impasse.  We tried to negotiate a

4   resolution.  The fundamental question here is the quantum of

5   the Debtors' liability for asbestos personal injury claims

6   from the people who used their talc over -- you know, the

7   last 30 years.

8          This Debtor didn't spend a lot of time litigating

9   claims.  It settled some.  In cases where the company has a

10  more mature litigation settlement history, that history

11  informs the question of how many claims they'll see in the

12  future and what those claims are worth.  We don't have that

13  information here and it's made the negotiations difficult,

14  to say the least.

15         So, the idea that there'd be a litigated result of

16  the quantum of liability -- we agree to that proposition.

17  We think it would be helpful to bring the parties closer

18  together.  And it was our proposal that, rather than embark

19  on this process, which we think unworkable and ultimately

20  will be unhelpful, is that the Court allow pending cases to

21  proceed in the venues where they're pending.

22         There are many competent judges who can hear

23  pending cases that are ready to go to trial in the near term

24  that will render results, and a result in verdicts that'll

25  answer the question -- is BMI liable for these types of

1    damages and what's the value of the damages that the

2    Plaintiffs incurred

3            When we debated the report and recommendation with

4    Judge Isgur, we suggested this process.  He rejected it.  He

5    seemed to think that he was bound by 157(b)(5) in the

6    context of a lift stay of a personal injury claim, that that

7    claim could only be litigated in this District Court before

8    Your Honor.  We think that's an incorrect application of the

9    statute and we were surprised that he took that position,

10   but we can submit that transcript, if Your Honor would find

11   it helpful.

12           THE COURT:  No.  I didn't -- that's what I was

13   trying to ask about, I mean, your thoughts on why this would

14   not work because it seems to me that it's clearly on the

15   table.  It's something that should be considered.

16           MR. HARRON:  Yeah --

17           THE COURT:  But maybe I just need to read the

18   transcript and see what the argument was on the other side.

19           MR. HARRON:  Well, we can forward you that

20   portion.  I'm sorry to interrupt you.

21           THE COURT:  Oh, no.  I'm sorry.

22           MR. HARRON:  But Judge Isgur had a resistance to

23   it.  We didn't agree with his reading of the statute or the

24   applicable case law, but it makes us concerned that it will

25   be difficult to obtain lift stay relief in this context from

1    Judge Isgur.

2         So, we considered whether individual Plaintiffs

3    could seek to withdraw the reference to Your Honor, and Your

4    Honor could consider their request for relief from stay in

5    which they'd be seeking to litigate their cases in the State

6    Courts where they're currently pending ready for trial.

7         Your Honor, we looked at the local rules.  There's

8    actually a Local Rule, 5011 and 1, which says that requests

9    for withdraw of the reference must first be considered by

10   the Bankruptcy Court, unless the District Court orders

11   otherwise.

12        So, it's our suggestion, Your Honor, that a way to

13   advance the dialogue, inform the issue of the extent of the

14   liability here would be for Your Honor to issue an order

15   allowing claims to seek lift stay from the District Court.

16        We're not asking you to try the cases, but just to

17   have you in the first instance -- rather than going back to

18   the Bankruptcy Court, have Your Honor consider whether the

19   Claimants have met the requirements for relief from stay,

20   which would allow them to return to their State Court

21   venues.  And after we obtain a number of verdicts, the

22   parties could get back together and see if we could resolve

23   the bankruptcy case.  So, that's our recommendation in a

24   nutshell.

25             THE COURT:  Okay.  Thank you, Mr. Harron.  Anyone

1    else who has not already spoken?  Because once we're done,

2    what I'm going to do is take the matter under advisement and

3    then allow the parties, if they want, to add or submit any

4    supplemental briefing on the issues we talked about today.

5    If you could do that by no later than Wednesday or next

6    Thursday.  But before we do that, anyone else that's not

7    spoken that would like to be heard this morning?

8         Okay.  I think we've got -- all the interests have

9    been able to speak.  So, what I want to do at this time --

10   two things.  One, I'm going to take this matter under

11   advisement.  I'll give the parties until next Thursday if

12   there's additional briefing that you'd like to file

13   regarding anything that we talked about today.  If you could

14   all do that by next Thursday.

15        And then, the second thing is, I've got two

16   pending motions, the motion filed by the retailer requesting

17   permission to intervene and the motion for leave to appeal

18   in Cause Number 4:25-cv-2201, which is Docket Entry Number

19   1.  The motion -- request for permission to intervene is

20   Docket Entries 8 and 2 in 4:12-cv-2193.

21        And what I'm going to do is set those for argument

22   later.  We're coming up, unfortunately, on our six-month

23   list.  We've got to get all our motions resolved coming up

24   by October 1st.  So, I'm going to be pretty busy over the

25   next five weeks in other matters, but I'll set oral argument

1   in those matters after October 1st.

2           So, first thing, any additional briefing.  I'll

3   get that issue resolved.  And then, on the two other matters

4   -- other motions -- I'll contact you to set a hearing after

5   October 1st.

6           Okay.  Well, thank you all for being available.

7   Great argument.  Really interesting topics.  Looking forward

8   to helping you all work through this one.

9           MR. THACKSTON:  Thank you, Your Honor.

10           THE COURT:  Okay.

11           MR. HARRON:  Thank you, Your Honor.

12           MR. DAVIS:  Thank you, Your Honor.  Have a good

13   day.

14           THE COURT:  Great.  Have a great afternoon,

15   everyone.  Talk again soon.  Bye.

16       (Hearing adjourned at 11:52 A.M.)

17                       *  *  *  *  *

18

19

20

21

22

23

24

25

Page 31

```
 1                    C E R T I F I C A T I O N

 2

 3        I, Sonya Ledanski Hyde, certified that the foregoing

 4   transcript is a true and accurate record of the proceedings.

 5

 6

 7

 8   Sonya Ledanski Hyde

 9

10

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  August 25, 2025
```